UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CAPRECE BYRD, BRYANT WATTS,                    Case No.
and RENAE WHITE,                               Hon.
individually, and on behalf of all
others similarly situated,

      Plaintiffs,

vs.

VISALUS, INC., NICK SARNICOLA,
ASHLEY SARNICOLA, BLAKE MALLEN,
RYAN BLAIR, TODD GOERGEN,
GARY J. REYNOLDS,
and VINCENT OWENS,

      Defendants.
_____/

| SOMMERS SCHWARTZ, P.C. | WEXLER WALLACE LLP |
|---|---|
| Andrew Kochanowski (P55117) | Edward A. Wallace |
| Sarah L. Rickard (P78767) | (IL Reg. No. 6230475) |
| Attorneys for Plaintiffs | Mark R. Miller |
| One Towne Square, Suite 1700 | (IL Reg. No. 6283542) |
| Southfield, MI 48076 | Adam Prom |
| (248) 355-0300 | (IL Reg. No. 6317283) |
| akochanowski@sommerspc.com | Attorneys for Plaintiffs |
| srickard@sommerspc.com | 55 W. Monroe Street, Suite 3300 |
| | Chicago, IL 60603 |
| | (312) 589-6272 |
| | EAW@wexlerwallace.com |
| | MRM@wexlerwallace.com |
| | ap@wexlerwallace.com |

1

PREBEG, FAUCETT & ABBOTT,
PLLC
Matthew J.M. Prebeg
(TX Bar No: 00791465)
Brent T. Caldwell
(TX Bar No: 24056971)
Attorneys for Plaintiffs
8441 Gulf Freeway, Suite 307
Houston, TX 77017
(832) 743-9260
mprebeg@pfalawfirm.com
bcaldwell@pfalawfirm.com

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of a Class consisting of all persons other than Defendants who purchased or otherwise acquired an interest in an offering of ViSalus, Inc., ("ViSalus") securities made between 2015 and 2016. This action seeks to recover compensable damages under (a) Sections 10(b) and Rule 10b-5 promulgated thereunder of the Securities Exchange Act of 1934 (the "Exchange Act"), (b) Sections 12(1) and (2) of the Exchange Act, (c) Sections 501, 502, 509 (2) and (4-7) of the Michigan Uniform Securities Act, MCL. 451.2501-2502, MCL 451.2509(2), (4) ("MUSA"), and (d) statutory conversion. This action is in part factually related to the currently pending case *Kerrigan, et al., v. ViSalus, Inc., et al.*, Case No. 2:14-cv-12693, however it concerns a distinct class of Plaintiffs and events occurring after the filing of the *Kerrigan* litigation. Damages in this case are believed to exceed $15 million for the Class.

## **OVERVIEW OF CLAIMS**

2.     Defendant ViSalus is a failed pyramid scheme. It is run by Defendants Nick Sarnicola ("N. Sarnicola"), Ryan Blair ("Blair"), and Blake Mallen ("Mallen") (hereafter sometimes referred to as "the Founders"), together with Defendant Todd Goergen ("Goergen"). Since approximately 2005 the company's only real business was to conduct a massive recruiting scheme for promoters. The company persuaded people that they could make money selling weight loss shakes to overweight people and pushed $500 or $1,000 boxes of samples and magazines on them to use to start their new business. The new distributor soon learned that very few people wanted to buy shakes from him for $50 or $60 a bag, and that he had to keep on selling or buy $125 worth of shakes a month to get a commission. Or, he could act on the company's real "business opportunity" and start to recruit one, two, or preferably more people under him and have them order a $500 or $1,000 kit and convince them to recruit more people under them to buy a $500 or $1,000 kit. For that the company would pay real money.


3.     The company helped the new distributor along by providing training and motivational conventions on how to make real money by recruiting people. It motivated people to try and recruit more and more distributors by pointing out, in many different ways, just how much money you could make "enrolling" people into

the system. Stage-managed "get rich just like me" performances enticed innocent, unsophisticated people to buy distributorships, only to learn that the only way to make money from the distributor rights was to recruit others. Almost 400,000 people in the United States, including over 200,000 just in 2012 paid money to become a distributor and participated in a massive operation. The company booked the sales it made of distributor fees, kits, shakes, vitamins, and a few other products to result in over $600 million in sales in 2012. And 2012 turned out to be, by far, the high-water mark.

4.      Because, as with all pyramid schemes based on endless downline replication, the "business opportunity" for distributors to sell weight loss shakes to each other becomes saturated as distributors trip over each other in the same market. Predictably, by the end of 2012, sales plummeted. The number of distributors enrolling in the "business opportunity" fell from well over 200,000 in 2012 to a fraction of that number by 2014. The company began to lose money and needed cash loans from its Founders to survive 2014. A core of professional promoters who were recruited in 2010 to energize the recruiting operation and paid in side deals to promote the "business opportunity" evaporated once the buzz wore off to go sell at other network marketing companies.

5.      This collapse was not a surprise to its management. The company was only a few years old and for much of that time it struggled until it got a cash infusion to hire the hundreds of professional promoters to play the part of distributors who sold ViSalus products and got rich.

6.      Virtually all network sales companies that survive the initial two or three year (transient) sales rise eventually collapse as the market for distributors selling the same few products saturates. The Founders who ran the company were veterans of network marketing and knew that network companies that paid vastly more for recruiting than they did for selling product will eventually collapse. That is why federal and state law classifies recruiting-based companies like these as inherently fraudulent pyramid schemes.

7.      The Founders did have luck on their side. This came in the form of a stock purchase agreement they reached in 2008 with a publicly-traded company, Blyth, Inc., ("Blyth") to sell their interest in ViSalus. Lucky for them, the agreement was negotiated by Blyth's CEO, whose family interests included 25% ownership of ViSalus it had purchased for a little money in 2005. Blyth performed for a while, while the CEO's family got a rich payout paid by Blyth, but by 2012, as the pyramid scheme was ramped up and sales sky-high, it found itself owing $143 million for the remainder of the stock, money it did not have.

8.     Everyone attempted to cash in on the company while its sales were temporarily flying high. The Founders, the CEO and Blyth attempted to float an initial public offering (IPO) in 2012, but the offering was pulled at the last minute due to concerns from underwriters about how the business was run. While the Blyth's CEO's interests were eventually paid off by 2012, with one large tranche of stock yet to buy, the company still owed the Founders $143 million under the by-then terrible deal its CEO had negotiated. But with ViSalus's collapse and its own operations suffering, Blyth ran out of money to pay the obligation.

9.     By 2014, Blyth had no cash to pay off the Founders for the remainder of their stock, even if it had wanted to pay on the terrible deal. By 2014 the company was in its second straight money-losing year with sales off by 80% from their high. ViSalus's international expansion was a disaster, and buyers, whether real customers (of which there were few) or the distributors hooked into the system by promises of wealth (the subject of the *Kerrigan* litigation) were not interested to buy the same shakes and products that had been available for years. The Founders were frantically seeking sources of both revenue and capitalization while fending off the *Kerrigan* class action lawsuit.

10.    In September, 2014, Blyth, its by-then former CEO, and the Founders cut a deal that would recapitalize ViSalus and get rid of the obligation to pay the last portion of the deal. The Founders wouldn't seek to enforce the $143 million contractual obligation for Blyth to purchase the remaining part of ViSalus's stock, and Blyth would hand back the stock it had purchased to the Founders (but not the ex-CEO). Part of the deal was that the ex-CEO and the Founders would have to reach into their own pockets to loan ViSalus capital and underwrite a credit facility. Blyth retained a small interest in ViSalus, and a year later sold itself to a private equity group for a small amount of money.

11.    It was a few weeks after the 2014 transaction that the Founders doubled down on the pyramid scheme and added this securities fraud on top. They announced to their distributors and other unsuspecting, unsophisticated investors that they had reached into their family's coffers and "bought" back ViSalus from Blyth for $143 million. Beginning in January, 2015, in a new, self-made IPO, the company offered to sell 6% of the Founders' re-purchased shares to existing and new distributors.

12.    The public offering was via an instrument called "Founders Equity Incentive Plan." According to the information the company made available on its website, the offering was being made available for "up to 2,000" families. The company announced that the equity would be sold in two lots, 3% in 2015 and 3%

in 2016. The offering ended in February, 2017. Neither the company nor the selling shareholders registered the offering, prepared a formal prospectus, or disclosed financial information about the company.

13.    The company advertised and promoted the offering as "Building a Legacy for 2000 Families." Buyers could get their equity by "qualifying" for it through participation in the distribution scheme. The company provided no means for a direct purchase, rather, buyers needed to sign up to be distributors (or could be existing distributors) and buy or recruit enough people who bought enough product in a given month to receive "points" convertible into "units" The method by which the company urged the purchase was called "March to Equity." Buyers were urged to "get qualified and walk the stage at Vitality saying "I OWN IT!" The company touted the "March To Equity" as an equity that would pay "generations" worth of dividends for the lucky few, "up to 2,000" who purchased it.

14.    The company promoted the offering by the announcement on its web page and by personal and videotaped promotion by the Founders. The company used a number of high-ranking distributors to tell the would-be buyers how much money their "equity" in the company had made them some years back, and videotaped those messages and embedded them on its web site. The company sent the Founders to

discuss the "March to Equity" and the plan to its national and regional conventions, where the offering was made before hundreds and thousands of people. Once the offering had been taken up, and distributors satisfied the "qualifications," the company began calling them "shareholders." It set up a designated area at national sales training meetings for "shareholders," handed them "shareholder" lanyards and gave them certificates. They publicly named them in front of the remaining distributors. The "shareholders" would then be marched on the stage holding their certificates in front of the people who had not yet "run to equity" to spur the laggards to likewise get in on the "opportunity of a lifetime."

15.    Speeches made by the Founders and the former promoters to push the offering were filled with half-truths and outright lies about the offering. The same speeches were videotaped and either published by the company itself, on its own "TV" channel on its website, or on its YouTube "channel." The company created a so-called "webinar" which it also published about the equity offering. It sent emails to thousands of distributors with links to some of the speeches. It provided talking points to high-ranking distributors to tout the offering in private meetings with people who had no connection to ViSalus. The webinar and videotaped speeches followed a "messaging" plan that emphasized several fundamentally fraudulent themes: that the Founders had "spent" $143 million on purchasing back the equity

just a few months earlier and were offering a valuable opportunity to just a few people and for a limited time; that an earlier group had been offered the same opportunity and look how much money they had made; and that ViSalus was incredibly successful, a "billion dollar" company that may overtake Amway and Herbalife and distribute billions in dividends to the lucky few who grabbed the equity offering while it was open.

16.    None of the talking points disclosed material information that made the statements false: the Founders did not pay any money for the stock, it was returned by a cash-strapped and soon to be sold company to unwind a bad deal; no former promoter touting how much money they made ever paid a penny for their stock; ViSalus was and had been losing money and booking less than $100 million in sales; the prospects of overtaking Amway and distributing a billion dollars a year in dividends were a fantasy and were being pitched at the same time as management was trying and failing to raise money from professional investors.

17.    To entice buyers to "March to Equity" the Defendants promised not only a "generational" dividend but a specific one, a payout on April 17, 2017. The payout did not occur, and over the resulting clamor from "shareholders" at an Atlanta, Georgia convention, management claimed that there was a

"misunderstanding" about the investment. Suddenly the buyers were told that before *anyone* gets any equity—equity that is illiquid and essentially worthless—they must sign a "Participation Agreement" with unknown terms and conditions, some *two years* after spending money for what they were told was a limited-time offer to buy. Several months after the offering closed, no shares have been tendered, buyers have no idea what their investment actually purchased them—investments exceeding $40,000 in 2015 and $25,000 in 2016, and are being told they must continue to work for ViSalus and a new startup or spinoff- no one is sure—called LIV in order to get their "equity."

18.    Plaintiffs here are a group of people of color cynically recruited to buy these securities by the Defendants. They were personally lied to by their pastor, Defendant Vincent Owens, a ViSalus promotor with long ties to Defendant N. Sarnicola. They were personally lied to by Sarnicola's wife, Defendant Ashley Sarnicola, and lied to by Defendant Mallen, when he, Ashley, and Nick personally visited their church and held ViSalus gatherings in the area. They, like tens of thousands of people, were inundated with phony claims, false promises, and grandiose touts of the value of ViSalus equity.

19.    Each Plaintiff invested between $25,000 and over $40,000 of hard-earned money they could ill afford to give to the Defendants on the false promises

of getting "equity" that would allow them to provide for their families for years to come. Not only they but their minor *children*—including a 14 year old boy- were exploited in this scheme. They for themselves and on behalf of hundreds of others likewise lied to seek damages and rescission of their "equity investment."

## JURISDICTION AND VENUE

20.     The claims asserted herein arise under Sections 10(b) and Rule 10b-5 promulgated and 12(1) and (2) of the Securities Exchange Act (15 U.S.C. §§77l/a-1, a-2, 78j(b), 78b-1 and 78t(a)) and State of Michigan blue sky laws.


21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §§ 1331 and 1332(d). This Court has personal jurisdiction over each defendant. As set forth above, the Defendants continuously and systematically engaged and engage in business in Michigan.  The Defendants do business as individuals or companies in Michigan.  In accordance with 18 U.S.C. § 1965(a) and (b), all of the Defendants are subject to this Court's jurisdiction in that they "transact affairs" in the Eastern District of Michigan. Venue is also proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa), and 28 U.S.C. §1391(b) as the Company maintains its headquarters and conducts business in this District.

## THE PARTIES

## THE PLAINTIFFS

22.     Plaintiff, Caprece Byrd, is an individual residing in Aurora, Colorado. Detailed allegations relating to her recruitment and investment in the equity plan are contained in Pars. 117 through 169, *supra*.


23.     Plaintiff, Bryant Watts, is an individual residing in Denver, Colorado. Detailed allegations relating to his recruitment and investment in the equity plan are contained in Pars. 170 through 181, *supra*.


24.     Plaintiff, Renae White ("White"), is an individual residing in Brighton, Colorado. Detailed allegations relating to her recruitment and investment in the equity plan are contained in Pars. 182 through 192, *supra*.


## THE DEFENDANTS

25.     Defendant, ViSalus, Inc. ("ViSalus") is a Nevada corporation headquartered in Troy, Michigan, where it maintains a "Global Headquarters."


26.     Defendant, N. Sarnicola is an individual residing in Florida and Michigan and a "Founder" of ViSalus. He was initially employed by ViSalus and

13

left the company 2010 as an executive and employee to become the top "promoter" of the pyramid scheme. Sometime in 2016 he resumed an executive position with ViSalus. Nick holds approximately 29% interest in ViSalus and purported to be one of the shareholders who was selling his equity under the "Founders Equity Incentive Plan." He was the most active promoter of the offering and appeared at dozens of conventions and many more meetings during the two years the offering was open. He recorded at least ten videos, or was recorded at a convention touting the investment. He along with other co-Defendants prepared the details of the offering to be posted on the website. For purposes of this Complaint, N. Sarnicola is an offeror, a seller, a maker, a promoter, a broker, an agent, an investment advisor, and an agent representative, as these terms are defined by federal and Michigan securities laws.

27.    Defendant, Ashley Sarnicola ("A. Sarnicola") is N. Sarnicola's wife and business partner in a related company, Power Couple, Inc. Ashley participated in the sale and promotion of the securities at issue by personal appearances before the buyers and by videotaping representations in the webinar used to tout the offering. She appeared at events touting the investment including at events in the Denver area. For purposes of this Complaint, A. Sarnicola is an offeror, a promoter,

14

a broker, an agent, an investment advisor, and/or an agent representative, as these terms are defined by federal and Michigan securities laws.

28.    Defendant Mallen is an individual residing alternately in California and Michigan, and employed in an executive capacity by ViSalus.  Along with Nick Sarnicola and Ryan Blair, Mallen holds himself out as a "Founder" of ViSalus. He holds approximately 29% interest in ViSalus and purported to be one of the shareholders who was selling his equity under the "Founders Equity Plan." He was an active promoter of the offering and appeared at conventions and meetings during the two years the offering was open, including personal appearances to tout the equity investment in front of some of the Plaintiffs in the Denver area. He recorded videos touting the investment. He along with other co-Defendants prepared the details of the offering to be posted on the website. For purposes of this Complaint, Mallen is an offeror, a seller, a maker, a promoter, a broker, an agent, an investment advisor, and/or an agent representative, as these terms are defined by federal and Michigan securities laws.

29.    Defendant Blair is an individual residing in Michigan and California. At various points in the company's history Blair was the Chief Executive Officer of ViSalus. Blair is one of the primary promoters of the ViSalus pyramid scheme, and

15

holds himself out as a "co-founder" of ViSalus. He holds approximately 29% interest in ViSalus and purported to be one of the shareholders who was selling his equity under the "Founders Equity Plan." He was an active promoter of the offering and appeared at conventions during the two years the offering was open. He recorded videos touting the investment. He along with other co-Defendants prepared the details of the offering to be posted on the website. For purposes of this Complaint, Blair is an offeror, a seller, a maker, a promoter, a broker, an agent, an agent representative, and/or an investment advisor, as these terms are defined by federal and Michigan securities laws.

30.    Defendant, Todd Goergen ("Goergen") is an individual residing in Connecticut. Goergen is the Chief Operating Officer for ViSalus. He was one of ViSalus's top management and was involved in the decision to offer the "Founders Incentive Equity Plan" to the public. Goergen has been publicly represented to be a "Founding Investor" and Chief Strategy Officer of ViSalus.  He along with other co-Defendants prepared the details of the offering. For purposes of this Complaint, Goergen is a maker, a broker, an agent, or associated with each of these, as these terms are defined by federal and Michigan securities laws.

16

31.     Defendant ViSalus operated through N. Sarnicola, Mallen, Blair, and Goergen, each of whom were each intimately knowledgeable about the company's activities for all years in question. Between 2012 and the present, each of them had a co-equal role in the daily decision-making of the company. Each of them:

(a)     directly participated in the management of ViSalus;

(b)     was directly involved in the day-to-day operations of ViSalus at the highest levels;

(c)     Except for Goergen, each participated in local, regional and national meetings where statements about the "March To Equity" and other equity-related pitches were made, gave investment advice, promoted the scheme, and recorded videos and participated in telephone calls with ViSalus distributors and potential distributors to promote the offering;

(d)     was privy to confidential proprietary information concerning ViSalus and its business and operations, including the details of the Blyth equity purchase and eventual recapitalization;

(e)     was privy to the details of the 2012 IPO and its filing, and was actually aware of federal security laws relating to public offerings;

(f)     was involved in drafting, producing, reviewing and/or disseminating the offering circular and false and misleading statements and information alleged herein;

(g)     was aware of or recklessly disregarded the fact that the false and misleading statements and/or omissions were being issued concerning the "Founders Equity Incentive Plan"; and

(h)    made, approved or ratified these statements and/or omissions in violation of the federal securities laws and Michigan securities laws.

32.    Defendant, Gary J. Reynolds ("Reynolds") is an individual residing in Lincoln, Nebraska. Reynolds promoted the equity offering by (1) agreeing to appear live at ViSalus training events, (2) recording videos that promoted the scheme which he knew would be posted to the ViSalus website page and widely disseminated, and (3) lending his name and allowing his past experience to be used to promote the offering. Reynolds was aware that in those appearances he falsely and misleadingly testified how much money he had made by an earlier equity deal. For purposes of this Complaint, Reynolds is a promoter, a broker, an agent, an investment advisor, and/or an agent representative, as these terms are defined by federal and Michigan securities laws.

33.    Defendant, Vincent Owens ("Owens") is a promoter of the offering. He holds himself out as a pastor at the Household of Faith Empowerment Temple in Aurora, Colorado. He promoted the March to Equity scheme, to dozens or more people, recruited many into working as ViSalus distributors, and personally recruited the named Plaintiffs and many others to buy ViSalus equity under the "Founders Equity Incentive Plan." In addition to his personal promotion of the scheme to Plaintiffs, Owens promoted the scheme in at least two videos posted to the ViSalus

website page and elsewhere, both with his permission and encouragement. Owens also promoted the scheme in person at regional and other meetings. For purposes of this Complaint, Owens is collectively a promoter, a broker, an agent, and an agent representative, as these terms are defined by federal and Michigan securities laws. Owens has had a long history of personal contacts with the State of Michigan by transacting business with ViSalus since it at least 2006.

34.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, all Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, and interstate telephone communications.

35.    ViSalus is liable for its own acts and the acts of the Defendants under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment and apparent employment. Scienter of the individual Defendants and other employees and agents of ViSalus are similarly imputed to ViSalus under *respondeat superior* and agency principles.

## CLASS ALLEGATIONS

36.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired ViSalus securities, or were informed by ViSalus that they were "unit holders" of such equity in the course of an offering called "Founders Equity Incentive Plan." Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and, any person or entity in which Defendants have or had a controlling interest. The Class Period is January 1, 2015 to February 17, 2017, the dates on which the offering was open.

37.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class. In 2016, in a communication to company distributors, the Founders represented that, "as we approach the end of the first year in this 2-year program, we've already helped build a legacy for hundreds of families. We have no doubt by the close of the Founders' Equity Incentive Plan at the end of 2016, that thousands of families [sic] future will have been changed by our efforts as a community." There appear to have been

20

several hundred individuals identified as "shareholders" at least one national meeting attended by one or more of the Plaintiffs.

38.    Members of the Class may be identified from records maintained by ViSalus, and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions. Defendants are in possession of an exact list of all individuals who they deem "shareholders" and who "qualified" for the 6% equity.

39.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal and state law. Each Plaintiff and the Class could "qualify" for the equity in the same way, subject to the same criteria established by the Defendants. Each Plaintiff and the Class obtained the same type of equity rights, differing only in amount. Each Plaintiff and the Class was shown the same information and exposed to the same representations and omissions. Each Plaintiff and the Class was similarly affected by lack of disclosure or registration. None of the Plaintiffs or the Class had access to information concealed by the Defendants during the offering.

21

40.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

41.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- What misrepresentations and/or omissions were made to prospective buyers of the offering;

- What facts did the Defendants omit and/or conceal from the purchasers;

- Whether the Defendants are liable under federal securities laws;

- Whether the Defendants are liable under Michigan blue sky laws;

- Whether the people who invested in the offering were damaged;

- Whether the people who invested in the offering are entitled to rescission of their investment.

42.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members

22

may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

43.    For those claims that depend on reliance, Plaintiffs will rely, in part, upon the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), and applicable Sixth Circuit and other law. Each Plaintiff and the Class were aware of the Defendants' role in the offering.

## DETAILED RECITATION OF SCHEME TO DEFRAUD

### A.    WHAT THE DEFENDANTS KNEW ABOUT TRUE CONDITION OF VISALUS EQUITY WHEN THE SHARES WERE OFFERED AND SOLD TO PLAINTIFFS

### 1.    2008 Share Purchase Agreement With Blyth

44.    Robert Goergen, Sr. was the chief executive and major shareholder at Blyth, a publicly-traded company operating direct-selling subsidiaries such as candle and home-décor seller PartyLite, Inc. Defendant Todd Goergen was also associated with Blyth, and both were capital owners of a family investment business (Ropart Asset Management or "RAM"). Goergen had been employed by a New York

investment house, had been in charge of M&A at Blyth, and had invested in direct selling companies for RAM.

45.     The Founders operated a Troy network marketing company selling telephone equipment. In December, 2005, RAM invested into the company and became an approximately 25% member in the then-LLC (the LLC later re-formed as a corporation in 2012). The company switched marketing efforts and, while continuing as a network marketer, renamed itself ViSalus, licensed some vitamin supplements from a Detroit-area doctor and began selling those through distributors. After the Goergen investment, Defendants Blair, Sarnicola and Mallen kept approximately 19% each of the remaining ViSalus equity. The investment initially capitalized the company and enabled it to expand. However, the company was still small and nearly went bankrupt.

46.     Blyth was substantially larger, traded on the NYSE, and operated its own direct selling division, marketing candles and other products. The Founders presented Blyth as a financially stable, strong and legitimate company which gave credence to the new and young ViSalus.

47.     By 2008 ViSalus moved into offering weight loss shakes and a few other health-related items, all through a network marketing model that depended on

recruiting independent promoter/distributors, into the system. It established an "Employee Incentive Program" (EIP) under which it gave away a small amount of equity to a few employees. It also gave away equity to a number of promoters in 2005 and 2006 as a reward and an additional inducement to recruit other distributors.

48.     In August 2008, Blyth, the Goergens (Todd and Robert), and the Founders entered into a Membership Interest Purchase Agreement ("MIPA"). Under that agreement, Blyth obligated itself to purchase the outstanding ViSalus equity from all the shareholders: the roughly 25% interest of the Goergen family investment, the interest held by the Founders, and the small equity interest in the EIP. The price that Blyth would pay these shareholders for their stock was tied to the company's profitability at the time of each closing. MIPA committed Blyth to pay a very high amount depending on ViSalus earnings and sales in 2011 and 2012.

49.     At the time that Blyth and the shareholders entered into MIPA, the Goergen family effectively controlled Blyth. The stock purchase agreement substantially benefitted the Goergens, who eventually obtained approximately $55 million from their investment in ViSalus and got paid off before the Founders' part of the purchase agreement was complete.

50.    The Blyth MIPA purchase commitments were to be staged over four years. In 2008 the company initially acquired 43.6% equity interest. By 2012 to increased its ownership to 80.9%, paying increasingly larger per share amounts. As it had obligated itself to do, Blyth cashed out for $25.3 million the EIP stock held by employees and promoters that had been given away, leaving those minority shareholders with an enormous windfall.

51.    Using the Goergen family investment and money from the first part of the Blyth stock purchase, ViSalus induced hundreds of professional marketers from other network companies "join" ViSalus. The flow of new promoters, sometimes singly and sometimes in groups, was designed to induce an aura of "success" or "momentum" into the ViSalus operation.

52.    The influx of distributors who were able to bring over "downlines" from other companies, which sometimes numbered in the thousands of people, increased the revenue numbers as each new distributor would buy certain amount of product and pay the distribution fee and would lend credence to the pitch that ViSalus' marketing department would repeat through any channel possible, that tens of thousands of people were flocking to the "business" or "income opportunity" because it paid so well and was backing such a popular product.

53.     In reality the "new" high-ranking distributors were paid to work for ViSalus through undisclosed side deals. Thus, ViSalus effectively ran a professional and highly-paid promoter operation to recruit a much larger pool of unsuspecting promoter-distributors, in large part by advertising these insiders as "people just like you" who made millions off of selling ViSalus vitamins and shakes. Under the compensation plan that governed the flow of money upstream from the point of sale, the insider promoters did in fact make millions of dollars—by recruiting tens and hundreds of thousands of people who in turn lost money.

54.     But all of these sales to new distributors caused ViSalus's revenues to escalate between 2011 and 2012, the two most successful years by far of its entire operation. The company's annual sales in 2010 were $32.8 million.  Its sales in 2011 were $230 million.  Its sales in 2012 were $623 million.

55.     In 2012, at the very peak of its operation the Founders, Blyth and the Goergens attempted to take ViSalus to the market and sell their shares in a $175 million IPO. The IPO would have benefitted everyone involved but especially Blyth, since it would have let it off the hook for an enormous obligation to pay for the remainder of the Founders' stock under the MIPA formula.

56.     The Founders and Todd Goergen, who by then had moved into a formal management position with the company, were familiar with US securities laws. They understood what an offering disclosure entailed, what disclosures are typically and legally necessary to investors when a security offering is made, and they published a prospectus in connection with the IPO in August, 2012. They announced the filing on its website and were careful to follow registration requirements for the offering.

57.     They then took the company on a roadshow to drum up interest in the IPO. But the market and underwriters were unimpressed, and amid concerns about the pyramid nature of the business, the uncertainty about the prospects of the company continuing a rapid rise of revenues and other factors, the offering underwriters backed out. The IPO was pulled in the late fall of 2012 and never attempted again.

### 2.     Kerrigan Lawsuit, ViSalus's Money Losses, And Re-Capitalization in September, 2014

58.     In July, 2014, the *Kerrigan* pyramid scheme class action was filed alleging that the entirety of ViSalus's operation was in violation of state and federal fraud and RICO anti-pyramid laws. Each of the Founders was named as a defendant. The damages claimed in that litigation were in excess of $200 million. Within the next two years, the District Court twice denied the Defendants' efforts to dismiss the

case. The case remains pending against each of the Defendants named here, jointly and severally, and Defendants are aware that the plaintiffs in that case have reported damages in excess of $350 million.

59.     In the third quarter of 2012, ViSalus's revenues started falling and continued to fall with the same speed with which they had risen. Beginning in 2012 and accelerating into 2014, ViSalus was undergoing a stream of departures by the professional promoters it had earlier purchased, including many of the highest "ranked" promoters who had thousands or tens of thousands of recruits in their downlines. ViSalus continued carrying on the business exactly as they had previously, with a compensation plan accused of being a pyramid scheme and a rapidly vanishing distributor base.

60.     During all this time, ViSalus management was aware why its sales had spiked up and why its sales were tumbling down. The Founders and Goergen received regular reports that the vast majority of booked revenues were composed of sales made to new distributors who were buying a so-called EPS kit for $499, who ordered a month or two worth of product, and dropped out never to order again. They knew the company's retention rates for both customers and promoters.  They knew that newly-recruited distributors typically dropped out after four months and

customers rarely lasted the full length of the 90 day auto-ship program. Management obtained and shared detailed information about revenues, numbers of promoters, churn rates, customer numbers, customer number ratios, and detailed metrics concerning the drop of sales that started in the third quarter in 2012 among themselves at board and monthly meetings.

61.     These Defendants knew that the distributors were churned out at a rate of over 200% per year. And these Defendants knew every multi-level marketing company operating on the basis of paying for recruiting eventually "saturates" and falls. Indeed, in private emails between them, they expected the North American market to saturate just when it did and that the company had peaked and was falling very fast.

62.     In 2013 ViSalus had a 44% drop in revenues. According to its then-owner Blyth's securities filing, "this decrease was attributed to a decline in North American promoters." In 2014, after a further severe drop in revenues, ViSalus suffered a net operating loss of $7.2 million. Management was aware that it had no real new products to offer, and that its distributors and whatever customers it could find were tired of the weight loss shakes (calling it "shake fatigue").

63.     In the meantime, Blyth, which by then owned around 80% of ViSalus's stock, was undergoing financial problems of its own. It reported only $114.8 million in cash at the end of 2013. This was $30 million less than its MIPA obligation to fully buy out the Founders, at the same time as the company carried current debt obligations of $55 million. It had already negotiated the MIPA obligation back to 2017 from 2012 and had not fully paid the ViSalus shareholders even in that transaction. The $143 million MIPA obligation for the remaining stock was valued at a per share price of $15.99— a price much higher than the price rejected by the underwriters in the failed IPO two years earlier. Several reports about Blyth's inability to pay the remaining $143 million obligation to the Founders under the MIPA share purchase agreement were published by analysts and others.

64.     In short, Blyth could not pay the $143 million obligation and did not want to pay the $143 million obligation. Nor could Blyth be sold unless it got rid itself of the ViSalus share repurchase obligation and of ViSalus itself.

65.     Three months after the *Kerrigan* case was filed, the shareholders who were contractually owed the $143 million, including the Founders, gave up the right to enforce the last tranche because, at least in part, they knew that Blyth could not pay it.

31

66.     As a result of all of these conditions, on September 4, 2014, Defendants Blair, Mallen, N. Sarnicola, and Goergen each entered into a multi-party Recapitalization Agreement with Blyth.

67.     Under the Recapitalization Agreement, Blyth kept 10% of ViSalus stock. It returned the remaining 90%, minus a fractional share to certain other shareholders, to the Founders. In return, the Founders gave up the right to demand the $143 million under MIPA.

68.     As part of the agreement, Blyth, the Founders, and the Goergens agreed to fund the ongoing operation of ViSalus with a $12 million revolving credit facility. The facility was to be funded by the Founders, the Goergens and Blyth in roughly equal parts until 2017. Thus, the result of the Recapitalization Agreement was that rather than purchasing the shares from Blyth for $143 million, the Founders actually ended up putting money into the company to enable it to keep operating.

69.     Both ViSalus management and Blyth knew that the MIPA number grossly overvalued the true worth of ViSalus stock. Blyth treated the recapitalization as a $118.9 million gain at the end of 2014. A year later Blyth, together with its 10% ViSalus interest, was sold for a total of $98 million to a turnaround shop.

70.   On September 10, 2014, Defendants Blair, Mallen, Goergen and N. Sarnicola offered 4% of another company that they had set up as a venture capital entity, HashTag One, LLC, to thirty high ranking distributors as an inducement not to leave and further deplete ViSalus's efforts at staying above water. They did not offer to give or sell ViSalus equity to these insiders because the insiders knew that the stock was virtually, if not actually worthless, and prospects for future liquidity were nil.

71.   At the same time they were seeking investment into the company from institutional investors. In May, 2016, ViSalus, through its in-house counsel Adam Morgan, filed a Rule D exemption from registration of a private offering. In that filing, ViSalus reported raising only $6.4 million out of a $15 million offering. The filing reported revenues in 2016 at less than $100 million. It listed Defendants Mallen, Blair and Goergen as executive officers and directors of the company.

72.   At the beginning of its equity offering therefore, these Defendants, all high level management, actually knew the following facts and business conditions surrounding company operation and future prospects: (1) ViSalus was losing money from its operations and had lost money for two straight years, (2) the company could

not operate except by cash infusions from its shareholders and through the contractual arrangement with Blyth to provide it support for several years, (3) the company needed additional capital but that it was unable to raise most of its offering to institutional investors, (4) the products it made available to its distributors were old and interest in them (aside from the pyramid nature of its system under legal attack) had waned, (5) the only way it could interest its professional distributors to stay was to increase the payouts to them or offer them interest in other companies, and (5) it was facing a class action lawsuit over its operation that sought vastly more than the worth of the company and the Founders.

## B.   THE SCHEME TO SELL BOGUS "EQUITY" TO THE DENVER CHURCH GROUP AND OTHERS

### 1.   The "March To Equity" Scheme

73.   The "Founders Equity Incentive Plan" (hereafter "Plan") offering was posted to the ViSalus website on approximately January 25, 2015, at http://visalus.com/equity.  Any distributor who "qualified" in "equity groups" that would get a portion of 3% of ViSalus "equity" from the Founders in 2015. The page looked like this:



74.    The representations on the web page relating to the Plan stated as follows:

OWN YOUR LEGACY

The Vi Co-Founders often maintain that "equity" is the most valuable asset one can have in business. So in 2015, we celebrated our 10th year by offering leading Promoters an opportunity to earn from a special Founders' Equity Incentive Plan and share in the company's future success together.

35

The Founders' Equity Incentive Plan provides Promoters with an ownership opportunity equivalent to 6% of the company, awarded over two years - 3% allocated in 2015, and 3% allocated in 2016. The plan is shared among four equity groups, based on your Paid Rank each month.

Own your legacy. Create greatness not just for today, but for your future. By personally reaching and maintaining leadership ranks of National Director and above, then helping your personally enrolled team do the same, *you'll earn equity in the plan and be able to proudly call yourself a Vi Equity Holder.*

(emphasis added)

75.    The same website page was (and is) accompanied by a text cut out in large font, identifying itself as a message from the Founders, that states:

> *Buying back ViSalus* was an immeasurable opportunity to optimize the company's value and impact… Now, being in position to invite our leaders to share in our growth means the world
>
> -Vi Co-Founders

(emphasis added)

76.    ViSalus posted a second page on the website called "March to Equity." The title at the top of the page was (and is) "Building a Legacy for 2000 Families." Neither this page nor the Plan page had (and continue to not have) a link to any other document. On this page the copy said, in font size approximated below:

# THE OPPORTUNITY OF A LIFETIME

When the Vi Founders recently *bought back* controlling interest of the company, they launched a series of bold moves which have helped spark an exciting time in the Vi story. *Spurred by their significant financial commitment ($134 million)* to take full ownership in Vi's future, they created an opportunity for Vi Promoters to take ownership alongside them.

After being one of the industry's most impressive success stories of the past decade, the Vi Co-Founders put forth an opportunity at the beginning of 2015 to help reward those people who build the foundation for our next exciting chapter: The Founders' Equity Incentive Plan.

(emphasis added)


77.    The "March To Equity" page was (and is) accompanied by a 17:56 minute video embedded into the page and watchable at the click of a mouse. It looks like this:



78.    The embedded video is narrated by Defendant N. Sarnicola. The

representations in the video are as follows:

> Hey everybody how are you?  This is Nick Sarnicola.  One of the co-
> founders of ViSalus and The Challenge and the new blockbuster
> product, Neon.  *I'm coming to talk to you guys about March to Equity*
> *and the Founders Equity Pool and what this means to you and your*
> *family potentially.* In order for me to tell you the future and what we're
> doing with this, I gotta take you back 10 years to the past. *10 years*
> *ago when we started this company ViSalus, we had no sales, we had*
> *no track record, we had nothing to point to as a reason for people to*
> *follow us, but we took 6% equity and we put it on the table.* And the
> grand majority of families out there and "experts" out there, they said
> it will never work, you are wasting your time, they're too young,

they're too this, they're too that, they'll never pull it off. But there was a series of families that did believe in us, that did put their faith in us, that did run with us, and they got the company off the ground, we got it successful, and in 2008 we were able to sell ViSalus to a billion-dollar a year holding company that owned multiple direct selling companies by the name of Blyth and that transaction was a 4-year transaction.

During that journey, my partners and I created The Challenge.  In 2010 it really took off. By 2012 we did $620M in sales. We were the #1 meal replacement shake in North America. It was just a blockbuster run.  Unbelievable. All of those people that believed in us in 2005, those very few people that believed in us, and stayed with us, 'cuz there were some people that were there that believed in us at the beginning, but then said you know what I don't see this equity turning into anything. Mainly because people, you know, gave them great advice, who really don't even have equity in their own homes, let alone know anything about equity of a business, and they left the company, *but the ones who stayed, we told them if you help us 15x this company, you'll all become millionaires. And they all did. In fact, a couple hundred people split up nearly $30M and I think of the Knight Family who she was a 2nd grade teacher, he's retired Air Force.  They made several hundred thousand dollars in that equity. I think of another family in the same area.  One who is a 2nd grade teacher and retired military – the McCoy family who made well over half-million dollars. I think of the Owens family out of Colorado who made 600,000 something dollars.  I think of Maggie Richardson, massage therapist/teacher made $250,000. I think of Matt Shumaker and his family. He was 18 when he got started. He was 19 when he qualified for the equity. Him and his family all qualified and did a smart transaction. $1.1M that they earned. This is the original equity. 2005.  I think of the Bunting Family who made $2.5M.  I think of GJ Reynolds who made $2.2M.  I think of Brian Cummings who made $4.5M or $4.7M. Jake Trzcinski who made $5M.  This is just equity.* And I could go on and on and on.  The Peterson family who made $250,000.  Mary Dowler, she's a dance instructor who made several hundred thousand dollars because they believed in us in 2005. Ali Sherraha who made a couple million dollars because they believed in us in 2005. We had nothing.

Well as times progressed, we became highly successful.  As I told you guys, we had sold ViSalus in 2008, but it was in a 4-year transaction. *So at the end of 2012, we no longer owned the company. The company was owned by Blyth.*  And we became a company that was big, and more conservative, very slow to make decisions because Blyth is a publicly traded company. Highly, highly intelligent, highly successful people highly productive group of people. It was just a difficult culture than the ViSalus culture.  Or the culture of myself, Blake and Ryan. For whatever reasons, we weren't having the same success in 2013 and beyond that we were having in 2012. Myself, Blake and Ryan looked at each other and said hey, we don't hunt, we don't fish, we don't golf. And at that point we were in 2013, we were 32, 34 and 36, fast forward to today and we looked at each other and said what do we want to do for the rest of our lives we had just created this idea of The Challenge.  It just exploded. So the company we sold was not even The Challenge company – it was a high-end supplement company. Now we got this idea of The Challenge. It's fun. It's mainstream. It's bold. It's big. It's us. What do we want to do?

[5:19]

*So the 3 of us made a decision to take the company ViSalus, private again, in a founder-led buy-back. And myself, Blake and Ryan spent $105M of our family's future legacy money. So imagine I gave you a trunk full of $35 million.  Because it was $35 million each, what would you do with that trunk of money? Or that trunk of cash?  It's an interesting question, right?  Here's what we did. We said well, we don't hunt, fish or golf, so retiring is not going to be very fun, we're only the average age of 35 between the three of us, there is nothing that we'd rather do than create transformations and to build ViSalus on a global level for decades to come, so we took $105 million between the three of us that was owed to us and we bought back controlling interest of ViSalus. This was just the end of 2014, this just happened.*  This is a one of those decisions that you make in your lifetime that will affect millions of lives, let alone my children, their children, or Ryan or Blake's kids, and their kids, we're talking about a multimillion life decision to buy this company back. And it put us in the position of decision making and control.  *We're still partnered with Blyth. We're still partnered with Bob Goergen, the chairman of Blyth. Amazing people.* They were our first mentors. They gave us the

gift of understanding on how to create a global business and how to be smart operators, and fiscally sound, and now we're back in the driver's seat, the three of us, to be an innovative, entrepreneurial aggressive company. *And we were willing to risk our families' generational money for one word: equity. We were willing to risk it all for one word: equity. Would you be willing, when given a trunk full of $35 million, would you be willing to risk it all the way we were? Would you be willing to double down the way we were? And I share this with you because the March to Equity and the entire idea here of equity is nothing more than the three of us buying back this company and immediately taking 6% of the equity that we just spent all of this time, energy, effort and resources in acquiring, and offering you a chance to earn some of it. It's the most valuable thing that we have to offer. I've worked my entire life for that one word, and now we're turning around and giving it to you.*

[8:19]

*How serious should you take that? How meaningful is it? Because we are a multiple, multiple nine figure a year company.* It's not like we're a start-up like 10 years ago when we had no value. We had no sales. There was nothing to believe in. *Now we've got 50+ millionaires. We've done nearly $2 billion in sales, $1.7 billion of it in the last 5 years. This isn't a question of is this a good idea for us to go earn a piece of this ViSalus equity. This is not a question for your family. This is what we call a no-brainer. The only risk is to myself, Blake and Ryan. That if this company doesn't grow because of this idea. If it doesn't explode because of this idea that we gave all of you equity without an explosion. But we're willing to bet on you. We're willing to bet on people, we're willing to bet on smart families, that understand what equity is, want to own a piece of it, want to own a piece of every country ViSalus goes into, every product that we launch, and every customer that we acquire. And the billions of dollars that we'll do in the future.* Guys, we want to have this company in our families for decades to come. That's why we bought it back. And you'll own a piece of every single thing that we do, if, between now and the end of 2015, you can become a national director or above [unintelligible]. You can't buy this equity, you can't raise capital to get some, you can only go to work.

[9:57]

I think of, right now, *I'm in Grand Rapids, Michigan. This is where the largest company in direct selling history is created. A great company. Fantastic mentors and just you can't argue with what they created – a company by the name of Amway.  And they do, $10, $11, $12 billion in sales. Their dividends to their shareholders are a billion dollars or so a year. It's crazy.  We feel that we can one day 10, 20, 30 years from now, be as big or surpass that company. We wouldn't be in business if we didn't believe or if that wasn't why, we were trying to achieve, if that wasn't what we were trying to achieve, why would even be here if we weren't trying to be number one? And many people will doubt and bet against the fact that we will. And that's OK. They always have for the last 10 years. But 6% of a billion dollars in dividends is $60 million a year. If we could get to that size, we'll be dividending $60 million per year to those promoters that go to work right now.  Let's forget about your commissions, let's forget about your weekly and monthly commissions. That would be $60 million per year that you and the rest and the shareholders would split up if we could go get to that size. What if we got to Herbalife size? That's like $40 billion, $40 million excuse me, a year, those shareholders would split up.  What if we got to Mary Kay size? That would be $20 million a year those shareholders would split up. Every year. It's about finding the right people who want to own a piece of this company, and us together, going to work year after year, decade after decade, and creating the greatest company in this industry. And you'll own a piece of it.*

*I don't care if it's a small piece.  Twenty years from now, if you own a small piece of this company, you get a $4,000 dividend for work you did 20 years ago, you haven't even mentioned the name ViSalus in 17 years, but you had a $4,000 dividend check still?  Who's happy? Who's cashing the check? See guys, this is what smart people do. Smart people, they try to own a piece. They try to own a piece.  How many nine figure, how many multiple  nine figure a year companies today are offering you a shot to own a piece of their company based on your own efforts?  I don't mean stock options. I mean, equity. Shareholder. How many nine figure a year companies, multiple nine figure a year companies are offering this shot? So recently we came out with the idea of March to Equity. One Cause. One Crusade. One*

*Focus. One Dream. One Goal. Let's Go. And that March to Equity is 2,000 families.*

[13:05]

*We're going to help 2,000 families own a piece of this company. Some will own a small piece. Some will own a big piece.* But what is important about those 2,000 families is the ripple effect that it will cause. The ripple effect of these 2,000 families will cause this: it will cause 5 million more meals to be served to children in need, it will cause 3 million more transformations of the physical body to happen, it will cause 20,000 more people to qualify for a BMW and make an extra $1,500 to $2,000 a month on the side of their career, that's a car payment, a house payment, a big dent in their grocery bill, *it will cause 2,000 families to own equity, it will cause about 1,000 families to be a six figure a year income earner in our company. 1,000 more. And it will create another 50-100 millionaires. So here's what I know for sure: if you're watching this, you fit in somewhere, in that spread. You either want to be one of those three million transformations, or you want to be one of those next 50-100 millionaires, or somewhere in between.* So even if you can't be one of those 2,000 shareholders, maybe you're one of the BMW qualifiers and you lose 50 lbs, *maybe if you're only an equity holder but you own a little piece, who cares? You're still making a several thousands dollars a month and you're gonna get a dividend* with the shareholders anytime there is a dividend to shareholders.

*Guys, this is a no-brainer. We need 2,000 families right now that want to be shareholders. We need 2,000 families right now that want to own a piece of this. We need 2,000 families right now that get it, and that will cause the ripple effect of everything else in our company.* This video is not to the people who doubt and don't believe. I've been dealing with doubt and disbelief my entire life. Anytime I said or my partners said, or our leaders said, or my wife said, we were going to achieve something, everyone doubted it. That's par for the course. This is not for the people that doubt. *We will allow them to doubt for the next 18 months, for the next 17 months, for the next 16 months, while other people achieve equity and receive equity. This video is for the people who just wanted to understand. They wanted to get it. They wanted another 15 minutes worth of, tell me about, tell me about*

43

*this equity idea, tell me about what the March to Equity means, tell me what it can mean to me and my family, tell me what it can mean to my future. It could mean owning a piece of a multiple nine figure a year company that we will one day take to a ten figures a year, that we will one day take to eleven figures a year, there are two companies in our industry that have done it, we will be the third one day.*

It would mean being to pass on that ownership to your children. *I want my daughter Giovanna, writing equity checks to your children, or to your grandchildren because of the work you do today. That's what I want.* It will also mean the opportunity for you guys to achieve ranks in our company and make weekly and monthly income. It will also mean if we can create 2,000 families to cross the finish line, 5 million more meals served to kids, three million more transformations, 2,000 families in equity, 1,000 more six figure earners, and another 50-100 millionaires. And I'm sorry, another 20,000 BMW's. This is what it means. *If you're hungry and if you're driven, take between now and the end of 2015, 2016, excuse me, and get extremely serious about the March to Equity. Get a game plan right now. Sit down for a March to Equity strategy session and let us give you the blueprints to go make it happen. Or, let this be yet another thing that passes you by as you explain to our kids and our grandkids about how we "never had a shot." Why is it "we're never lucky?" Why is it "we never get the opportunities?" Maybe you do. Maybe you just don't recognize them and maybe you just don't take action on them. Will this be one of those? I worked my entire life for one word: equity. I've given up everything financially for us. And now I'm giving you a shot to be our partner in equity. What will you give up for it?* And how serious will you take it? Guys, I cannot wait to work with you. I cannot wait to partner with you. And I cannot wait to make you a shareholder in this company. March to Equity. 2,000 Families. Let's get it done. Thanks everybody. Good luck.

(emphasis added)

79.    The "March To Equity" page also contains a number of embedded videos which feature past promoters talking about the large amounts of money they

had allegedly made in the "first" ViSalus equity plan. The page currently posted on the ViSalus website, as of August, 2017, only contains two videos, one of which features a prominent promoter who had not received equity under the plan. When the page was first posted there were approximately twenty such videos included, including testimonials by Defendants Owens and Reynolds. These testimonials have been taken down at an unknown point in time.

80.    At some point well after the offering was made in January, 2015, a so called "equity flyer," in PDF format appeared as a link to the ViSalus website. The site itself is massive and not easily traversed. It contains a multitude of videos, pages and promotions. It is not known exactly when this page was posted but the flyer is copyrighted 2016, or at least one year after the start of the offering. Text on its last page states: "These rules apply for 2016 only."

81.    The 2016 flyer's first page, "About the Founders' Equity Incentive Plan" description states: "This is a once in a lifetime opportunity to 'own your o0wn legacy' and create something truly great not only for today but for your future. By personally reaching and maintaining leadership ranks of National Director and above, and helping your personally enrolled team do the same, you'll earn equity in the Plan."

45

82.    The first page continued, "Earn From 6% In 4 equity Groups." "The [Plan] provides Promoters with an ownership opportunity equivalent to 6% of the entire company worldwide. The 6% to be available will be awarded over 2 years, with 3% available to be earned in each of 2015 and 2016." The description then sets forth criteria for four "groups" eligible to participate. On the first page, one of the bullet points beneath the description states: "If you fail to qualify in any production month, you will not lose any Shares you earned in previous months."

83.    The flyer contains a chart that contains what appear to be random "unit" number allocations (similar or identical to a chart linked from the earlier page posted in January, 2015). Neither chart contains information about the total number of shares offered, per share price, or any other meaningful financial objective information about the offering.

84.    ViSalus routinely prepares financial statements for its management use, and has employed a CFO and an outside accounting firm. Its management, including the management Defendants, have access to those documents on a regular basis. The ViSalus website does not contain, and has never contained, either an embedded or downloadable financial statement about ViSalus's condition that the

equity offerees could examine. None of the pages that refer to the Plan or the "March to Equity" contain any statement marked as a forward looking statement nor contain any cautionary statements concerning any statements made in the Sarnicola video.

85.    None of the website pages that discuss the Plan or "March to Equity", or indeed any part of the ViSalus site, contain any information relating to the *Kerrigan* litigation.

86.    The 2016 "equity flyer" appears to differ from the earlier pages in that on its last page it adds certain other conditions towards obtaining "equity." It makes references to the "forfeiture" of shares by an entity called "Vi's Culture Standards Committee" and the following, in approximate font scale:

SHARE AND UNIT AWARDS; VESTING OF UNITS; CASH DISTRIBUTIONS

At the end of each Plan year, the Shares you have accumulated during the year, plus or minus any additional Shares awarded or forfeited by Vi's Culture Standards Committee, will be converted into Units that will track and reflect the changing value of equity in ViSalus. *The value of ViSalus's equity will be determined by an independent valuation.* Your earned Units *will vest* 1/3 (one-third) per year over the three years following their issuance, *provided that you enter into a Participation Agreement and remain an Active Promoter of ViSalus.* For example, Units received at the end of 2015 will vest 1/3 each in 2016, 2017, and 2018, subject to the requirements of the Plan. *Once your Units are vested, you may be eligible to receive Cash Payouts at the same time that ViSalus stockholders receive any cash*

*distributions. In order to be eligible to receive any Cash Payout, you must be an Active Promoter in good standing, and there will be a minimum paid rank requirement at the time of the distribution. A participant's percentage in the Plan is subject to adjustment for stock splits, dividends, recapitalizations, and other events that would affect a common stockholder's percentage interest in ViSalus.* While ViSalus is very excited and optimistic about the growth of its business, it can make no guarantees of its future financial performance, *the amount of payments under the Plan, or that any payments will be made under the Plan. Legal terms and further details of the Plan will be outlined in the Participation Agreement that will be provided to all qualifying participants when Units are awarded at the end of 2015 and 2016.*

(emphasis added)

87.    The 2016 "Equity Flyer" was never provided to Plaintiffs in physical form nor was its presence on the website (whenever it appeared) disclosed in any email or other communication to any buyer of the equity or potential buyer of the equity. On information and belief, the "Equity Flyer" has never been actually mailed, sent by email, or otherwise distributed to any of the "shareholders" who eventually purchased ViSalus "equity" under the Plan.

88.    No copy of any document referred to as a "Plan" aside from the information on the web pages discussed above has been disclosed to the Plaintiffs and upon information and belief to any member of the Class. No so-called "Participation Agreement" referred to in the 2016 "equity flyer" has ever been presented to the Plaintiffs. No "independent valuation" referred to in the "Equity

Flyer" has ever been provided to the Plaintiffs, and no information has ever been posted or sent to Plaintiffs concerning whether such an independent valuation has been made. No information, or evidence that a "Cultural Standards Committee" was ever established, has ever been provided to the Plaintiffs.

89.     The offering did not list a price per share and offered no meaningful way to determine how much the sellers were asking on a per share basis. However, the cost to reach National Director, the requirement associated with the common pool, in 2015 was $40,000, a figure explicitly told the Plaintiffs and others before they "ran" to equity to qualify. In 2016, the cost was lowered to $25,000, and that sum was explicitly announced by the Defendants.

90.     The offering was made public to thousands or tens of thousands of people by a coordinated plan overseen by Defendant N. Sarnicola and assisted by Defendants Blair and Mallen. Goergen was aware of the offering before it was made public. The plan to pitch the message as "re-purchase of equity" plus "millions" made by other promoters under the earlier plan, was discussed in multiple drafts of internal memos. The fact that Defendants Owens and Reynolds were featured "old equity" speakers in a number of pre-recorded calls then disseminated as videos was planned in advance.

91.    Promotion occurred in three ways. First, Defendants produced additional videos, most notably a so-called "webinar" dated December, 2014 released in January, 2015, in which they and a select number of distributor promoters talk about the "generational wealth" to come from the "opportunity" to get the 6%. Second, Defendants spread details of the "opportunity" in scripted appearances at ViSalus regional and national meetings. These appearances were knowingly recorded and the videos of the presentations made there were posted on the Web by promoters and promoted on Twitter and Facebook. These videos were always made available to the public and were easily searchable. Third, Defendant spread details of the "opportunity" in personal appearances at local events. Some of those events were videotaped by local attendees and also posted to public websites. During these events, the promoters would often play the pre-recorded videos and show slides of the web page announcing the offering as well as speak live.

92.    The common elements of the representations made in the disseminated videos and in statements made in personal appearances were the following: (1) the Founders took and used $143 million of their own money to "buy" or "purchase" back the company from Blyth just a few weeks earlier; (2) ViSalus was a "billion" dollar company that would generate "dividends" for generations to come for the 2,000 families; (3) new distributors should invest in "marching to equity" because

nine years earlier many promoters who likewise made a similar investment became millionaires; and (4) the offer is limited in time and scope, and the new investor should get in on the equity action soon or it will all be gone.

93.     These appearances and resulting videos were not spontaneous but carefully choreographed. For example, the promoters who were paraded on stage and represented as getting rich through the old EIP program, as for example in an April 11, 2015 video was posted by a ViSalus promoter from a live appearance hosted by Defendant N. Sarnicola called "ViSalus Equity Recognition The Original Vi Equity Owners:"



94.    The equity "opportunity" was also announced in planted "interviews" on prominent network-marketing sites where it would reach people interested in multi-level marketing companies, in for example, an announcement featuring a photo of Defendant Blair and accompanying text:



## ViSalus Offers Shares – Equity To Distributors

**BY TED NUYTEN**

**JANUARY 11, 2015**

  

The **ViSalus** Co-Founders, **Ryan Blair**, **Blake Mallen** and **Nick Sarnicola**, have often maintained that "equity" is the most valuable asset one can have in business. Starting in 2015 they made 6% of the shares available for distributors.

According to the ViSalus website:

"Beginning in 2015, the year we celebrate our 10th year, leading Promoters will have an opportunity to earn from a special **Founders' Equity Incentive Plan** and **share in the company's future success together.**

The Founders Equity Incentive Plan provides Promoters with an ownership opportunity equivalent to 6% of the company, awarded over 2 years (3% allocated in 2015, and 3% allocated in 2016).

The Plan is shared among 4 Equity Groups, based on your Paid Rank each month.

This is a once in a lifetime chance to **own your legacy** and create something truly great – not only for today, but for your future. By personally reaching and maintaining leadership ranks of National Director and above, then helping your personally enrolled team do the same, you'll earn equity in the plan and be able to **proudly call yourself a Vi Equity Holder".**


**Nick Sarnicola Explains The Future of Vi for 2015**



The Founders Equity Incentive Plan provides Promoters with an ownership opportunity equivalent to 6% of the entire company worldwide.

The 6% will be available to be awarded over 2 years, with 3% available to be earned in each of 2015 and 2016.

Eligible Promoters can earn in any one of the 4 Equity Groups below based on your Paid Rank each month of the Plan period:

Equity Groups:

1. National Directors & Presidential Directors (open line National Director)
2. Ambassadors to 2-Star Ambassadors (open line Ambassador)
3. 3-Star Ambassadors to 5-Star Ambassadors (open line 3-Star Ambassador)
4. Diamond Ambassador to Global Ambassador (open line Diamond Ambassador)

More information can be found here: **www.visalus.com/equity**

95.     Pre-recorded videos, or links to them, were disseminated by email to high-ranking distributors, with instructions (often by Defendant N. Sarnicola) for them to email a link to the videos to their downlines. This made it possible to directly push the videos thousands or tens of thousands of people. In regular internal emails to high-ranking distributors in 2015, Defendant N. Sarnicola directed his distributors to "focus" on the "March To Equity" (M2E) offering:

> The primary focus of these emails is going to be to share what you should focus on this week, but most importantly, a constant push of the event calendar/schedule so that we are aware of where they are at…Attached are our Event Flyers for North American Events…*Your focus this week:… March to Equity- Building a Legacy for 2000 Families.*

(emphasis added)

96.     Once distributors "qualified" for the equity the company began calling them "shareholders." They were sent emails through the Vi-net internal email system entitled "Valued Shareholder." Emails sent through the internal email system that enabled communication between the company and the hundreds of thousands of people who were signed up as distributors pointed to N. Sarnicola's videos: "Watch Nick launch the March to Equity (Short)… Watch all three Founders share their 2020 Vision plus the March to Equity rollout…Finally, Nick recently recorded a powerful video to help you in your recruiting efforts focused specifically on Equity and the March to Equity Opportunity. WATCH VIDEO [hyperlink]."

54

97.    One of the pre-recorded videos that Defendants particularly featured as the offering was rolled out was a 46:28 minute "ViSalus Equity Incentive Plan Announcement Webinar." Although dated December 8, 2014, it is believed that it was posted on or about January 5, 2015. The video was made available on the "tv" portion of the ViSalus site, and later on YouTube, and on other places on the Web, where it was posted and re-posted by various distributors.



A copy is currently residing on YouTube, where it is posted by a ViSalus promoter named Matthew Jamison over a photo of his $25,000 check:



98.    The "Webinar" features Defendants N. Sarnicola, Mallen, A. Sarnicola, Blair and Reynolds. In the video, these Defendants state as follows:

[9:50]

[**Blair**] Thank you Nick. The irony is, *I'm sitting here in my house with Todd Goergen, really our 4ᵗʰ founder and the person that was our [inaudible] capital and brought the Blyth relationship to us* and taught us so much about how to build value and how to build a company, and how to build equity value and so forth and his family has done so in the direct selling industry and they've created a lot. For those of you not familiar with him they are people that we admire on the inside of our walls. And I'm here and he's sitting with my son and they're doing arts and crafts and I'm just thinking to myself, everything around me was created by equity. So we created a

company that had value. We put our blood, sweat and tears into it. We build value. We worked hard. This is what you have. This is what ViSalus [inaudible]. [inaudible] re-acquired the company from Blyth, it was Todd's family so it's not like it was a hostile situation. It was what was right for us. *We bought the company back with the Goergens and now we're going to offer you the same thing that we asked for from the Goergens, and that is equity within our company. An opportunity for you to build a legacy alongside of us.  One where one day your kids are going to be playing with my kids, and their kids, and all of our children are going to have something that we all dreamed of.*

And for those of you that don't know my story. I'm a self-made individual. I never dreamed that I would have the life that I have now and the reason why I do is because I understood the value of equity. *And that is what we are going to be bringing to our field. We're taking 6% of our equity, of our family's wealth, and we're giving it to yours based on how you decide to earn it, and Nick and Blake will go into more details on that and more information will be coming [inaudible] directors and so forth. I'm telling you right now the most valuable asset that I have in my life, is not the homes or the stuff that you read about. It is the equity in ViSalus. We are letting you participate in that as well. So that said, this is a very emotional thing for me, it's a very passionate thing for me. It is something we could not have done had we not bought back the company.* It's something that no one else in the company of our size, can do or will do, because our vision for this company is different. We want to say ViSalus is a promoter-owned company. *One day I want you on this phone to be sitting down with someone and say, actually you know what, I don't want you on this phone – I want your grandchildren, your grandchildren's grandchildren, to be sitting down and say, you know what, my grandma or my grand dad was one of the equity holders of ViSalus, created this value and the life that I have right now, that I'm able to give back and able to contribute, able to give to charity, give to my church, give to whatever causes I'm passionate about. That's happened because of the decision that was made tonight, that one day in December. That's what equity is all about.  Everything that we have, myself, Nick & Blake, all of our value, all of our success, all of our wealth has come from equity and now we're inviting you to participate in it with us.* So I call you to action tonight. This is

57

probably the most passionate thing that we've ever done. *We did this once before when we first started our company and those founding equity partners, they made something like $27.9 million.* And I gotta tell ya, you know, there's no promises or commitments, but I'll tell ya, I'm gonna work the rest of my life to build a value of the equity that I own within ViSalus, and now you're gonna own that as well and we're gonna do that together.  Nick, back to you….

[14:45]

We're not doing this because we want to create a lifestyle for ourselves – we already have that.  *We didn't have to buy back this company. We could have retired.  I always tell people, we have a private jet, I could've been on that jet, on a private island, and never have to ever look at a bank account again, or care about it.*  We bought this company back because we want to make a change on this planet because we know that the world needs better nutrition, we know people need supplementation, we know that the food sources out there are terrible and that we provide them value. It is up there with a need; it's not a want.  It's not like we're providing a luxury or something that they can do without.  We're providing good nutrition for families. And this is what we stand for and we know that we're going to create a lot of value. *We bought this company back so that way we can create the maximum amount of value and now we're inviting you to be owners with us in this company so we can do that together. So I hope I answered your question Nick, I don't see this as an other Ferrari in the garage; I see this as solving a major major need of humanity which is nutrition, fortified nutrition through supplementation, and through for fortified foods….*

[19:34]

[**Mallen**]  Thank you Nick, and I think you and Ryan did an amazing job rolling out the significance of what this means. I'm watching the Facebook feed there on my phone and I can see the excitement. I know there's a lot of you guys on the line here tonight, that you get it.  That you understand what the ability to be an owner.  Because that's what equity means – to be an owner of ViSalus means a lot of ya, this is gonna be a sleepless night for ya, knowing that you're passionate about what you do and now tonight you have the opportunity to own

a piece of what many of you put your lives into every single day. But I also know there's a lot on the line that this is new to ya, right? Maybe you think of the concept of buying equity in a company, equity in business, is a new idea, right? We work all our lives to build equity in a house, a couple hundred thousand dollars, we go out there and achieve our dreams a couple million dollars. *But what does it mean to own equity in a company that in the last four years did over $1.8 billion in sales?  Ryan said it and I'm gonna reiterate it – equity is the most valuable thing that we have and the most valuable thing that I own. It's the most valuable thing that Ryan owns. It's the most valuable thing that Nick owns.* It's the most valuable thing that ViSalus could ever done [inaudible]. We put the [inaudible] incentives out there in the past, we paid out a lot of money over the last couple of years. *Matter of fact, we paid out somewhere near $800 million to a comp plan  but I tell you guys nothing we've done in the past, is even close to the opportunity that you're hearing rolled out here tonight – equity ownership and the entire future of [inaudible]. Nick mentioned, and he's gonna bring on some people guys that we did this in a way of [inaudible] buy back before The Challenge, back what everything we have with just a vision, and we put a smaller pool on the table before we knew it was possible and I strolled through some of those names and you get a chance to hear from some of them in a minute, and I watch people walk away with $4 million, with $3 million, with $5 million. You're gonna hear some of those stories here tonight. I want you guys to understand that that opportunity was real back then but now it's [inaudible] with an idea. That was before we had ten years of experience.  What is equity ownership guys? Equity ownership is walking into the ability to own a piece of what we've been dealing for ten years. Every lesson, every investment, every idea, ever piece of infrastructure, every technology, everything that I have done, you now have a front door that flung wide open; the ability to walk in and grab a piece of that and you may be asking yourself why? Right? Why would – we just spent $143 million to buy the same [inaudible] equity that we're putting on the table for you. Why would we do that?  You guys [inaudible]? When we spent $143 million that was our third all-in moment.* For those of you who have heard us tell the Vi story, you know it's a series of all-in moments, when we started the company, when we started the challenge and *75 days ago our biggest all-in moment when we bought back the company and I challenge you guys who are hearing this tonight, make this your all-*

*in moment.  Make the decision to go out there and get a piece of a company that you're passionate about. A piece of a mission you're a part of. Make this your all-in moment and be not only a top income earner, be not only an ambassador, be an owner of ViSalus. Because that's the opportunity we're putting on the table for all of you guys here tonight.* And I hope it is an all-in moment for many of you guys here on the line. I'm excited. I hope a lot of people on this line understand the magnitude and I wanna hear some of the stories to show them the way it's possible….

[27:26]

[**Reynolds**] *Thank you very much Nick. It's been an honor and it's been a great ride over the last nine years. I bought into a vision.  Nine years ago I bought into a vision with three 27-year old guys and I saw the value of it, we just didn't have a monitoring value. So I saw a value then and then in 2008, when we did the transaction, the first transaction, Ryan, Nick & Blake made a promise that you stay with us, you stay with us, we're gonna 15x this company and all of you will make millions of dollars from the equity alone. Now what's been great about where we're at today is that we didn't do 15x. We did much greater than 15x so that means we made a lot more money. And also we've been able to establish a company that is valuable. We have a track record. So unlike what we had nine years ago, we now have a track record. It's proven. So like when any other company that you think you're gonna potentially invest in or put time in, you know, you hope that it's going to achieve something. We've done it. We've got a 10-year track record and I keep telling people this on a daily basis: what we did in the last ten years as a company, we'll do more in the next five years than we did in the previous ten combined.* That's my belief because we know exactly who we were; we know exactly where we're going; and we've got the platform to do that. We knew exactly where we were going before; we just didn't have the platform. We were just trying to figure it out and we've been able to do that. My wife and I are obviously able to travel the world [inaudible], I tell them Deb, we were able to purchase property, write a check, you know, hundreds of thousands of dollars check for just the property, we've given hundreds of thousands of dollars to charity. So to be able to do the dreams and not bat an eye about writing a big check all because we saw a vision, we chose action, and I'm challenging you

who is listening tonight to choose the action. Those of you that can get the regional director and above get to Detroit on January 8, 9, 10 or 9th and 11th, one of those days, get to Detroit. But this is real and as Nick just said, we're giving you free money. All you have to do is choose action. There's going to be people say it might be something, it probably isn't, I heard all that. I heard thousands and thousands and thousands of people tell me that before we actually did the transaction. And every one of them now are saying, I wish I had stayed, I wish I had never left and now I'm coming back. So I challenge you to go to work. I'm excited more than ever, more than ever, and I think you Ryan, I thank you Nick, I thank you Blake for seeing the visions and leading the vision, and now giving that opportunity [inaudible]….

[34:32]

[**A. Sarnicola**]  *I just want to say wow to those living legends we got to hear from tonight. It's just a handful by the way guys, a small handful of the people who literally you know, overnight became you know, millionaires and multi-millionaires because of a simple decision they made years ago. I want to point out to everybody on the line that most people in life you know, who get a chance to become equity owners in a company, guys they're already wealthy! They're just spreading their money out, they're investing in companies, and they're betting on the right guys. You have a chance to become an equity owner tonight with a company that's already massively successful. Not some start-up that may be, will day, one day, do something – a company that has proven right now to be one of the best product in weight loss companies in the world, right before the peak season of weight loss.* And guys, I don't know about you but you know, I've been, like Nick said, around seven years and there is nobody on earth I would ever rather have ride a piece of that equity with and with the three men that leading this company. There are no founders not in this industry, not in business period, that I'd rather have a global business with. I can tell you guys right now that we all have a chance. This is it. *It begins TONIGHT.* You have a shot to make a decision and have every single day, the value you put on every single day now, if you go out there and help other people. We also say that every dollar we earn is directly correlated to someone else's life that we're impacting in a positive way. *Well you're about to multiply that by the millionaires. I'm talking about legacy money guys and*

61

*leaving this world knowing that you made your millionaires by going out there and helping people have a better life.   That's a pretty amazing thing!* I'm so excited to be a part of this with you guys. I can't wait to see what the next year or so has in store for all of us. Nick, back to you.

 (emphasis added)


99.    In January, 2015, Defendants conducted and then published a so-called "Vision Call" about the Plan. In this scripted call, the three Founders and Defendant Reynolds discuss earning equity in ViSalus.  The Vision Call was a pre-scheduled telephone and video conference between the Founders and a number of high-ranking promoters. The call was recorded and a video containing edited parts of the call was produced and disseminated. In the video certain Defendants state the following:

[4:30-6:37]

[**Blair**] I'm very excited about that and I'm most excited though about the equity component that we also rolled out this week and this weekend … *We're issuing 3% of those people who are national director and above this year.* It's a program where you [inaudible] by doing so but you also earn points by helping people achieve that rank by retaining those ranks and beyond. *Blake's gonna go over those details and in 2016, that's 3% in 2016, that's another 3%.* Myself, Nick & Blake [inaudible] 6% of the equity of our company. To people in this field who wanna go hand in hand and work full time with us and build this business alongside of us. To us, it's a very meaningful thing. *For those of you not familiar, we just reacquired the company in a transaction with Blyth, the people that we've been working with for many years, and we did that just in September.* … With that said, I thank you guys very much for joining me. I hope every one of you is taking courageous action this year and you're relentless this year.

I'm gonna turn it back over to Blake to go over the details of both the Neon product and the equity product. Blake, back over to you sir…

[11:07]

[**Mallen**] … *Everybody on this call you gotta be running to that national director rank so you get into that very, very first pool.* Also last week we covered how you earn shares every month by [inaudible]. *We're 11-12 days in. The clock is ticking.* You can earn shares [inaudible], you helping people enroll in your team [inaudible] and maintain this rank. … For those of you guys that are not a national director on the line, the first thing you should be focused on is achieving national director this month, next month, right before it peaks, *you'll earn 20 shares of those* [inaudible] points. [inaudible] 70 and so on, [inaudible] reproduction [inaudible] others will do the same and [inaudible] shares are the ones that you can earn monthly for every single month that you maintain those ranks. Right?

Real quick I wanna bring on a fellow who is very excited about the equity and someone who knows first hand how this [inaudible] impact all of your bank accounts, all your lifestyle. He was around when [inaudible] GJ Reynolds. GJ are you on the line with me my man?

[**Reynolds**] Yes I am Blake and thanks for having me. *Equity has definitely had a major impact in my life, my family's life, and when I first joined in Vi in 2006, I came in the equity program had already launched. And I only had 8 months to earn equity and I understood the power of equity and hoped that the equity would be worth something and I trusted you, I trusted Nick, and I trusted Ryan, and all 3 of you said, trust us, stay with us, stay the course, your shares will be worth millions and fast forward a few years later, [inaudible] I saw people getting checks for $1,000, I saw my upline get $250,000, [inaudible] national director [inaudible] they got $250,000. I saw in my upline earn in excess of $4.5 million. It's real and it's what we have [inaudible], I've been able to pay cash for properties, I've been able to have [inaudible]. It's definitely been something that one dreams about, [inaudible] is that the plan now is to [inaudible] over and over, year after years. So all you have to do is get to national director and do it as fast as possible and I'll tell ya this: Vi is here. Vi will grow. This is big big. This is legacy opportunity. Legacy, Legacy,*

*Legacy. I wanna say that no matter when you hit that national director and above, [inaudible] value. I'm honored to be part of this company* and thanks for having me.

[16:15-18:00]

[**Sarnicola**] … I want to make one comment on equity. *I would not sleep on this one guys. I would not sleep. It is real. $30 million a couple hundred million to a couple hundred people split it up because we require the one-time payment. What about or how about getting paid year after year after year after year, getting a dividend every single time myself, Blake and Ryan take a dividend, a shareholder to [inaudible] we will be paying you as our partner for life.* We forego and we passed up on $104 million because we want to go bigger, we think we can take this further, we think we [inaudible] we've ever seen and when we do that, you and your family will be very well taken care of for your support and participation. Keep in mind if you wanna pay your bills, make a weekly check. [inaudible] if you want a nice residual, go get a [inaudible] you're an ambassador and your [inaudible] check for [inaudible]. *If you wanna increase the wealth for decades to come, get as much equity as you can, but build the company up and then let's start issuing dividends to every single one of you shareholders for the rest of your lives.*

(emphasis added).


100.   In another early 2015 video produced by ViSalus, called "Vi CEO Ryan Blair's Vision to 2020 with the Equity Plan," (it is believed that this is the video referred to by Rathling above) Defendant Blair says the following:

We are the greatest company in the history of network marketing because we put all the value into the company that we possibly could where other companies will find ways to take it out. *Because we bought equity in ownership, we just, to be a promotor-owned company is a powerful thing. So I believe 2015 is our year. Our year of greatest. And if we do what we need to do this year, 5 years ago,*

*when we had 16,000 new national directors around the world, we're in 50+ countries…*

*And we're doing $6.8 billion a year in sales, we've paid out roughly 20% of that … by the year 2020 we'll have a diversified product portfolio, because we're [inaudible] company [inaudible] will have 50 some odd countries open to do business, 16,000 national directors and above that, think about the culture when everywhere around the world rally groups together like this to talk about the changes that we wanna make every year. ….* Think about when you call up customer service and they [inaudible] and we're doing a shareholders meeting. That you're a part of. I want you guys to think about that because you're gonna qualify [inaudible] and we're gonna continue walking through what we've done in the past. *We're gonna give you the exact plan, the exact strategy, [inaudible] new perspectives, new concepts, new directions to our business model. We're gonna continue doing this and we're gonna continue working the way we have executing [inaudible]… myself, Nick & Black as the executive team, we plan to do that forever. …*

So my vision for 2020 … imagine in 2020 we're on the cusp of being a 15 year old company on the cusp of being [inaudible] and imagine you being you being proud to be a part of that. Imagine being able to bring your kids, your grandkids, your friends, your family, to events that have 15,000-16,000 people, countries from Mexico to Asia to [inaudible]. Imagine when you're [inaudible] the work you give will pay to you and their families for the rest of your lives. Imagine. I want you to keep thinking about that. I want you to write a goal. 2015 how are you going to change? How are you show [inaudible]. How many national directors are you going to personally sponsor to be/get to equity, founding shareholder level?  How many people in your team are you gonna go and run up to national director or get re-qualified so they don't miss out on this.

*Because I promise you this weekend today, so forth, what we have in store for you, this is the biggest thing we've ever rolled out in the history of the company. We've never put more value on the table that we have today in 2015. Ever. The first equity program that they signed up on our company was only worth $1 million bucks, if that. Right? So giving 6% of a $1Million bucks is what?*

65

> *[**Audience member**] $60,000.*
>
> *[**Blair**] And that wasn't even 6%. Right now this company, you've gotta put your money, is worth $10 Million dollars to be had. And the equity and your participation is only gonna be available to a few people. They'll be 1,500-3,000 people, mark my words, that are dividing up 3-6% of this company. That's it. Double this room. Triple this room. There you have it. Will it be you? How much of it will you get because you deserve it. You know how to too. That's the thing I wanna try to help you guys with. The beauty of this is, I'm not sitting in front of a room telling you to do something you've got no idea how to do. I'm just telling you to do what you know how to do with what you've already done and get back to work!*

(emphasis added)

101.    Defendants distributed another video featuring former promoters in

January, 2015:

> *Nine years ago when we got recruited into ViSalus is because of the equity piece.  We had no idea what it meant.  Are there still some people out there that really don't get it yet?  This is what I can tell you.  It doesn't matter if you understand it or not.  It matters if you take action.*  We wanted to make some money anyways; we wanted to get out of our jobs.  I wanted to be a stay at home mom.  I knew what my why was.  Our health changed.  *We decided like hey, since equity's on the line let's go ahead and go and try to get us some.  We don't know what it means.  We went out there, we hit the rank of national director and what I can tell you is that when we got that last check, you know, in the mail I remember opening up the envelope.  I'm shaking as I'm telling this right now you guys because I had no idea what was in that envelope.  You have no idea what's going to be in that first check that you get; that first dividend check, right?  You have no idea but I can guarantee you that it's going to be worth it because when I opened up that envelope tears filled up in my eyes as I fell to the floor on – in my office I fell to the floor and looked at it and I went praise God because two hundred and fifty thousand dollars*

*was able to completely free us.* We were making a lot of money in the comp plan already, you guys. The comp plan will make you money, right? It's made us money, right? You guys, but this is going to create that legacy for your children. My why has completely changed now. I'm starting all over again from scratch just like I'm that brand new director running to national director. I'm going to take as many people as I can with me. Who's going with me*? Who's going to get that equity check? You guys, the dream home that we are living in right now in San Diego, that equity check was our down payment on that house. Who wants your dream home? Who wants your dream car? You guys, this is it, this is the company. Go out and get as much equity as you can.*

[**N. SARNICOLA**] *You know right now there is a battle going on right now. There's a battle going on between this, this head and this heart. See your head's going is it really for real; can I really do it? What if I don't get any; should I even try? That's what your head's doing. I want your head just to be quiet, just give me five minutes, head, because I want to talk to your heart because here's what your heart is saying right now. Your heart's saying damn it, I deserve it! Your heart is saying damn it, I want it for my kids, for my family, for my grandkids, for my charity. Damn it I deserve it! That's what your heart is saying. You are a hero. You've worked your ass off. You have survived. You've made it this far. Do not listen to this anymore, not for this because if you follow your heart – you guys got dreams?*

[**CROWD**] Yes

[**N. SARNICOLA**] Big dreams?

[**CROWD**] Yes.

[**N. SARNICOLA**] You better start dreaming bigger because your heart wants big things to happen to you. Your head will shrink those dreams if you listen to it. Will you listen to your heart?

[**CROWD**] Yes.

[**N. SARNICOLA**] *Will you listen to your gut, that instinct and if you do and when you truly do, you guys, legacy income, that life you*

> *dream about, that life you pray about, that life you're manifesting, it will happen.  We've got six hundred and twenty-nine days to listen to your heart. Damn it, you deserve it!*

(emphasis added)


102. The Defendants also contemporaneously disseminated the "news" about the equity offer in a press release. This release stated that they had "spent" $143 million in buying the equity from Blyth.


103.  Many other videos relating to the offering were rolled out over the next several months. While it is believed that the following video was posted on its site earlier, on July 27, 2015, ViSalus in its YouTube channel, posted a video in which promoters discussed their ownership of equity under the program:



104.   As the offer of the Plan was disseminated, promoters produced their own videos to post on the Web. ViSalus and the other Defendants were aware of these videos but did not pull them down—a simple process when a video that alleges or contains something claimed to infringe is posted on YouTube. One such example is an August 24, 2015 video in which a high-ranking promoter named Sam Rathling, posted a series of shockingly false and misleading statements on her YouTube channel, called "March to Equity (M2E) Webinar – How to Earn Equity in Vi."

69



105.   In the video, which is still up today, Rathling explains step-by-step how to earn equity and the projected payouts for the "families sharing the dividends every year" on top of their commissions. She recorded herself and another promoter named Nina Zuckerman to say as follows:

[12:08 – 29:33]

So why are we here today? We're talking about March to Equity. You can go check out equity.vi.com if you want to learn more about this founder's equity incentive plan. And, March to Equity is really an incredible crusade. *This is the 3 founders literally giving 6% of their company away to people like you and me, for us to be able to earn significant legacy income that we can hand down to our kids generation to generation. This March to Equity represents something*

*that is not available in any other company of its kind in this industry. There is no one else out there offering a piece of the company. You know, I qualified for my equity, I have my equity certificate, I am officially a shareholder, I am officially an owner of this company and it feels amazing to know that I'm really an owner of this business. I'm proud to partner with the three founders. I'm proud to partner with all of the other people so far that have qualified to become shareholders* because now I don't think like an independent promoter, I think like an owner. And I am the CEO of my own business but at the same time, I'm a shareholder and get to directly impact what happens in the company going forward. *It's an absolutely incredible feeling to know that I have this equity locked in for the rest of my life. We have 265 people so far, 265 families already qualify for equity but in the next 18 months, so between now and the end of 2016, we're looking for another 1,700 families that want to qualify for a piece of equity. ….*

[**Zuckerman**] Thank you Sam. So go ahead and share your story and what happened when you came across Vi. …. *I became a shareholder in the company in 45 days. …*

[**Rathling**] Great, thanks Nina I'll be coming back to you in just a second with a few other points.  It's been incredible to see Nina …

*So I wanted to see what founders' equity incentive looked like, well at 6% of the company, divided into two years. So we're already half way through 2015 at the time of this webinar. So 3% of the company will given away this year, and 3% will be started again, will start in 2016 for a whole 'nother 12 months.  So how do you earn equity? Well quite simple.* You become a national director with Vi and you start earning equity in the equity pools here and you earn points on a monthly basis to go towards equity depending on your rank, depending on how many other people you help in your team. So it's based on a couple of things: number one, your own personal production, your own personal growth through the ranks in the company and your own career development that's how you earn equity one way, but the other way that you earn it is by helping other people in your team. So myself and my husband's goal is to help at least another 20 people become national directors with us in the next 18 months. My goal is also to create some ambassadors, Nina will be

one of them, and help as many people in the team as possible to achieve their goals. Because this business is all about helping others which is why I love it so much. I'm really passionate about seeing other people achieve their goals and achieve their dreams.

*So as a company where have we come from? Well in wave one, which was 2005-2009, we were a tiny little company. We were doing pretty well. We were up to $50-60 million done in that four years. As a company, that was the first time that Vi ever gave away equity and if you're interested I have a little video I could send to you with some of the equity holders through the very first wave but there were multiple multiple millionaires created when we last had an equity incentive like this.* Many of them still are still in the company and some of them would say welcome to the sunset, but you know *there are many many people who benefitted from the previous equity that we gave away during wave one. Five years ago in 2010 we actually created the challenge and that's when it absolutely exploded. You can see there in wave 2 we did $1.65 billion just in those four years all when we launched the challenge. So who knows what the next wave is gonna look like but I can tell you this: you are not gonna want to miss wave 3. What we've already done and what we've already achieved I know that these three founders, their goal is to be the biggest company in the network marketing industry.* They want one day to be as big as Amway and they're all in their mid-30's and they are committed for the rest of their lives to build this business to become the #1 company not just in the health [inaudible] but in the world in direct selling and network marketing. So you do not want to miss wave 3. I am so excited about the future holds for this company. The fact that I have equity and ownership in that is absolutely fantastic. *So here's the projections for what we're looking to do as a company over the next five years, and this is what growth we are looking to put on projected between now and 2020. So the fact that you've got a company that's within 5 years looking to be growing by another $6.8 billion and the fact that you could own a piece of that, that is absolutely mind blowing to me. So what we're looking to do is this year put an extra 500 national directors into the business, then following into that double that to another 1,000, as you can see it's a double the number of national directors we have in the company over the next 5 years until 2020. So imagine having 6%, share that with 2,000 families just 2,000 families sharing the*

*dividends every year, you getting a paycheck every single year on top of your commissions, because you earn a piece of equity in this company.*  So how do you qualify for equity? This is the game plan. So you've already seen the overview videos so if you have not seen those yet, you need to go watch those for this to make sense, which is overview.vi.com and this is the game plan for earning equity. …

*So if you were to come here today and become a promoter with us and they go get your BMW in a short space of time, you could be on track to be an ambassador with us and earn significant shares in the company. These are class A shares that you cannot buy. They are not available on the stock market. These are class A shares that you can earn and hand out generational to generation.*  Give them to whomever you choose to do so.  So my message today is you know, join the movement. Help us to transform people on all levels of life, health and prosperity.  These are the three pillars of everything that we do. We change people's lives you've heard that from Nina. We've changed people's health. You've seen my story. Nina's transformation. And the 6,000 other people I've helped, plus the 3 million people that we've helped all over the world. *And we also change people's prosperity. We put them on a path to better wealth, to legacy income, this March to Equity is gonna give people an opportunity to really transform their lives. The ripple effect of this March to Equity is that we're going to effectively do what we've already done all over again. The ripple effect will be that we'll transform another three million people's lives. We will put another 20,000 people in BMW. We will create a 1,000 six figure a year earners. You just have to decide if one of them is you.  And we will create another 50-100 millionaires in the next number of years through this equity program. Again, you just have to decide if it's you. If you wanna take action, if you wanna change your life, if you wanna get out what financial situation you're in right now, and achieve your goals and dreams, then we have the vehicle to do that...*

(emphasis added)

106.   Defendant Blair promoted the offering in a March, 2015 ViSalus meeting before hundreds of distributor attendees in Grand Rapids, Michigan. His speech was recorded and disseminated. Blair told the attendees the following:

[00:19-58]

We're going to have a great company that we get to leave to our heirs and if one day your children and your grandchildren and your grandchildren's grandchildren, like the ones that created this very building we're in, will probably say my mom and dad were shareholders in ViSalus and that's why we're able to do but that's why, you know, my child is able to get the education that he needs and your children are able to or their children or the community because we are owners of this great company.

*So my challenge to each and every single one of you is go after that equity like you've never gone after anything you've gone after anything in your life. I gave that same message to the first shareholders of ViSalus when we closed the pool and there's a lot of individuals that are now multi-millionaires as a result of taking action.* I hope that every single one of you in here my words  and take that level of action and just go out there with intensity….

[02:48-3:50]

 *I would look at it with a level of urgency, a level of intensity as though this year is done all of your goals, everything are going to be handled by who you have in the room and then by the work that you do to get people to NST [National Success Training] in Fort Lauderdale and everything, it's done.*  … So take this seriously.  *I guarantee you the people with the passion in January and February are the people that are going to yield or receive the most of the three percent equity that we [unintelligible].* We'll beat them.  It's easy; guys, this is going to be easy for you.  If you take it seriously and you say I will not take any vacations.  I will not – I will restrain myself or, you know, resist actions that don't support by ViSalus business and I'm not going to do anything but build my ViSalus business during this period of time. I will restrain myself from thoughts that are not conducive to my

ViSalus business like, you know the thought of pizza with ranch dressing. …Imagine all this all around the world your brothers and your sisters and the people that are focusing on building ViSalus, creating value and use it to receive a piece of that in the form of ownership of this company just like I have and?

[06:04-6:42]

And I'll end with this, guys. The reason why I'm so passionate about this alone – alone.  Get up at five a.m. and have the – it's not easy getting into Grand Rapids and so forth but I'm going to on the subject because this is the way my family gets paid.  I don't – I'm not going to be out buying, I'm not in the downline, I don't – I don't – I make a nominal salary.  I mean I'm talking far less than any of our leaders are making.   *My family gets paid based on our company being a profitable, successful company.  That's – that's my family's and I so much believe in that that I gave thirty-four million of my family's wealth, which is the vast majority of it, in order to be able to build equity value with all of our families together indefinitely, right.  So that's how serious I am about this; that I'd be willing to take my family's net worth and put it into a thing called equity because I believe in what we're doing, you know.*

(emphasis added)

107.    Defendant N. Sarnicola promoted the offering in a January, 2015 speech at a ViSalus training conference. His speech was recorded and disseminated. He said the following:

*I just took thirty-four million dollars out of [his daughter's] piggy bank.  I took thirty-four million dollars out of her piggy bank to buy back controlling interest of this company, my piece.  Blake took thirty-four million out of his future kid's piggy bank.  Ryan took thirty-four million out of his son's piggy bank and then we took six percent of that to put it into your piggy bank; put it in your kids' piggy bank.  See it's easy for us on conference calls or see slides, you guys see these slides and hear these calls, equity, equity, equity; I need you to get the*

*visual. Thirty-four million dollars just came out of this little girl's piggy bank and that big girl's piggy bank to buy back the equity that we then turned around to say go get some and put it in your kids' piggy bank but it doesn't stop there. It doesn't have to stop there. It won't stop there because your kids are going to put it in their kids' piggy bank and I don't care – I don't care if it's two thousand dollars a year. I don't care if you qualify once and you get a two thousand dollar equity check, that's still showing up thirty-five years from now, forty years from now, forty-five years from now and your grandkids get a two thousand dollar a year check that they pay for their college with. Would that be okay with every single one of you guys; would you be all right that?*

Would you like to own a piece? Let's talk about some of the companies in this industry. Would you like to own a piece of Herbalife? Who would like to have owned a piece of that six percent? I would have. If you didn't raise your hand you should check it out. They own – they have a six billion dollar company. How many guys would like for your family to own a piece of Amway, anybody? Man, do you guys know our goal is to be bigger than them; that's our goal. Not in spite of them but because they're number one and we like number one. We like lots of ones; we like one, one, one, one, one. I think you guys learned Friday that we really like some ones.

I always said in my dream circle, you know your dream circle, when I was eighteen years old I said I'm going to build a hotel on the other side of the river of the Amway Grand Plaza so I can block their sunset every night; that's my goal. When I was nineteen I met that goal. I don't have that goal anymore but guys that's – I want to beat them. Do you know how much in dividends they pay out a year? A billion every year, a billion dollars of dividends every year. A billion, you know what a billion is? A billion is a thousand millions.

 …

*When we beat them – when we beat then ten, twenty years from now; twenty years, ten years, five years, whatever, when we beat them and a billion dollars a year is being paid out sixty million of it every year will be split up between whoever decides to put one of those hats on. Sixty million boom, boom, boom, that's a lot of millions.* That's not counting your commissions because as you learned you can make a lot in commissions.

*That's what's available. You want a math equation? That's a math equation. We go be number one, let's pay out a billion a year, let's give you sixty million a year to play with for sixty years. That's what's available if you own it. Who's going to own it?*

*Check out these slides.* We're a company of before and afters. We will be the company that has more before and afters than any other company in history. Who believes that? Who believes like more before and afters? I believe it. We're a company of before and afters. More transformations; you guys want to see a transformation? This is ViSalus' ten year decade, this is our birthday. You want to see the transformation say I do.

[**CROWD**] I do.

[**N. SARNICOLA**] Do you want to see the transformation? Say I do.

[**CROW**D] I do.

*Check out these slides. Do you want own a piece?* Ten years ago you would have owned a piece of this, those three knuckleheads. Guys, can I – can I get you guys out of the way right here? I can't see the slides. These are the three knuckleheads that you would have owned a piece of ten years ago. Remember those people with the tan hats, they believed in these three juggle heads. You see how Blake is the first person in the front and then we cut him and then we move him up so he looks older and taller, that's what we do. That's a true story. Look, I'll show you the after. Blake's not so tall, is he? Look at that. Right here he's almost as tall as Ryan. Right there before, that's ten years ago. That's that you were buying ten years ago. *Ten years later this is what you're buying now. Who wants to own a piece of that with us?*

. . .

*Are you ready for – are you guys – are you guys ready for some serious, serious wealth, success, financial freedom? Come join ViSalus. That was not to one person; that was to the whole company. That was the entire commission run. As an entire company, me, Blake and Ryan could only generate thirty-one thousand dollars in sales in our first month of business. That's it, the three of us combined. Many*

77

*of you have done thirty-one thousand in your first month.  You're bigger than we were ten years ago. The original equity owners, they bought into that.  We've already paid out a billion now.  Can you buy into that?  How many of you guys want to own a piece of the company that's paying out a billion dollars in commission?*

> . . .

*Wave three; don't be a part of it, own it, lead it, live it.  Own it, lead it, live it.  Own wave three, lead it.  Be on this stage telling a story ten years from now.  Heck, be on an island; send us a video telling a story about how you gained a six figure a year equity check sent to your house like clockwork because ten years ago you decided to take massive action.* For twenty-one straight months you didn't buy anyone else's story. You didn't buy anyone else's excuses.  You didn't buy anyone else's crap. You didn't buy anyone else standing in your way. You didn't care. You owned it. For twenty-one straight months you walked out of here and you what? Owned. You what? You owned it.

(emphasis added)

108.  In another promotion made to ViSalus distributors, Defendant N. Sarnicola emphasized how fast the equity must be grabbed:

[2:00-3:50]

*We're here to talk about you getting the equity. That story is absolutely critical in helping you guys achieve equity. The faster we get that done, qualifying you to get a car the faster we can replicate it, the faster you got equity. So we started you from scratch right now and we're going to run into the fifteen hundred to two thousand dollars a month. We're going to put that BMW in your driveway, put a big dent in the grocery bill. How many days from right now do you want to have it done?  How many days from right now do you want to be BMW qualified?* We got people that are taking three years to do it; we got people that are taking three weeks to do it; we got people that are taking three days to do this. *Turn to the person next to you and let them know the amount of days or months go, go, go.*

(emphasis added)

109.   In a national event in April, 2015 in Ft. Lauderdale, Florida, Defendant N. Sarnicola promoted the offering to hundreds or thousands distributors and potential distributors. His speech was recorded and disseminated on the web. He said:

> Gang, remember *it's generational wealth*.  You just, you know, sat here and you listened to stories from the past of people who made a decision, who went out and put theirself [sic] in a position to create wealth.  *Everybody in this room has an opportunity to do the same thing.  Over the next nineteen months time is going to pass, yes, say yes.*

> [**CROWD**]  Yes.

> What we decide to do over the nineteen months is going to be making the decision for you of what your story's going to be ten years from now.  *Ten years from now you're all going to have a story. Your story is either going to be I was in Fort Lauderdale, I got it, I went out, I took action and today my life will never be the same.  I've created generational wealth within my family or your story's going to be I was there, I had the shot, I wished I would have, I sure should have and all you'll have is a mess on your hands, yes?* I don't care how much go or how much pro, now much Neon, how many shakes you drink. I don't care if you take it topically, through the IV or snort it, makes no different.  At some point in life you're all going to croak, true story?

> [**CROWD**]  Yes.

> And you're all going to leave someone behind.  There's going to be children, grandchildren, spouses.  *This is your shot; this is your opportunity to go secure your future.  Don't miss your shot.*

(emphasis added)

    110.   In another speech in 2015 to distributors and prospective distributors that was recorded, and later disseminated and available on the web, Defendant N. Sarnicola said:

> October last year myself, Nick and Ryan, *we spent a hundred and five million dollars between the three of us to buy back controlling interest of ViSalus; thirty-five million dollars each that we spent to buy the controlling interest back.* Now when we did this there was one thing and one thing only – one thing and one thing only that we purchased; one thing and one thing only.  Any guesses?
>
> [**CROWD**]  Equity.
>
> Equity, that's it. Like there was no box of chocolates. There wasn't a, you know, a new car, there wasn't a house, it was just equity, a piece of paper. It was a piece of paper and *I personally spent my family's legacy; thirty-five million dollars and buying them a trunk of cash, a trunk of it not a briefcase of it. A trunk of thirty-five million dollars for each of you right there's a trunk of thirty-five million dollars for each of you right now.  What's your next move?  Hey, you can live without it or you can grab it* ?
>
> Well we didn't run. *We took the thirty-five million and we bought a piece of paper each thirty-five million. We took a hundred and five million dollars and bought a piece of paper. That's how valuable the piece of paper is.* That's how important equity is that we were given all back.

(emphasis added)

111.   In another promotion of the offering made to numerous distributors and prospective distributors that was recorded in January bit believed to have been disseminated over much of 2015, titled "M2E Game Plan," Sarnicola said as follows:

Hey everybody, what's happening; this is Nick Sarnicola. I'm the co-founder of Vi and I just got off the phone with some of my leaders and they asked me to shoot a video and it's impromptu.  Not a script, just talking to my laptop here real quick.

Obviously there's a lot of buzz happening the world of Vi because of a lot of recent announcements and I just want to be here to shed some light on them and recap them, et cetera, and just diving right in it's pretty simple. *Ninety days ago my partners and I led a controlling interest buy-back of the company and what that means is we spent a hundred and four million between the three of us, myself, Blake and Ryan to buy back controlling interest from Blythe.  They're still our partners, they are still our partners. We just now just had an interest shift so that we are now in control....* The fourth thing that we're going to do is we're going to – we've already launched an equity pool that goes live in January. This is real money, this is real equity. *This is something that we did in 2005/2006 and three hundred or so people split up thirty million dollars.  The top people made four or five, six, seven million dollar payouts each when we were purchased by Blyth.* This time around we don't have an intention to sell the company. This will be a family owned company for decades to come and myself, Blake and Ryan's.  I'm sitting in Grand Rapids; I'm staring out over the city that is owned by Amway, and, you know I can share with you guys we want to own Vi for decades and decades.  We want to pass it down to our children.

*More importantly we set aside six percent of the company and it's for you.  It's for the leaders, it's for the promoters, it's for someone that wants to get paid when we get paid* and there's no company of our size, of our magnitude that's had the success that we've had that's willing to set aside a chunk of the equity, six percent of it, to share with the leaders. *We will be a promoter owned company and I'm not talking about making people a millionaire. We've already created fifty-two millionaires in the last five years.* I don't know what other

direct selling company can step up right now and say they made fifty-two millionaires and the last five years *we did but we will create million a years.* A millionaire and million a years, very different. *I want to be paying dividends that are seven figure dividends to our top money earners and why don't you come find out how you can be one. Why don't you become one of them and why don't you own a piece of this company. One point eight billion dollars of sales the last few years; what would it have been like had you owned a piece of that and you were getting a dividend out of it let alone the commissions that you can earn in this company.*

(emphasis added)


112.   Similar to promoter Rathling, in a July 28, 2015 video a promoter named Johnna Parr recorded and the video never pulled down:

Well, the word's out.  So many people are asking, you know, what is … what's this march to equity that we're seeing all over social media; we call it M2E.

                  .   .   .

We are looking for people that want to make money while making a difference.  We're looking for people that maybe spare time, part time want to challenge other people to lose weight, get fit and help a child in need and if that's you we need to talk because there's something very, very significant happening right now in this very moment.  That's what March to Equity is. *March to Equity is we are going to help two thousand families earn equity in Vi.  Vi is a two billion dollar company that's rapidly expanding around the globe.*  We're already in fourteen countries.  We're expected to be in fifty countries in five years.  So the question is what would equity in that mean to you and your family.  Well I already know what it means to our family; it means generational wealth. It's wealth for my daughters, their daughters, their children, their children and their children's children. *This is legacy income for those two thousand families that want to earn equity in Vi.*

4:17-cv-12626-MFL-DRG   Doc # 1   Filed 08/10/17   Pg 83 of 174   Pg ID 83

But the ripple effect of us helping these two thousand families earn equity is astounding, it's extraordinary. By us accomplishing this by the end of December 2016 we will have helped three million more people have transformations. We will have donated five million more meals to children in need. We will have created over twenty thousand more BMW qualifiers and at that level they're making an extra eighteen hundred bucks a month, they've got a car payment, a house payment and they're getting a big dent in their groceries. Would you like to be a part of that?

We're also going to be helping a thousand more people earn six figure earners and one hundred more people become millionaires over the next eighteen months. That's the ripple effect of what's going to happen over the next eighteen months with this March to Equity.

I can tell you this; for every opportunity of a lifetime there is a lifetime to that opportunity and we're getting busy really, really fast. … *Do you want to be a part of our March to Equity and change your family's legacy forever; awesome. Get with us ASAP.*

(emphasis added). Parr's video has been up for over two years and has never been taken down, although it is readily findable.

113.    In a training and promotional event in January, 2016, the "ViSalus Compensation Plan Enhancements Leadership Launch 2016, Detroit, Michigan," in front of several hundred distributors including some of the named Plaintiffs, Defendant N. Sarnicola said and was recorded saying the following:

[12:07-12:24]

*So here's what we decided to do. We decided to take national director and drop it down to twenty-five thousand in volume. Whoa, whoa, whoa. Before you get too excited I never said that equity was going to start there.*

83

*Okay, equity now starts there too. If you just based by last month's – you know where you were last month, November. If you just qualified for equity on the new national director come to stage real quick. No RDs that earned twenty-five thousand last month? There's no RDs in the room that earned twenty-five thousand last month? Okay. There's one. Come on up here, let's recognize you. A brand new shareholder; let's give it up for him right now. I don't know who he's pulling from but we've got to – Ernest is telling me to get my own hat you guys.*

*Real quick, sixty seconds, how you guys feeling? Brand new shows, name where you're from and how you guys feel?*

*[UNIDENTIFIED] We are from Denver, Colorado and we're Vincent Owens. I feel good; I feel good right now. Thank you. We were praying; we were praying about this and so I'm happy right now.*

*[LEAH WARE]    And I'm Leah Ware from Denver, Colorado our whole life and I'm so excited I'm jacked out of my mind. Like we said we've been praying on this and this is God's answer and all I can do is say thank you, thank you, thank you.*

(emphasis added)

114.   With his permission and cooperation, Defendant Owens was a frequent example of a prior promoter who got rich by getting in on the earlier equity offer. In January 2016, he recorded a video available on video aggregator WN.com and YouTube titled: "Original Vi Equity Shareholder Earns $600,000! Want to Build Equity for yourself?"

84



Original VI Equity Shareholder earns $600,000! Want to build Equity for yourself?

published: 04 Jan 2016      views: 172                                      Report rights infringement

Original VI Shareholder Vince Adams shares his equity story with VI! Co-founder & Global Ambassador Nick Sarnicola is interviewing! Now YOU can Earn Equity with ViSalus through 2016. Contact me at www.liveproject10.com or call Matthew Jamieson at 1-506-850-3219

115.   In the video N. Sarnicola and Owens state the following:

[**Sarnicola**] Vince and I have known each other for 17 years. We were in the company that Blake and I were a part of. We met when I was 19 years old. He joined ViSalus, how long ago?  10 years ago. A decade! Yes. You've been here for a cool decade! Yes sir. And Vince actually was one of the original equity – look at that guy! That guy said No 10 years ago.  He said No 10 years ago.  I'm back!  I've known him for 18 years!  17 years! That guy said No 10 years ago, but this guy said YES.  He said YES!  10 years ago.  What happened, what did you get 10 years ago in return for saying yes and building a business, and hitting a certain rank?

[**Owens**] Well, I got my mind blown for one and then the second thing that I got was over $600,000 in equity with ViSalus, so I admonished all you guys, man, right now, *this equity that's on the table right now. Run for it like a man with your hair on fire. Don't get any sleep. It's time to go get this equity!*

[**Sarnicola**] So for those of you guys that couldn't hear that, or were stunned in disbelief, Vince was a part of the original ViSalus. He got

some equity and that equity turned into how much again?  $600,000!
What did you do with that?

[**Owens**] Man, I paid off my church, man, we burnt our mortgage at
the house, man, we were able to put some stuff away for our
grandkids and children so I mean, it was just incredible man, it
changed my whole life. Changed everything….

So I have no idea what this next equity's gonna be *but I can
guarantee you this, guys, I can guarantee you that if you don't
become one of these 2000 families you're doing yourself a disservice
and you're doing your family a disservice for generation. …* Man, I
don't know, my dad was a pastor and so you know, I understood what
it was like to try to pay mortgages and you know, have to depend on
other people to give their tithes and offerings, and that kind of thing,
so, to be able to do that and be able to talk to people freely about the
gospel, is, I mean, it just made all the difference in the world, brother.
*Thank god for you all man, and the opportunity. I'm forever indebted.
I'm in Vi for life. You gonna get equity the second time?  You better
believe that… 2000 families March to Equity! Get a piece!  Get your
piece!*

(emphasis added).

116.  On YouTube alone, videos about the M2E and the Plan have the
following number of views:

| Video Name | Location (site) | Uploader, Upload Date | View Count 7/28/17 | Speaker(s) |
|---|---|---|---|---|
| Videoplayback.mp4<br><br>(Nick Sarnicola Explains The Future for Vi for 2015) | YouTube | Nick Sarnicola, | 13,707 | N. Sarnicola |
| ViSalus Equity Incentive Plan Announcement Webinar 12-8-14 | YouTube | Matthew Jamieson, | 687 | N. Sarnicola, R. Blair, B. Mallen, A. Sarnicola |

86

| March to Equity (M2E) Webinar - How to earn Equity in Vi | YouTube | Sam Rathling | 7,646 | S. Rathling |
|---|---|---|---|---|
| ViSalus Compensation Plan Enhancements Leadership Launch 2016 | YouTube | Matthew Jamieson | 786 | N. Sarnicola |
| Nick Sarnicola explains Visalus Equity | YouTube | Challenge Pro Trainer Network | 207 | N. Sarnicola |
| M2E Game Plan | YouTube | ViSalus | 1,152 | N. Sarnicola |

**2.    Luring Denver Church Group Plaintiffs Into Believing They Had Purchased "Equity" When They Signed Up As Distributors And Fulfilled The "Equity" Requirement**

**a.    Caprece Byrd**

117.   Plaintiff Caprece Byrd ("Caprece") is a single mother living in Aurora, Colorado.  She first heard about ViSalus from her then-14 year old son, Cory Henry. Cory and Caprece were members of the Household of Faith Empowerment Temple ("Faith Empowerment") also located in Aurora, Colorado.  Faith Empowerment had a small, largely African-American congregation.

118.   Defendant Owens is the pastor of Faith Empowerment. Unknown to Caprece before these events took place, Owens was also a ViSalus "Two Star Ambassador" or high-ranking distributor, and had for a long time recruited people to become ViSalus distributors. Owens promoted the ViSalus "business

opportunity" through Faith Empowerment by making pitches to the congregation and their invitees in regular Saturday morning, and later Thursday night meetings.

119.   In 2015, Owens encouraged 14 year old Cory to attend his Saturday morning meetings at the church so that he too could learn how to make a "six-figure income." Cory began attending the Saturday morning meetings regularly in August 2015. In these meetings Owens pitched him (and others) the ViSalus "business opportunity," and told Cory that he could own a part of ViSalus by becoming an "equity shareholder" and in return receive huge payouts for the rest of his life.  Cory was persuaded that Owens, his pastor, had his best interest at heart, and wanted to become a ViSalus distributor so he too could get rich like Owens told him he would. But since Cory was only 14 years old at the time, he needed the money from Caprece to purchase the ViSalus "business opportunity" to become as rich as Owens.

120.  Cory repeated Owens's words to Caprece about the business opportunity and explained to her that he could choose to be one of four people: self-employed, an employee, a business owner, or an investor.

121.   Caprece called Owens to discuss the ViSalus "business opportunity" for Cory.  Owens encouraged Caprece to attend a Saturday morning meeting at Faith Empowerment to learn about the opportunity.  Caprece attended the meeting with

Cory, which lasted approximately from 10:00am to 1:00pm in the church basement, and learned from Owens that Cory could own a business and be a successful entrepreneur "just like Owens" for $499 or $999.

122.   Owens showed the crowd of 40-50 people in the basement meeting who attended along with Caprece PowerPoint slides about ViSalus and the money available to those who wanted to participate with him.  He told Caprece that if Cory was "serious" about being successful with his business she needed to purchase the $999 kit to give him the best opportunity.

123.   Caprece gave Owens her credit card information and purchased the $999 kit for Cory's business – she did not read or sign anything nor was she asked to read or sign anything.   Neither she nor Cory were then aware that ViSalus ostensibly prohibited anyone from being a distributor unless they certified they were 18 years old. Owens processed Cory's "application" to become a ViSalus distributor, using Caprece's credit card for the distributor kit, Cory's real social security number, but a fake birthdate since he was not yet 18.

124.   Caprece was told that ViSalus would set up Cory's "business" under Caprece's business name, Frame of Mind, but Cory's name is associated with his

promoter number.  Cory received his ViSalus kit a few days later and was assigned promoter number 3973550.

125.   After signing up the minor Cory and selling her the $999 "business," Owens, together with his business partner, ViSalus promoter Deb Johnson, started calling Caprece to encourage her to attend the ViSalus meetings at the church. Caprece only wanted to support Cory's business, so she did not attend, but dropped him off at the required meetings each Saturday morning and Thursday evening at the church.

126.   At each of these meetings, Owens would bring Cory up to the front of the room, praise Cory for being so focused on being an entrepreneur, and tell the audience that Cory was going to be the youngest shareholder of ViSalus. Owens conveyed the same message to the audience at every meeting: "you too can be successful and make lots of money. All you have to do is follow the system and find three business partners to join you, and then they find three business partners to join them, and so on." Owens repeated statements that directly related to the equity Plan: that ViSalus was a multi-billion dollar company, and that an investment would make everyone rich for generations; and that a "payout" would happen on April 17, 2017. Owens would often play a video hosted by N. Sarnicola at these meetings, believed

to be the embedded video from one of the ViSalus pages discussed above, and show the room PowerPoint slides that emphasized these messages.

127.   In October 2015, Caprece learned from Owens that Cory "needed" to attend a business event for ViSalus in Kansas City, Missouri.  Caprece drove Cory to Kansas City so he could attend ViSalus's Vitality event.  Caprece purchased tickets to the Vitality event for Cory, herself, and John Owens, Owens's brother.

128.   Vitality is one of ViSalus's largest events. It is held annually in various cities throughout the United States and features ViSalus's new products, "Vi success stories," and ViSalus's top promoters parading their large cardboard bonus checks around the event.

129.   The Kansas City Vitality event that Caprece attended with Cory was a 3-day event with approximately 7,500 people in attendance.  This particular event featured hundreds of people dubbed as new "shareholders" who had earned equity in the Plan.

130.   Caprece witnessed all of the new "shareholders" receiving their shareholder certificates on stage at the Vitality event, including Owens's business partner, Deb Johnson. She also witnessed Owens receiving two large cardboard

checks on stage at the event – a $250,000 check and a $750,000 check. At that point she assumed that Owens was a ViSalus millionaire and was telling the truth about the opportunity, else why would ViSalus give him a million dollars worth of checks?

131.   After the Kansas City Vitality event, Deb Johnson told Caprece that Cory only had two more days to achieve "Rising Star" – a requirement if he, a 14 year old without a driver's license, was going to unlock the possibility of receiving a BMW automobile and a chance at receiving "equity" in ViSalus.  Not wanting Cory to miss the opportunity to become a ViSalus shareholder, at Owens's urging, Caprece purchased three more $999 distributor kits so Cory could achieve the Rank of Rising Star: two for Owens's brothers and one for Owens's cousin.  Again she was not given anything to read or sign. ViSalus readily processed these orders.

132.   Later that year, Caprece and Cory attended a second large ViSalus event in Omaha, Nebraska.  Cory was attracting a lot of attention at the event from the other promoters because he was wearing a Regional Director armband at the event, yet by then he was (and looked) 15 years old. Owens told Cory to stay quiet about his age and told him not be bragging about his business at the event.  When Caprece questioned Owens about Cory's age, he told her not to worry about it. Caprece later heard top ViSalus promoter Anthony Lucero mention to a crowd at the

event that promoters do just about anything when they are trying to achieve rank, including enrolling their cats and dogs as promoters, so it put her at ease.

133.   At the Omaha event, ViSalus again made a show of parading their "newest shareholders" with "share certificates" on stage. At this event Caprece first saw Defendants N. Sarnicola and Mallen in person. Previously she had seen videos of their "March to Equity" and other ViSalus presentations, and Owens often talked about his close relationship with them.

134.   At the event Defendants Mallen and N. Sarnicola talked about the income families who participated in the "March to Equity" would be receiving as a result of owning "a part of" ViSalus. After seeing certificates that purported to show ViSalus stock being handed out to the "shareholders" on stage at the events and hearing Defendants Mallen, N. Sarnicola, and Owens all talk about the financial benefits the ViSalus "shareholders" in the "March to Equity" were going to receive, Caprece decided that she too wanted to be one of the 2,000 families to obtain the limited "equity" that she was hearing about.

135.   Owens told Caprece that in order to become a ViSalus shareholder she needed to become a ViSalus distributor, reach Rising Star within 30 days, and invest $40,000 into her ViSalus business.  He explained that 3% of the company would be

available through December 2015, and another 3% would be available through December 2016, but that these offerings were only going to be available to 2,000 families.  Those statements were similar to those she heard at the earlier conventions and Owens's meetings at the church.

136.   In December 2015, Caprece once again provided her credit card information to Owens to purchase a $999 kit so that she could become a ViSalus distributor (although her start date in the ViSalus system indicates July 2015).  Deb Johnson, Owens's business partner, placed Caprece above Cory's business in the ViSalus compensation system.

137.   Caprece reached Rising Star within 30 days by, among other things, purchasing ViSalus kits for three distributors so she could unlock her opportunity to earn equity in ViSalus. Caprece applied for a home equity line of credit in order to fund her ViSalus business and get equity in the Plan. She qualified for her BMW on December 24, 2015 and focused her "run for equity" as Owens called it, between December 24 and December 31, 2015.   The $40,000 "investment" was spent at Owens's and Johnson's direction to essentially pay for new recruits and their product along with Caprece's product.

138.   Caprece also paid to run both Cory and Owens's brother, John, to the rank of Regional Director so they could each qualify for a BMW.  Cory qualified for the ViSalus Bimmer Bonus Program in the Vi Incentives Plan, yet he was not old enough to legally drive a car.

139.   Before she decided to run, Owens encouraged Caprece to visit the ViSalus websites http://visalus.com/equity and http://equity.vi.com. He explained that by becoming an equity shareholder in ViSalus, Caprece would receive a large payout on April 17, 2017, and dividends for years after, sufficient to support her family. Owens encouraged Caprece to find the $40,000 required to become a National Director and earn 3% equity in ViSalus available through December 2015 "by any means possible" so that she could secure her future financially. Owens explained that the $40,000 would "fund" her business by enrolling enough individuals as ViSalus promoters in one calendar month to allow her to achieve the rank of National Director. Caprece believed Owens and saw nothing on the website, nor nothing in the presentations she witnessed that suggested anything else.

140.   Once she was in the system, Caprece attended the Saturday morning and Thursday evening meetings at Faith Empowerment and participated in the Monday evening ViSalus calls with other high-ranking distributors via Skype.  At

95

the church meetings, Owens continued to pitch the "equity" opportunity. He would continue to show slides and give out materials explaining the different ranks and the availability of the equity shares in the Plan. On the Monday evening calls, there would be a payday portion of the call where Owens would announce promoters' bonuses and rank advancement and the new shareholders. Defendants N. Sarnicola, Mallen, or a top-ranked ViSalus promoter closed the call by offering advice on how to build the business and achieve bonuses.

141.   As directed by Owens, Caprece paid to enroll promoters in her business to hit the rank of National Director. She enrolled Owens's family members, her own family members, and anyone else she could find.  She even paid a homeless man, Mr. Moody, $5.00 to fill out the promoter application and use his social security number (Caprece still gives Mr. Moody the leftover ViSalus products). Caprece enrolled the individuals through the ViSalus website and used the PayNearMe cash payment method available at the 7-Eleven near her house—a method encouraged by ViSalus for people to pay for their ViSalus purchases.

142.   Caprece reached the rank of National Director on December 31, 2015 and believed she became a ViSalus shareholder. Owens and Deb Johnston confirmed her volume in her ViSalus BackOffice account and took a picture for their records.

As she had been repeatedly told, and as the web pages she visited seemed to confirm, she had obtained "equity" in ViSalus and was waiting for her first of many dividend checks to come, the first supposedly in April. She even received a "Certificate of Qualification" signed by the Founders:



143.   In January 2016, ViSalus held a shareholder meeting in Detroit, Michigan. Owens attended the meeting in Detroit, while Caprece and several other members of his downline attended the meeting virtually via video feed. Owens had Caprece and another promoter on his team who had "earned" equity in December

stand up so he could acknowledge them as new ViSalus "shareholders" in return for their $40,000 investment.

144.   This again confirmed to Caprece that she had earned something significant, and would receive dividend checks from the "billion dollar" ViSalus, as Owens had repeatedly called it.

145.   A few minutes later, Owens told his team that ViSalus decided to make a change to the equity requirements, and everyone who had invested $25,000 prior to January 1, 2016 was also now an equity shareholder.

146.   In April 2016, Caprece attended a ViSalus National Success Training event in Orlando, Florida and was again officially recognized as a ViSalus "shareholder" in front of hundreds of other distributors. At this conference, Defendants N. Sarnicola and Mallen again discussed the Plan. The pitch was essentially identical as the 2015 Plan pitch except that the "buy in" was $25,000 rather than $40,000. The new "shareholders" were paraded as examples in front of the other distributors.

147.   The audience was even shown a slide with the names of all of the "new" ViSalus shareholders who had earned equity in ViSalus, including Caprece's

name. She also received an "I Own It" hat, a special ViSalus "shareholder" lanyard that identified her as a shareholder, and a certificate with her name on it that she understood to be a symbol of her equity.

148.   She was also invited to attend the special shareholder meeting at the event held separately from regular distributors. All this and the certificate led Caprece to believe that she was indeed a part-owner of the company, and, as she herself heard Nick and Blake say or imply, would receive payouts for her $40,000 investment for years and generations to come.

149.   Caprece was never given any kind of prospectus, any financial statements (beyond hearing repeatedly that ViSalus was a multi-billion dollar company and had reached several billion dollars in sales and that Sarnicola, Mallen and Blair paid $143 million to buy the stock, that is how valuable it was), or any written disclosure of any kind about ViSalus's financial condition. She was never told, and there was no literature ever published by the Defendants, how many shares of common stock there were. The only information provided to her about these subjects came from Owens and the oral statements she heard at the meetings. In none of these did she hear any suggestion that ViSalus was losing money.

150.   After becoming a ViSalus "shareholder" in 2015, and believing she had gotten a part of the 3% promised for 2015, Caprece continued to attend ViSalus events at Faith Empowerment and in other major cities, such as Chicago and Omaha. Just as they had pitched the Plan in 2016, the message she heard at these conferences from Sarnicola and his wife Ashley, Mallen, Blair, or Owens, was always some rendition of the same: If you want to own a legacy, an opportunity of a lifetime, a piece of this company, equity checks for the rest of your lives, generational wealth for your family, then ViSalus equity is your vehicle and it is only going to be available to 2,000 families for a limited period of time.

151.   Caprece did not have to go to far-away meetings to get pitched again and again. Defendants Mallen, N. Sarnicola and A. Sarnicola routinely visited and held ViSalus events at Faith Empowerment and in the Denver surrounding area, with Owens playing up his familiarity with these Founders. Indeed, often, Owens would make representations about the Plan, and the generational wealth, multi-billion dollar company and the rest *in front of* the Sarnicolas or Mallen. For their part, the Sarnicolas and Mallen played up the church and spirituality angle of their weight loss "mission," with Mallen telling the church congregation about his wife's pastor father.

100







152.   These messages often included the pitch that there was only a little time or space left to get equity. For example, in 2016 Caprece heard over a "Vi Live" national call from that there were only 375 spots "left" of the 2,000 families. She believed after hearing this that she only had a little time left to get in on this lucrative opportunity.


153.   During this process one of the only written materials she was given (by Owens) was this:

**VISALUS EQUITY PLAN**
**Jan 1, 2015----Dec. 31, 2016**
**Receive a Portion of 6% of 2.2 Billion**
**Projected to Be over $10 Billion in Year 2020**
**Would You Be Interested in Seeing How You Could Qualify**
**FOR EQUITY FOR LIFE IN VISALUS**
**A COMPANY WITH 10 YEARS of SUCCESS**
**WHO HAS ACCOMPLISHED THE FOLLOWING**

**Visalus is a 2.2 Billion Dollar Company To Date in Sales**

**Donated over 5.5 Million Meals to Charities/Disaster Relief**

**Shipped over 750,000 Free Kits (3 For Free Program)**

**Created over 60 Millionaires Through Promoter Program**

**Has Had Over 20,000 Promoters Qualify For BMW**

**Over 3 Million Health Transformations (wt. loss/ muscle up)**

**Visalus is Presently in 14 Countries World Wide and Expanding**

**Experienced, Dedicated Leaders Taking The Company Globally**
*A Once in A lifetime Opportunity*

154. In November 2016, with the promised April 17, 2017 payout date approaching, and fearful that space in the 2016 program would run out, Caprece decided that she wanted another portion of the 3% of ViSalus equity. She was impressed by the Owens material and wanted a "portion of the 6% of 2.2 Billion projected to be over $10 Billion in 2020."

103

155.    To take part in this new $25,000 "investment" Caprece intended to "run" her son, Cory's account. But Owens convinced Caprece to "run" his brother, John Owens, to equity instead since the equity would result in too much money and be overwhelming to a younger person such as Cory.  And, he said, since John Owens was in Caprece's downline, she would also receive shares herself from the investment.

156.    Listening to and trusting Owens, Caprece invested *another* $25,000 in November 2016. She scraped together the funds to earn additional equity, but she was not concerned because Owens assured her and the rest of the Denver team that they would receive their first large check on April 17, 2017, only a few months away. As with the first $40,000 "investment," Caprece, at Owens's direction, set up an account and paid for required purchases, this time through John, so that the total "investment" in ViSalus product totaled $25,000 in a limited period of time. In this way again, Caprece believed that she now had another portion of the 3% equity set aside for 2016.

157.    After obtaining her first certificate of qualification, Caprece got another certificate, but this one was a little different:



158.   The "contingent on" and "Participation Agreement" language, and the "vesting requirements" language were something never previously disclosed to her, and certainly not before she decided to "run for equity."

159.   In March 2017, Caprece attended the ViSalus National Success Training event in Atlanta, Georgia. The schedule was similar to every other ViSalus event, but the number in attendance was much smaller than in earlier events she attended.  Caprece noticed a different atmosphere with the top promoters showing less enthusiasm at the event.  But Caprece was excited to attend the shareholder

portion of the event because the event was so close to the April 17, 2017 payout date she had been told about, and she wanted to hear about the details.

160.   But Defendant Mallen gave the shareholders different news - instead of talking about the big first payout in April like they had been led to expect, or presenting the perks of being a shareholder like he had done at all the past events, he told the shareholders in the room that "equity is for the long haul" and that similar to their houses, equity is realized when there is a sale, but ViSalus was not ready to sell.

161.   Mallen did not offer time for the Q & A session as he normally did at the shareholder meetings to answer any of the questions raised by all of the shareholders about the April payout. Instead, he told the entire audience something brand new: that a shareholder "Participation Agreement" was being reviewed by ViSalus's legal department and would be provided to them soon via email. This was the first that Caprece explicitly heard about having to sign another agreement before she would get "equity," or that she would not get a payout the next month.

162.   Mallen transitioned quickly to the "training" part of the event and opened the doors for the general promoters to enter the meeting room – effectively closing the doors to any discussion about equity because shareholders were not to

discuss any of the information given to them in their meetings with the general promoters.

163.   At the meeting Caprece talked with other "shareholder" distributors, including many not connected to the Denver Church Plaintiffs group.  Several other distributors told her they too had believed and been told there was supposed to be an April, 2017 payout.

164.   While they were still recovering from the shock of the Mallen statements, Defendant A. Sarnicola met with Caprece and the other members of the Denver team for a quick Q & A and to try and calm down a few of the members that were upset after not hearing any mention of the April payout for equity. But when confronted with the statements about an April 17, 2017 equity payout that Owens, in front of her and Nick, had talked of, she told Caprece and the other shareholders words to the effect she had no idea what they were talking about, and "we never said that."

165.   When Caprece continued to ask questions about the payout, Ashley Sarnicola asked Caprece to "keep it down" and then moved on to meet with another group. Owens's entire Denver team was upset because Mallen and Sarnicola

contradicted what Deb Johnson, Owens, Ashley's own husband and Mallen had said in the videos and in the church meetings.

166.    On April 13, 2017, Caprece emailed Jody Doll, the ViSalus Sales Support Manager to inquire about the "Participation Agreement." Jody Doll responded to Caprece and the other Denver team shareholders that the agreements would be going out "this month" but provided no detail on what they may contain.

167.    When she invested in 2015 and 2016, Caprece did not expect that she would have to continue to work as a distributor for ViSalus in perpetuity in order to get her "generational wealth."  She had no interest in selling ViSalus shakes, nor did she think that there was much of a market for doing so in the Denver area in 2016 or 2017. But she was now being told by Owens and Deb Johnson and others that in order to "qualify" further for the equity she believed she had purchased, she needed to continue to buy ViSalus shakes every month and continue to recruit and continue to have others buy the shakes or buy them for her recruits. And, a few months ago, she was told about a new ViSalus venture, LIV, a travel concierge program but in a network marketing format, that she would need to spend $150 a month to support in order to get her equity. Jonson pressured her to get into LIV.

168.   Caprece and the other Denver Church Plaintiffs have never received any legal document that purports to be a "Participation Agreement." To the extent ViSalus, or the selling Founders purport to now re-define a "Plan" or condition receipt of equity or dividends on a "Participation Agreement," or such conditions would occur years after the offer and sale and are unenforceable.

169.   Caprece has lost money as a result of investing in the Founders Equity Incentive Plan, the costs associated with attending the ViSalus events and shareholder meetings, and the amounts required to stay "Active" in order to, as she now understands, be eligible to receive an equity payout.

### b.      Bryant Watts

170.   Plaintiff Bryant Watts ("Bryant") is employed in the construction industry. Bryant heard about ViSalus from his sister, Plaintiff Caprece Byrd.  He "invested" in the Plan via the "March to Equity" in December 2016 after attending the ViSalus meeting at Faith Empowerment hosted by Defendant Owens and his partner Deb Johnson.  At the meeting, Owens introduced Defendant Mallen, who gave a talk about the ViSalus prosperity that would come if everyone there—about 20 people—signed up as distributors and joined the equity Plan.

171.   But Bryant was only interested in earning equity in the Plan – he did not want to be a distributor or sell any ViSalus product. He had heard about the April, 2017 equity payout at the December meeting at the church. In the meeting, Mallen hyped-up the opportunity to earn equity in ViSalus. He explained that ViSalus equity "would change lives" and that they would receive an equity check every year and "the more equity, the higher the checks." The presentation on the screen while Mallen spoke to the audience showed pictures of yachts, RVs, and luxury vacations. It also showed slides depicting sales for ViSalus at $3.5 billion dollars and percentage breakdowns indicating that since the opportunity was limited to 2,000 families, the first payout check to each of the shareholders would be over $4 million dollars.  That presentation sold Bryant and he decided to invest, although he was concerned that the "opportunity" to invest would be over by the end of December and he would lose his chance to get a part of the 3% that he heard about.

172.   Good news came, however, when Owens told Bryant that ViSalus extended the deadline to qualify for equity from December 31, 2016 to the end of February 2017 to promoters who enrolled in December and achieved Rising Star by enrolling three additional promoters.

173.    Because of the equity extension and the income opportunity shown to him at the Faith Empowerment event, Bryant enrolled as a ViSalus distributor shortly thereafter.    Caprece Byrd loaned him the money required to enroll as a distributor.    Bryant paid to enroll three additional distributors on December 30, 2016 in order to achieve Rising Star and "unlock" his opportunity to become a ViSalus shareholder. He was not given any disclosure, prospectus, or other financial information, he was not shown any "Participation Agreement" or a copy of the Plan, and was not asked to sign anything other than whatever Owens told him was needed to enroll as a distributor, a simple application.

174.    Bryant initially tried to sell product and enroll distributors by the scripts he received in his ViSalus kit to achieve rank of National Director and receive equity, but he struggled to find anyone that wanted to buy the product or enroll.

175.    Owens told Bryant to get to equity any way possible: "beg, borrow, steal, but get the money!" Bryant found someone to fund his run to equity on the promise that Bryant would repay the loan when he received the April 17, 2017 payout and give a percentage of his equity checks.    The funder was hesitant to loan the money so Bryant arranged for him to participate in a call with Owens. Owens reassured the funder that the first equity payout would occur on April 17, 2017 and

that the money would be substantial. As a result, Bryant was able to get a loan from his funder so that he could receive equity in ViSalus.

176. On February 27, 2017, Bryant was told he "achieved" the rank of National Director and equity in ViSalus. He did so by paying to enroll and purchase product for 20 promoters—with Owens's full knowledge. Bryant cashed the check from his funder and used the 7-Eleven PayNearMe feature to become a National Director before the end of February. Deb Johnson assisted Caprece with enrolling the promoters online and structuring Bryant's business through his Back Office account.

177. Bryant attended the ViSalus National Success Training event in March 2017 in Atlanta, Georgia. Bryant walked across the stage at the event with the other National Directors, and ViSalus recognized him as a shareholder. Bryant received a "Founders Equity Incentive Plan Certificate of Qualification" signed by Defendants N. Sarnicola, Mallen, and Blair, at the event:



178. As a result of the qualification certificate and his official recognition, Bryant believed that he too had purchased a portion of the 2016 3% equity and that he too would be eligible for "generational wealth" from the multi-billion dollar year company he was told about. He did not know that he would be asked to continue to buy the product and continue to try to recruit people into the weight loss system. He could not afford to spend $1500 a year to buy the shakes or Neon drink that he could not sell to anyone just to maintain his "share" of the promised equity.

179.   Bryant became concerned about his investment at the event shareholder meeting when Mallen refused to discuss the April 17, 2017 equity payout and the shareholder meeting turned into a "training."   Bryant attempted to ask Ashley Sarnicola about the equity payout, but she would not answer any questions about the equity.

180.   Owens has also refused to answer Bryant's questions about equity.

181.   Bryant has lost money as a result of investing in the ViSalus Founders Equity Incentive Plan, the costs associated with attending the ViSalus events and shareholder meetings, and the amounts required to stay "Active" in order to, as he now believes, be eligible to receive an equity payout.

c.     **Renae White**

182.   Renae White enrolled as a ViSalus distributor in January 2016.  She heard about ViSalus through ViSalus promoter, Dr. Frank McWhorter, while volunteering at his clinic, Step Up, Inc., a non-profit counseling service. Renae viewed a video on ViSalus equity and participated in a call with Deb Johnson and Dr. Frank before enrolling as a promoter. Dr. Frank paid for Renae's enrollment as a ViSalus distributor. Renae, a former nurse, has been diagnosed with rheumatoid

arthritis, so she was interested in the ViSalus products because she was looking for a healthy eating routine.

183.    Renae attended the ViSalus Regional Success Training event in Omaha, Nebraska in February 2016 with Dr. Frank.  Renae attended the three days of the event and heard speeches about the business opportunity and how to be a successful promoter from ViSalus distributors Kyle Pacetti and Rhonda and Anthony Lucero and other stories from the "top earning" ViSalus millionaires. These speeches impressed her.

184.   At his invitation, Renae also attended Owens's meetings at Faith Empowerment every Thursday and Saturday, as well as participated in the weekly ViSalus calls and Zoom calls.

185.    Renae heard about the Plan from Dr. Frank and Mr. Owens during the meetings at Faith Empowerment. She attended the meetings at Faith Empowerment and in the Denver area, which featured Defendants Mallen, N. Sarnicola, and A. Sarnicola. Her knowledge and understanding of the Plan and the "March to Equity" programs come primarily from these meetings and the materials and slides she was

shown there. Like the other Plaintiffs, she was never asked to sign any agreement beyond enrolling as a distributor, nor shown a copy of a "Participation Agreement."

186.   The statements she heard from the Defendants prior to investing were substantially similar or identical to those heard by the other Plaintiffs. The message about the Plan and the 6% equity opportunity at 3% per year that Renae understood from the ViSalus events was: equity was really valuable, the Founders paid a lot, it was only going to be offered to 2,000 families, and that ViSalus was going to pay out a percentage of the $3.2 billion in sales to the equity shareholders starting on April 17, 2017.

187.   Renae did not imagine these things. At one of the events held at Faith Empowerment in 2015, before she invested in the equity, Owens said the following in statements Renae videotaped and later circulated on Facebook to other prospective investors:

> Let's just say we get 300 more shareholders in, let's just say that happens, between now and the end of December which, we're gonna do it, I know it's gonna happen. *But here's what I'm saying to you, take 1,000 people and if we say we're at, let's just say we're at $3.1 billion because of what they're getting ready to drop, ok, if you take 10% of $3.1 billion, that's $300 million every year to be split up between 1,000 folks. Do you understand that? Every 365 days if we just stayed at $3 billion, another $300 million is coming every April to help those 1,000 families. And then another 365 days here comes another $300 million to help those 1,000 families. And say it goes to*

*$5 billion, then it turns to $500 million, that's coming to help those families. I'm just doing the math to keep it real simple so you can understand what's happening. If you knew what I knew, there's nothing short of breathing that will keep you out of this equity pool.* I would call a family meeting if I was you and I would tell everybody in my family that has a 401K, ya'll need to have ya'll's behind if they have a 403B, or a SEP, or SAR SEP or contractual, whatever they got, *you need to get your butt over to that church over there on 13th & Jamaica on the 28th and you need to see the founder's wife who is going to be here talking to you about the propensity of equity and what it does for families.* They are building foundations. Do you understand what I'm saying? They deal with the Goergen Family. The Goergen Family that actually has the Wharton School of Business was named after Robert Goergen. It's called the Goergen School of Entrepreneurship. Nick Sarnicola himself just did an endowment at the Muskegon Community College where they are building a wing on there for the School of Entrepreneurship. These are our leaders! They are showing us what to do! And some of ya'll are still talking about "well you know, that equity." Seriously? You gonna play with it?

(emphasis added)


188.   After repeatedly hearing about the equity opportunity, and the payout in April, Renae finally decided to "run for equity" in November 2016. Owens persuaded Renae to find the funds to achieve equity in any way possible. Renae cashed out her 401(k) retirement fund and sold her vehicle to invest in ViSalus and receive equity.  Renae sponsored (paid for) three promoters to hit the rank of Rising Star to be eligible for equity. Renae believed that she had invested, and that she was an owner of a portion of the 6% equity she was told about when she achieved the rank of National Director. She did so by paying to enroll and purchase product for a

number of promoters by using the 7-Eleven PayByMe cash feature and her Back Office account.

189.   Later Renae attended ViSalus events in Chicago, and Orlando. Each of these events ran the same way: success stores, cardboard check parade for the bonus earners, and shareholder recognition.

190.   After she believed that she had successfully obtained her equity, Renae attended the March 2017 ViSalus National Success Training event in Atlanta, Georgia.  She was unable to attend the entire event, including Defendant Mallen's shareholder meeting, because her rheumatoid arthritis did not allow her to leave her hotel room. She became concerned when she learned from other shareholders that did attend the shareholder meeting that there would not be an equity payout on April 17, 2017.

191.   Sometime this year Renae learned that ViSalus planned to launch a new product, a travel concierge multi-level marketed recruiting program. She was told that she needed to pay a monthly minimum charge of approximately $150 to participate in LIV if she wanted to keep her equity.  She does not understand why she needed to do this and has no interest in the program.

192.   Renae has lost money as a result of investing in the ViSalus Founders Equity Incentive Plan, the costs associated with attending the ViSalus events and shareholder meetings, the amounts required to stay "Active" in order to be eligible to receive an equity payout, and the amounts she has paid to participate in LIV.

### d.   Other Denver Area Defrauded Investors And Demands That Plaintiffs And Others Sign Additional Legal Documents

193.   After the April meeting in which Mallen and Ashley Sarnicola denied there would be a payout, Defendants went silent on the question of what exactly the Plaintiffs had obtained as a result of their investment. Instead, through Owens and his business partner Deb Johnson, Plaintiffs continued to be pressured to keep working as distributors, and join and pay for LIV, the "new" venture.

194.   Plaintiff Byrd confronted Defendant Owens, who attacked her character for even asking questions about the equity payout. Owens physically threatened another "shareholder" (there are at least four other known Denver-area "shareholders" who "ran" to equity like the Plaintiffs, but who are intimidated and afraid they will lose their "investment" if they complain) and publicly blamed Plaintiff Byrd for "stirring up dissention" by asking questions.

195.   Owens did tell Plaintiff Byrd that he would "ask" the Sarnicolas and Mallen to find out what "happened." To the best of Plaintiffs' knowledge no such meeting has taken place, and no one has responded to the question.

196.   Plaintiff Byrd then complained to the Colorado Department of Regulatory Affairs about her "investment." Plaintiffs were informed approximately two weeks ago that the department has issued subpoenas to ViSalus and Owens with respect to the complaint. An attorney within the department provided Plaintiff Byrd with a copy of the *Kerrigan* litigation, which was the first that Byrd, or any Plaintiff, had ever heard of the fact that their equity "partners" were being sued for a pyramid scheme.

197.   Last week, a quickly-organized "shareholder" telephone/video conference was held by ViSalus, N. Sarnicola and Mallen. During the conference, these Defendants announced that there had been an "error" in how units had been calculated, that "everyone" on the call was a "shareholder," and that Plaintiffs and others would get "new" certificates. But, Mallen and Sarnicola repeated, they would need to sign new legal documents to get their equities, and there would be no dividends or payouts for at least 24 months:

[**Mallen**] How you feeling? *How you feeling as owners? I mean come on. I know when you guys ran for equity in the Founder's Equity Incentive Plan, right, ran for the program, right, you knew we were gonna do something, right?* You knew and believed we were going somewhere, you had faith, you had vision, but I know a lot of you didn't probably think we'd be where we're at right now, so. As owners, I just wanna ask you guys how you feel right now. I'm feeling pretty good about us a team, where we're at, and most excited about where we're going. Very clear vision where we're going. Thank you guys for who you are. Loved to see all of the comments there in the chat box. …

This actually is not a formal shareholder call. We're not going in to a whole shareholder update. We don't have a whole lot of announcements for shareholders. This is actually gonna be a very short conversation on a screw up we made and a positive outcome for all of you. … I'm gonna kick it over to our CEO. We got Nick here on the line to give you guys a quick update and then we'll give you some next steps here with Ms. Zorica [Bosev, a ViSalus employee] we have on the line and we'll go from there. So with that we're at 6:03. Nick, I'll turn it over to you my man to have a conversation with this segment of our shareholders.

[**N. Sarnicola**] Alright well guys as Blake shared with you, it's gonna be a quick call. Bottom line is we discovered an error in the math in the amount of shares. So what we need to do is we need to reissue you guys a whole new set of certificates. It's gonna give you guys more shares. Bottom line is we gave you not enough shares. *It doesn't change the amount of equity that you own so the percentage that you have been told that you own of the company, of that total percentage, is the same, it's just the issue that we gave you guys was not enough shares so technically didn't equal enough equity for you, so we have to reissue your certificate with more shares.* Bottom line is we found an error, we caught the error, we're now correcting the error. And I think overall you guys should know that we will always do the right thing. We will always figure out a challenge when there is a challenge and we'll make it right and that's what we're doing for all of you guys right now. We shorted you on some shares, we're [inaudible] you guys up, we're sending

you some more shares and the percentage of the company that you own is still the same.

You're not gonna own more of the company because you have more shares, it just means the total math didn't check out with it was all said and done. Your shares were not enough. So we need to send you guys some more. Blake's gonna talk about process, etc.

*I think the only thing that's really important here for all of you guys is this: we need to make the shares worth value and we need to make them worth a lot of value. And the only way we make them worth a lot of value is to continue to run with Italy who just approached just shy if not crossed a million dollars a month in July. We gotta continue to run our strategy of Body by Vi going to Mexico. We gotta continue to launch for the first time challenge pro, and we gotta double down, triple down, and quadruple down, with our strategy with LIV, and make all this equity worthwhile to all of you guys.  24 months from now and start cuttin' out some dividend checks for everybody.*

Trust me, I want one just as bad as you want one. I'm the number one shareholder in the company. Blake's number two. We don't get paid unless you get paid on these dividends so let's go make it happen.  Do everything you can to make this equity worthwhile and worth value. Big shout out to Zorica whose on the line right now guys. She spent dozens and dozens and dozens of hours doing the math, correcting the math, and making sure that you guys had the right number when it was all said and done. So that's it. Real simple real basic. Wanna tell you guys that we owe you some more shares. Blake, have you got anything else to add in terms of process and what to do next, please do so. The rest of you guys, there's no need to keep rambling. Let's go kick some butt.  Blake over to you.

[**Mallen**] I love it. So guys, our bad. We messed up on those pieces of paper. We wanted to get 'em in your hands at the shareholder meeting and recognize them so we fast-tracked our process.  *So guys, again, just to clarify ya on the details: the shares in the plan you earned, that you saw in your back office and the points, right, which were shares that you earned, that share number is the same, it's when we did the math on what those shares means when they*

*convert to units, which is what you guys saw on that piece of paper, that unit number was incorrect.* We went back and did a triple check before we went into the actual paperwork of it, that makes it official and it was wrong. So, our bad. We now have the numbers. We cross-checked the numbers 82 times in every different way. We are confirmed on the shares you earned in the plan and how it's converted to units so that way you got the equity that you did earn. All of you guys on this line, you will be issued a new certificate. The share number will be the same. The unit number will be higher. Ok? So in every one of your, every one of your situations, the unit number will actually be more than the piece of paper that you got at that event. Percentage that you earned is equal, is the same. So, that's the update. We gotta issue you your new certs, we apologize for the mistake, but hey, it's a good thing we got checks and balances in place to confirm this stuff cuz it is critically important before we went to the actual official document process which is now coming out.

So, now that we're on the other side of LIV launch, we got the sister companies, we've done all kind of that legal and corporate housekeeping in terms of what the units are gonna be and how this is going to work. *We have now [inaudible] are moving forward on the process to kind of formalize all of this.* So, Zorica you guys, Nick just kind of explained Z. Z oversees so much behind the scenes. She definitely oversees the entire support team and everything that she does with her team to present and represent you guys in growing your businesses. Um, also oversees all the commissioning and also is overseeing this specific part of the plan, the Founder's Equity Incentive Plan. *So Z, what do we need to look for as far as just next steps for all shareholders going forward.*

**[Zorica Bosev]** *So hello everyone. So next steps will be in the coming weeks. You will receive the updated certificate with your new shares. You will also receive a participation agreement which will require a docu-sign signature that you will send back via email to our legal team so you'll see that. You'll get that via email. And then also you'll get the full plan document which will explain the ins and outs of the entire plan. So those will be forthcoming and once you receive them, if you have any questions feel free to reach*

*out me, reach out to your liaison, we're happy to help you. That's what we're here for.*

[**Mallen**] I love it. You guys can say thanks to Z in the chat box. So that is the update. So hey, you can keep the piece of paper. It's a cool piece of paper but you guys are gonna be the only ones that actually get a second piece of paper. So keep an eye out here. We'll let you guys know when it goes out, your new unit certificate with the correct unit number will go out, *and then we'll keep you posted on the participation agreements and the plan, the Equity Incentive Plan details.* So, appreciate you guys. Thanks for the understanding.

Yes, even we do make mistakes sometimes in trying to go too fast. But again, you can always trust the honesty, the transparency, and the integrity from the top down here. It always make things right, when we do catch that. So, our bad. Hopefully you forgive us and hey, your unit number is going up. So only sometime to celebrate.

So guys, I think we'll wrap this call with where Nick started it: (a) we own it, it's an exciting time now it's time to take what we own and elevate the value and we got every reason to do it and every reason to do it now. So whether your path is Body by Vi, your path is challenge pro, your path is LIV, and get this thing launched. Hey, the clarity we have today and the vision we have today, and what we have today as a strategy to go out there and really make an impact and take our mission of life, health and prosperity touch even more people across the world as it's better than it's ever been since the inception of Vi 12 years ago. So thank you for the faith. Thank you for the vision. You have earned the rights to own a piece of where we're at today. Now let's unify as a team and do what we're capable of and go out there and help the world live. That's what it's about. So thank you guys, thank you Z, thank you Nick, and stay tuned guys for details for the updated unit certs and the participation agreement coming soon.  So we're a wrap for today.  Thanks everybody.

(emphasis added)

124

## COUNT I

## Violation of Section 10(b) Of The Securities Exchange Act And Rule 10b-5, 17 C.F.R. Sec. 240.10b-5
### (Against All Defendants)

198.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

199.   ViSalus engaged in the offer or sale of a security in connection with the "Founders Equity Incentive Plan." Plaintiffs' allegations for violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 are not preempted by the PSLRA.   Plaintiffs' sworn certificates are attached as Exhibits 1, 2, and 3 to this Complaint.

200.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:

- Defraud and deceive Plaintiffs and other Class members into a reasonable belief that they had collectively purchased 6% of ViSalus common stock from Defendants N. Sarnicola, Mallen, and Blair (the Founders) when in fact the shares have never been tendered by the sellers to the buyers and the Defendants have not revealed how much stock each Plaintiff purchased.

- Defraud and deceive Plaintiffs and other Class members into a reasonable belief that by fulfilling the conditions of the offering in 2015, they would be tendered equity in ViSalus by the

125

Founders. Defendants' demands they fulfill new terms and conditions to obtain their equity is fraudulent, and the Defendants' actions and material misrepresentations and/or omissions in connection with the scheme were made with the intent to induce Plaintiffs and the Class to invest in a fraudulent securities scheme;

- Defraud and deceive Plaintiffs and other Class members into a reasonable belief that by fulfilling the conditions of the offering in 2016, they would be tendered equity in ViSalus by the Founders. Defendants' demand they fulfill new terms and conditions to obtain their equity is fraudulent, and the Defendants' actions and material misrepresentations and/or omissions in connection with the scheme were made with the intent to induce Plaintiffs and the Class to invest in a fraudulent securities scheme;

- In 2015, defraud and deceive Plaintiffs and the Class into a reasonable belief that, when they qualified by transacting $40,000 worth of business with ViSalus during a limited time, they would (1) obtain valuable common stock in ViSalus that (2) would pay dividends for years and decades to come. Plaintiffs have in fact been issued certificates of qualification of non-transferable "units" in an undefined Plan, the "units" having no value, with the Defendants' scheme and actions being unlawful, and based on material misrepresentations and/or omissions;

- In 2016, defraud and deceive Plaintiffs and the Class into a reasonable belief that, when they qualified by transacting $25,000 worth of business with ViSalus during a limited time, they would (1) obtain valuable common stock in ViSalus that (2) would pay dividends for years and decades to come. Plaintiffs have in fact been issued certificates of qualification of non-transferable "units" in an undefined Plan, the "units" having no value, with the Defendants' scheme and actions being unlawful, and based on material misrepresentations and/or omissions;

- In 2015 and 2016 fraudulently cause and induce Plaintiffs and other Class members to purchase worthless and illiquid ViSalus

126

equity based on a common scheme, course of conduct, and/or false or recklessly made statements, claims, representations and omissions that exaggerated the value of the offering, concealed material facts of the financial condition of ViSalus, and made false promises of future dividends or other payouts that would result from the purchase of the equity, for the purpose of inducing Plaintiffs to act on the offering.

- All of the above was in violation of Rule 10b-5, subsections (a), (b) and (c).

201.   All Defendants made statements in connection with the offer to sell the Plan with the intent that Plaintiffs and others in the Class rely and act on such statements made in the ViSalus website, other than the "equity flyer" which did not exist at the time of the offering, and in the personal appearances and disseminated videos as set forth. The Plaintiffs and the Class did rely on the statements. During the course of making such statements, in written and oral form, Defendants made material misrepresentations and omissions as follows:

### N.  Sarnicola

a.   Statements relating to "buying back the company" shortly before offering to sell 6% of the Founders' equity to promoters. These statements were false when made, or omitted to state facts necessary for it to be true, and were made with the intent to imply that the Founders were offering some $8.5 million worth of equity to the promoters (6% of $143 million), to falsely exaggerate present day value the

value of the equity, and to induce Plaintiffs and the Class to invest in equity that had

a far lesser, if any, value:

- "Buying back ViSalus was an immeasurable opportunity to optimize the company's value and impact… Now, being in position to invite our leaders to share in our growth means the world… "**ViSalus Equity page**)

- "I just took thirty-four million dollars out of [his daughter's] piggy bank.  I took thirty-four million dollars out of her piggy bank to buy back controlling interest of this company, my piece.  Blake took thirty-four million out of his future kid's piggy bank.  Ryan took thirty-four million out of his son's piggy bank and then we took six percent of that to put it into your piggy bank; put it in your kids' piggy bank.  See it's easy for us on conference calls or see slides, you guys see these slides and hear these calls, equity, equity, equity; I need you to get the visual.  Thirty-four million dollars just came out of this little girl's piggy bank and that big girl's piggy bank to buy back the equity that we then turned around to say go get some and put it in your kids' piggy bank but it doesn't stop there.  It doesn't have to stop there. It won't stop there because your kids are going to put it in their kids' piggy bank and I don't care – I don't care if it's two thousand dollars a year.  I don't care if you qualify once and you get a two thousand dollar equity check, that's still showing up thirty-five years from now, forty years from now, forty-five years from now and your grandkids get a two thousand dollar a year check that they pay for their college with.  Would that be okay with every single one of you guys; would you be all right that?" **(January, 2015 training speech and video)**

- "October last year myself, Nick and Ryan, we spent a hundred and five million dollars between the three of us to buy back controlling interest of ViSalus; thirty-five million dollars each that we spent to buy the controlling interest back.  Now when we did this there was one thing and one thing only – one thing and one thing only that we purchased; one thing and one thing

128

only.  Any guesses? Equity, that's it.  Like there was no box of chocolates.  There wasn't a, you know, a new car, there wasn't a house, it was just equity, a piece of paper.  It was a piece of paper and I personally spent my family's family's legacy; thirty-five million dollars and buying them a trunk of cash, a trunk of it not a briefcase of it.  A trunk of thirty-five million dollars for each of you right there's a trunk of thirty-five million dollars for each of you right now. What's your next move? Hey, you can live without it or you can grab it**?...** We took the thirty-five million and we bought a piece of paper each thirty-five million.  We took a hundred and five million dollars and bought a piece of paper.  That's how valuable the piece of paper is.**" (2015 speech and video)**

- "Ninety days ago my partners and I led a controlling interest buy-back of the company and what that means is we spent a hundred and four million between the three of us, myself, Blake and Ryan to buy back controlling interest from Blyth.  They're still our partners, they are still our partners.  We just now just had an interest shift so that we are now in control…. The fourth thing that we're going to do is we're going to – we've already launched an equity pool that goes live in January.  This is real money, this is real equity." **(2015 video)**

- "So the three of us made a decision to take the company ViSalus, private again, in a founder-led buy-back. And myself, Blake and Ryan spent $105 million of our family's family's future legacy money. So imagine I gave you a trunk full of $35 million. Because it was $35 million each, what would you do with that trunk of money? Or that trunk of cash?  It's an interesting question, right?  Here's what we did. We said well, we don't hunt, fish or golf, so retiring is not going to be very fun, we're only the average age of 35 between the 3 of us, there is nothing that we'd rather do than create transformations and to build ViSalus on a global level for decades to come so we took $105 million between the three of us that was owed to us and we bought back controlling interests of ViSalus. This was just the end of 2014, this just happened." (**Video embedded on ViSalus equity page**)

- "And we were willing to risk our family's family's generational money for one word: equity. We were willing to risk it all for one word: equity. Would you be willing, when given a trunk full of $35 million, would you be willing to risk it all the way we were? Would you be willing to double down the way we were? And I share this with you because the March to Equity and the entire idea here of equity is nothing more than the three of us buying back this company and immediately taking 6% of the equity that we just spent all of this time, energy, effort and resources in acquiring, and offering you a chance to earn some of it. It's the most valuable thing that we have to offer. I've worked my entire life for that one word, and now we're turning around and giving it to you." (**Video embedded on ViSalus equity page**)

- Similar statements made by Defendants Mallen and Blair and ratified by N. Sarnicola.

b.     Statements relating to the representation that ViSalus was a "billion dollar a year, or "multi-billion dollar" company, or that ViSalus was going to be as large as Amway or Herbalife, and generate massive dividend returns to a few new shareholders like Plaintiffs. These statements were falsely made to exaggerate the value of the 6% equity offered. These statements were falsely made to suggest that the investment was likely to result in significant returns for the participants. These statements were false when made, or omitted to state facts necessary for it to be true because: ViSalus was never a billion-dollar company; by 2015, ViSalus was booking less than $100 million in revenue and losing money doing so; by 2015 it had lost the majority of its distributors; its management knew it needed cash loans and credit to operate; its management knew its products were flagging in the

market; and its management knew it was facing a ruinous lawsuit over its business

practice:

- "When we beat them – when we beat then ten, twenty years from now; twenty years, ten years, five years, whatever, when we beat them and a billion dollars a year is being paid out sixty million of it every year will be split up between whoever decides to put one of those hats on.  Sixty million boom, boom, boom, that's a lot of millions.   That's not counting your commissions because as you learned you can make a lot in commissions. That's what's available.   You want a math equation?  That's a math equation.  We go be number one, let's pay out a billion a year, let's give you sixty million a year to play with for sixty years.  That's what's available if you own it.  Who's going to own it?  .... We've already paid out a billion now.  Can you buy into that?  How many of you guys want to own a piece of the company that's paying out a billion dollars in commission?" **(January, 2015 appearance and video)**

- Similar statements made by Defendants Mallen and Blair and ratified by N. Sarnicola.

c.      Statements relating to earlier promoters who made a similar investment

earlier and became millionaires. These statements were made to imply that the new

participating promoters stood a good chance to likewise be made millionaires if they

"got in" on the deal. These statements were false or omitted to state facts necessary

for them to be true. The earlier promoters were given the equity, not purchased it,

and enjoyed the result of a unique deal negotiated for the benefit of a conflicted

party, a similar deal not existing at the time of the statements were made:

- "This is real money, this is real equity. This is something that we did in 2005/2006 and three hundred or so people split up thirty million dollars. The top people made four or five, six, seven million dollar payouts each when we were purchased by Blyth….. We will be a promoter owned company and I'm not talking about making people a millionaire. We've already created fifty-two millionaires in the last five years. I don't know what other direct selling company can step up right now and say they made fifty-two millionaires and the last five years we did but we will create million a years. A millionaire and million a years, very different. I want to be paying dividends that are seven figure dividends to our top money earners and why don't you come find out how you can be one. Why don't you become one of them and why don't you own a piece of this company. One point eight billion dollars of sales the last few years; what would it have been like had you owned a piece of that and you were getting a dividend out of it let alone the commissions that you can earn in this company." **(2015 video)**

- Similar statements made by Defendants Mallen and Blair and ratified by N. Sarnicola.

d.      Statements relating to this being a "limited" or time-sensitive offer being made to a shrinking market of buyers, fraudulently made to suggest or imply that the "limited" number of offerees means that massive dividends will be divided up among a few people, and a "limited" time means Plaintiffs must hurry to get in on the deal because it is so desirable:

- "I would not sleep on this one guys. I would not sleep. It is real. $30 million a couple hundred million to a couple hundred people split it up because we require the one-time payment. What about or how about getting paid year after year after year after year, getting a dividend every single time myself, Blake

and Ryan take a dividend, a shareholder to [inaudible] we will be paying you as our partner for life." **(January, 2015 Vision Call tele/videoconference and video).**

- "…you and your family will be very well taken care of for your support and participation. Keep in mind if you wanna pay your bills, make a weekly check. [inaudible] if you want a nice residual, go get a [inaudible] you're an ambassador and your [inaudible] check for [inaudible]. If you wanna increase the wealth for decades to come, get as much equity as you can, but build the company up and then let's start issuing dividends to every single one of you shareholders for the rest of your lives." **(January, 2015 Vision Call tele/videoconference and video)**

- "We're here to talk about you getting the equity.  That story is absolutely critical in helping you guys achieve equity.  The faster we get that done, qualifying you to get a car the faster we can replicate it, the faster you got equity.  So we started you from scratch right now and we're going to run into the fifteen hundred to two thousand dollars a month.  We're going to put that BMW in your driveway, put a big dent in the grocery bill. How many days from right now do you want to have it done? How many days from right now do you want to be BMW qualified?  We got people that are taking three years to do it; we got people that are taking three weeks to do it; we got people that are taking three days to do this.  Turn to the person next to you and let them know the amount of days or months go, go, go." **(2015 recorded video of personal appearance)**

- "Gang, remember it's generational wealth. You just, you know, sat here and you listened to stories from the past of people who made a decision, who went out and put theirself [sic] in a position to create wealth.  Everybody in this room has an opportunity to do the same thing.  Over the next nineteen months time is going to pass, yes, say yes… What we decide to do over the nineteen months is going to be making the decision for you of what your story's going to be ten years from now. Ten years from now you're all going to have a story.  Your story is either going to be I was in Fort Lauderdale, I got it, I

went out, I took action and today my life will never be the same. I've created generational wealth within my family or your story's going to be I was there, I had the shot, I wished I would have, I sure should have and all you'll have is a mess on your hands, yes?  I don't care how much go or how much pro, now much Neon, how many shakes you drink.  I don't care if you take it topically, through the IV or snort it, makes no different. At some point in life you're all going to croak, true story?... And you're all going to leave someone behind.  There's going to be children, grandchildren, spouses.  This is your shot; this is your opportunity to go secure your future.  Don't miss your shot." **(April, 2015 Ft. Lauderdale, Florida training conference and video)**

- Similar statements made by Defendants Mallen and Blair and ratified by N. Sarnicola.

## B. Mallen

a.    Statements relating to "buying back the company" shortly before offering to sell 6% of the Founders' equity to promoters. These statements were false when made, or omitted to state facts necessary for it to be true, and were made with the intent to imply that the Founders were offering $8.5 million worth of equity to the promoters, to falsely exaggerate the value of the equity, and to induce Plaintiffs and the Class to invest in equity that had a far lesser, if any, value:

- "Buying back ViSalus was an immeasurable opportunity to optimize the company's value and impact… Now, being in position to invite our leaders to share in our growth means the world…" (**ViSalus Equity page**)

- "What is equity ownership guys? Equity ownership is walking into the ability to own a piece of what we've been dealing for 10 years. Every lesson, every investment, every

134

idea, ever piece of infrastructure, every technology, everything that I have done, you now have a front door that flung wide open; the ability to walk in and grab a piece of that and you may be asking yourself why? Right? Why would – we just spent $143 million to buy the same [inaudible] equity that we're putting on the table for you. Why would we do that? You guys [inaudible]? When we spent $143 million that was our third all-in moment. … that's the opportunity we're putting on the table for all of you guys here tonight." **(December, 2014 Webinar)**

- Similar statements made by Defendants Blair and N. Sarnicola and ratified by Mallen.

b.      Statements relating to the representation that ViSalus was a "billion dollar a year, or "multi-billion dollar" company, or that ViSalus was going to be as large as Amway or Herbalife, and generate massive dividend returns to a few new shareholders like Plaintiffs. These statements were falsely made to exaggerate the value of the 6% equity offered. These statements were falsely made to suggest that the investment was likely to result in significant returns for the participants. These statements were false when made, or omitted to state facts necessary for it to be true because: ViSalus was never a billion-dollar company; by 2015, ViSalus was booking less than $100 million in revenue and losing money doing so; by 2015 it had lost the majority of its distributors; its management knew it needed cash loans and credit to operate; its management knew its products were flagging in the market; and its management knew it was facing a ruinous lawsuit over its business practice:

- "But what does it mean to own equity in a company that in the last 4 years did over $1.8 billion in sales?  Ryan said it and I'm gonna reiterate it – equity is the most valuable thing that we have and the most valuable thing that I own. It's the most valuable thing that Ryan owns. It's the most valuable thing that Nick owns." **(December, 2014 Webinar)**

- Similar statements made by Defendants Blair and N. Sarnicola and ratified by Mallen.

c.    Statements relating to earlier promoters who made a similar investment earlier and became millionaires. These statements were made to imply that the new participating promoters stood a good chance to likewise be made millionaires if they "got in" on the deal. These statements were false or omitted to state facts necessary for them to be true since the earlier promoters were given the equity, and enjoyed the result of a unique deal negotiated for the benefit of a conflicted party, a similar deal not existing at the time the statements were made:

- "Matter of fact, we paid out somewhere near $800 million to a comp plan  but I tell you guys nothing we've done in the past, is even close to the opportunity that you're hearing rolled out here tonight – equity ownership and the entire future of [inaudible]. Nick mentioned, and he's gonna bring on some people guys that we did this in a way of [inaudible] buy back before The Challenge, back what everything we have with just a vision, and we put a smaller pool on the table before we knew it was possible and I strolled through some of those names and you get a chance to hear from some of them in a minute, and I watch people walk away with $4M, with $3M, with $5M. You're gonna hear some of those stories here tonight." **(December, 2014 Webinar)**

136

- Similar statements made by Defendants Blair and N. Sarnicola ratified by Mallen.

d.    Statements relating to this being a "limited" or time-sensitive offer being made to a shrinking market of buyers, fraudulently made to suggest or imply that the "limited" number of offerees means that massive dividends will be divided up among a few people, and a "limited" time means Plaintiffs must hurry to get in on the deal because it is so desirable:

- "Everybody on this call you gotta be running to that national director rank so you get into that very, very first pool. Also last week we covered how you earn shares every month by [inaudible]. We're 11-12 days in. The clock is ticking." **(January, 2015 Vision Call tele/videoconference and video)**

- "Because I promise you this weekend today, so forth, what we have in store for you, this is the biggest thing we've ever rolled out in the history of the company. We've never put [inaudible] on the table that we have today in 2015. Ever. The first equity program that they signed up on our company was only worth $1 million, if that. Right? So [inaudible] 6% of a $1 million is what? [inaudible] Right now this company, you've gotta put your money [inaudible] is worth $10 million that you had in the equity in your participation is only gonna be available to a few people. They'll be 1,500-3,000 people, mark my words, that are dividing up 3-6% of this company. That's it. Double this room. Triple this room.  There you have it. Will it be you?" **(January, 2015 Vision Call tele/videoconference and video)**

- "I would look at it with a level of urgency, a level of intensity as though this year is done all of your goals, everything are going to be handled by who you have in the room and then by the work that you do to get people to NST [National Success

Training] in Fort Lauderdale and everything, it's done. … So take this seriously. I guarantee you the people with the passion in January and February are the people that are going to yield or receive the most of the three percent equity." **(March, 2015 appearance in Grand Rapids, Michigan and video)**

- Similar statements made by Defendants Blair and N. Sarnicola ratified by Mallen.

## R. Blair

a.   Statements relating to "buying back the company" shortly before offering to sell 6% of the Founders' equity to promoters. These statements were false when made, or omitted to state facts necessary for it to be true, and were made with the intent to imply that the Founders were offering $8.5 million worth of equity to the promoters, to falsely exaggerate the value of the equity, and to induce Plaintiffs and the Class to invest in equity that had a far lesser, if any, value:

- "Buying back ViSalus was an immeasurable opportunity to optimize the company's value and impact… Now, being in position to invite our leaders to share in our growth means the world. "(**ViSalus Equity page**)

- *"We bought the company back with the Goergens and now we're going to offer you the same thing that we asked for from the Goergens, and that is equity within our company. An opportunity for you to build a legacy alongside of us. One where one day your kids are going to be playing with my kids, and their kids, and all of our children are going to have something that we all dreamed of."* **(December, 2014 Webinar)**

138

- "My family gets paid based on our company being a profitable, successful company. That's – that's my family's and I so much believe in that that I gave thirty-four million of my family's wealth, which is the vast majority of it, in order to be able to build equity value with all of our families together indefinitely, right. So that's how serious I am about this; that I'd be willing to take my family's net worth and put it into a thing called equity because I believe in what we're doing, you know." **(March, 2015 appearance in Grand Rapids, Michigan and video)**

- Similar statements made by Defendants Mallen and N. Sarnicola and ratified by Blair.

b.     Statements relating to the representation that ViSalus was a "billion dollar a year, or "multi-billion dollar" company, or that ViSalus was going to be as large as Amway or Herbalife, and generate massive dividend returns to a few new shareholders like Plaintiffs. These statements were falsely made to exaggerate the value of the 6% equity offered. These statements were falsely made to suggest that the investment was likely to result in significant returns for the participants. These statements were false when made, or omitted to state facts necessary for it to be true because: ViSalus was never a billion-dollar company; by 2015, ViSalus was booking less than $100 million in revenue and losing money doing so; by 2015 it had lost the majority of its distributors; its management knew it needed cash loans and credit to operate; its management knew its products were flagging in the market; and its management knew it was facing a ruinous lawsuit over its business practice:

- "And we're doing $6.8B a year in sales, we've paid out roughly 20% of that … by the year 2020 we'll have a diversified product portfolio." **(January, 2015 tele/videoconference and video)**

- Similar statements made by Defendants Mallen and Sarnicola ratified by Blair

c.      Statements stating or exaggerating the alleged "value" of the 6% made available under the Plan. The statements were false when made since Defendants knew that they had paid nothing for the stock and had not done a valuation of the equity prior to the statement being made:

- "Because I promise you this weekend today, so forth, what we have in store for you, this is the biggest thing we've ever rolled out in the history of the company. We've never put more value on the table that we have today in 2015. Ever. The first equity program that they signed up on our company was only worth $1 million bucks, if that. Right? So giving 6% of a $1Million bucks is what?
[**Audience member**] $60,000.
[**Blair**] And that wasn't even 6%. Right now this company, you've gotta put your money, is worth $10 Million dollars to be had. And the equity and your participation is only gonna be available to a few people. They'll be 1,500-3,000 people, mark my words, that are dividing up 3-6% of this company. That's it. Double this room. Triple this room.  There you have it. Will it be you? How much of it will you get because you deserve it." **(Video "Vi CEO Ryan Blair's Vision to 2020 with the Equity Plan")**

- "We're taking 6% of our equity, of our family's wealth, and we're giving it to yours based on how you decide to earn it, and Nick and Blake will go into more details on that and more information will be coming [inaudible] directors and so forth.

I'm telling you right now the most valuable asset that I have in my life, is not the homes or the stuff that you read about. It is the equity in ViSalus. We are letting you participate in that as well." **(December, 2014 Webinar)**

- "We didn't have to buy back this company. We could have retired. I always tell people, we have a private jet, I could've been on that jet, on a private island, and never have to ever look at a bank account again, or care about it. We bought this company back because we want to make a change on this planet because we know that the world needs better nutrition, we know people need supplementation, we know that the food sources out there are terrible and that we provide them value. It is up there with a need; it's not a want. It's not like we're providing a luxury or something that they can do without. We're providing good nutrition for families. And this is what we stand for and we know that we're going to create a lot of value. We bought this company back so that way we can create the maximum amount of value and now we're inviting you to be owners with us in this company so we can do that together. So I hope I answered your question Nick, I don't see this as another Ferrari in the garage; I see this as solving a major major need of humanity which is nutrition, fortified nutrition through supplementation, and through fortified foods…." **(December, 2014 Webinar)**

- Similar statements made by Defendants Mallen and Sarnicola ratified by Blair

**<u>ViSalus</u>**

a.    Statements relating to "buying back the company" shortly before offering to sell 6% of the Founders' equity to promoters. These statements were false when made, or omitted to state facts necessary for it to be true, and were made with the intent to imply that the Founders were offering $8.5 million worth of equity to

the promoters, to falsely exaggerate the value of the equity, and to induce Plaintiffs

and the Class to invest in equity that had a far lesser, if any, value:

- "Buying back ViSalus was an immeasurable opportunity to optimize the company's value and impact… Now, being in position to invite our leaders to share in our growth means the world." (**ViSalus Equity page**)

- "When the Vi Founders recently bought back controlling interest of the company, they launched a series of bold moves which have helped spark an exciting time in the Vi story. Spurred by their significant financial commitment ($134 million) to take full ownership in Vi's future, they created an opportunity for Vi Promoters to take ownership alongside them." (**ViSalus Equity Page**)

- All statements on same subject attributed to N. Sarnicola, R. Blair and B. Mallen made in sponsored videos, meetings with distributors, and conventions.

- All statements on same subject attributed to Reynolds and Owens made in sponsored videos, meetings with distributors, and conventions.

b.    Statements made by ViSalus, or which ViSalus knew were made by

others and which it did not remove from public dissemination, relating to the

representation that ViSalus was a "billion dollar a year or "multi-billion dollar"

company. These statements were made to exaggerate the value of the 6% equity

offered. These statements were made to suggest that the investment was likely to

result in significant returns for the participants. These statements were false when

made, or omitted to state facts necessary for it to be true because ViSalus was never a billion-dollar company; by 2014, ViSalus was booking less than $100 million in revenue and losing money doing so; its management knew it needed cash loans and credit to operate; its management knew its products were flagging in the market; and its management knew it was facing a ruinous lawsuit over its business practice:

- "So why are we here today? We're talking about March to Equity. You can go check out equity.vi.com if you want to learn more about this founder's equity incentive plan. And, March to Equity is really an incredible crusade. This is the 3 founders literally giving 6% of their company away to people like you and me, for us to be able to earn significant legacy income that we can hand down to our kids generation to generation. This March to Equity represents something that is not available in any other company of its kind in this industry. There is no one else out there offering a piece of the company. You know, I qualified for my equity, I have my equity certificate, I am officially a shareholder, I am officially an owner of this company and it feels amazing to know that I'm really an owner of this business. I'm proud to partner with the three founders. I'm proud to partner with all of the other people so far that have qualified to become shareholders." **(Sam Rathling Video)**

- "It's an absolutely incredible feeling to know that I have this equity locked in for the rest of my life. We have 265 people so far, 265 families already qualify for equity but in the next 18 months, so between now and the end of 2016, we're looking for another 1,700 families that want to qualify for a piece of equity." **(Sam Rathling Video)**

- "So I wanted to see what founder's equity incentive looked like, well at 6% of the company, divided into two years. So we're

143

already half way through 2015 at the time of this webinar. So 3% of the company will given away this year, and 3% will be started again, will start in 2016 for a whole 'nother 12 months.  So how do you earn equity? Well quite simple. You become a national director with Vi and you start earning equity in the equity pools here and you earn points on a monthly basis to go towards equity depending on your rank, depending on how many other people you help in your team." **(Sam Rathling Video)**

- "So as a company where have we come from? Well in wave one, which was 2005-2009, we were a tiny little company. We were doing pretty well. We were up to $50-60M done in that 4 years. As a company, that was the first time that Vi ever gave away equity and if you're interested I have a little video I could send to you with some of the equity holders through the very first wave but there were multiple, multiple millionaires created when we last had an equity incentive like this. Many of them still are still in the company and some of them would say welcome to the sunset, but you know there are many many people who benefitted from the previous equity that we gave away during wave one." **(Sam Rathling Video)**

- "So here's the projections for what we're looking to do as a company over the next 5 years, and this is what growth we are looking to put on projected between now and 2020. So the fact that you've got a company that's within 5 years looking to be growing by another $6.8B and the fact that you could own a piece of that, that is absolutely mind blowing to me. So what we're looking to do is this year put an extra 500 national directors into the business, then following into that double that to another 1,000, as you can see it's double the number of national directors we have in the company over the next 5 years until 2020. So imagine having 6%, share that with 2,000 families just 2,000 families sharing the dividends every year, you getting a paycheck every single year on top of your commissions, because you earn a piece of equity in this company.  So how do you qualify for equity? This is the game plan. So you've already seen the overview videos so if you have not seen those yet, you need to go watch those for this to make sense, which is overview.vi.com

and this is the game plan for earning equity." **(Sam Rathling Video)**

- "So if you were to come here today and become a promoter with us and they go get your BMW in a short space of time, you could be on track to be an ambassador with us and earn significant shares in the company. These are class A shares that you cannot buy. They are not available on the stock market. These are class A shares that you can earn and hand out generational to generation. Give them to whomever you choose to do so." **(Sam Rathling Video)**

- "And we also change people's prosperity. We put them on a path to better wealth, to legacy income, this March to Equity is gonna give people an opportunity to really transform their lives. The ripple effect of this March to Equity is that we're going to effectively do what we've already done all over again. The ripple effect will be that we'll transform another 3 million people's lives. We will put another 20,000 people in BMW. We will create a 1,000 6-figure a year earners. You just have to decide if one of them is you. And we will create another 50-100 millionaires in the next number of years through this equity program. Again, you just have to decide if it's you. If you wanna take action, if you wanna change your life, if you wanna get out what financial situation you're in right now, and achieve your goals and dreams, then we have the vehicle to do that..." **(Sam Rathling Video)**

- "I became a shareholder in the company in 45 days." **(Sam Rathling Video)**

- "Vi is a two billion dollar company that's rapidly expanding around the globe. We're already in fourteen countries. We're expected to be in fifty countries in five years. So the question is what would equity in that mean to you and your family. Well I already know what it means to our family; it means generational wealth. It's wealth for my daughters, their daughters, their children, their children and their children's children. This is legacy income for those two thousand families that want to earn

equity in Vi." **(Johnna Parr recorded in speech to distributors)**

- All statements on same subject attributed to N. Sarnicola, R. Blair and B. Mallen made in sponsored videos, meetings with distributors, and conventions.

- All statements on same subject attributed to Reynolds and Owens made in sponsored videos, meetings with distributors, and conventions.


c.    Other statements made in the offering pages on the ViSalus website:

**<u>"March to Equity" Page</u>**

- The entirety of the "March to Equity" page omits disclosure necessary for a public offering.

- "It doesn't matter if you understand it or not" (ViSalus March to Equity video at 0:8).

- "The opportunity of a lifetime."

- "After being one of the industry's most impressive success stories of the past decade…"

**<u>"Founders Equity Incentive Plan" Page</u>**

- The clanging of a cash register in embedded music overlaying the page.

- "Earn shares in the Plan every month."

146

**GJ Reynolds**

a.    Statements relating to earlier promoters who allegedly made a similar investment earlier and became millionaires. These statements were made in order to imply that new participating promoters would likewise be made millionaires if they got in on the deal. These statements were false or omitted to state facts necessary for them to be true since the earlier promoters were given the equity, and enjoyed the result of a unique deal negotiated for the benefit of a conflicted party:

- "Nine years ago I bought into a vision with three 27-year old guys and I saw the value of it, we just didn't have a monitoring value. So I saw a value then and then in 2008, when we did the transaction, the first transaction, Ryan, Nick & Blake made a promise that you stay with us, you stay with us, we're gonna 15x this company and all of you will make millions of dollars from the equity alone. Now what's been great about where we're at today is that we didn't do 15x. We did much greater than 15x so that means we made a lot more money. And also we've been able to establish a company that is valuable. We have a track record. So unlike what we had nine years ago, we now have a track record. It's proven. So like when any other company that you think you're gonna potentially invest in or put time in, you know, you hope that it's going to achieve something. We've done it. We've got a 10-year track record and I keep telling people this on a daily basis: what we did in the last ten years as a company, we'll do more in the next five years than we did in the previous ten combined." (**December, 2014 Webinar**)

- "Equity has definitely had a major impact in my life, my family's life, and when I first joined in Vi in 2006, I came in the equity program had already launched. And I only had 8 months to earn equity and I understood the power  of equity and hoped that the equity would be worth something and I trusted you, I trusted Nick, and I trusted Ryan, and all 3 of you said, trust us, stay with

147

us, stay the course, your shares will be worth millions and fast forward a few years later, [inaudible] I saw people getting checks for $1,000, I saw my upline get $250,000, [inaudible] national director [inaudible] they got $250,000. I saw in my upline earn in excess of $4.5M. It's real and it's what we have [inaudible], I've been able to pay cash for properties, I've been able to have [inaudible]. It's definitely been something that one dreams about, [inaudible] is that the plan now is to [inaudible] over and over, year after years. So all you have to do is get to national director and do it as fast as possible and I'll tell ya this: Vi is here. Vi will grow. This is big big. This is legacy opportunity. Legacy, Legacy, Legacy." **(January, 2015 Vision Call tele/videoconference and video)**


## A. Sarnicola

a.    Statements implying that the company is "massively successful" and that investing would make Plaintiffs "millionaires" when Defendant knew the true financial condition of the company:

- "I just want to say wow to those living legends we got to hear from tonight. It's just a handful by the way guys, a small handful of the people who literally you know, overnight became you know, millionaires and multi-millionaires because of a simple decision they made years ago. I want to point out to everybody on the line that most people in life you know, who get a chance to become equity owners in a company, guys they're already wealthy! They're just spreading their money out, they're investing in companies, and they're betting on the right guys. You have a chance to become an equity owner tonight with a company that's already massively successful. Not some start-up that may be, will day, one day, do something – a company that has proven right now to be one of the best product in weight loss companies in the world, right before the peak season of weight loss." **(December, 2014 Webinar)**

- "Well you're about to multiply that by the millionaires. I'm talking about legacy money guys and leaving this world knowing that you made your millionaires by going out there and helping people have a better life." **(December, 2014 Webinar)**

b.      Statements relating to the April 17, 2017 payout and ratification of statements made by Owens in Defendants' presence.

## V. Owens

a.      Statements relating to his earlier experience, made to imply that new participating promoters would likewise be made millionaires if they got in on the deal. These statements were false or omitted to state facts necessary for them to be true since Owens had been given the equity, and enjoyed the result of a unique deal negotiated for the benefit of a conflicted party, and had lied about the extent of his alleged ViSalus success. These include statements he made in the recorded video with N. Sarnicola:

- "So I have no idea what this next equity's gonna be but I can guarantee you this, guys, I can guarantee you that if you don't become one of these 2000 Families you're doing yourself a disservice and you're doing your family a disservice for generation. … Man, I don't know, my dad was a pastor and so you know, I understood what it was like to try to pay mortgages and you know, have to depend on other people to give their tithes and offerings, and that kind of thing, so, to be able to do that and be able to talk to people freely about the gospel, is, I mean, it just made all the difference in the world, brother. Thank god for you all man, and the opportunity. I'm forever indebted. I'm in Vi for

149

life. You gonna get equity the second time? You better believe that… 2000 Families March to Equity! Get a piece! Get your piece!" **(January, 2016 video with N. Sarnicola)**

b.     Statements relating to the expectation of an equity payout on April 17. 2017. These statements were false or recklessly made.

c.     Statements stating that ViSalus was a "billion dollar" company and other misrepresentations designed to imply how rich and sophisticated ViSalus and its owners are, and that Plaintiffs should get a "piece" of such company:

"But here's what I'm saying to you, take 1,000 people and if we say we're at, let's just say we're at $3.1 billion because of what they're getting ready to drop, ok, if you take 10% of $3.1 billion, that's $300 million every year to be split up between 1,000 folks. Do you understand that? Every 365 days if we just stayed at $3 billion, another $300 million is coming every April to help those 1,000 families. And then another 365 days here comes another $300 million to help those 1,000 families. And say it goes to $5 billion, then it turns to $500 million, that's coming to help those families. I'm just doing the math to keep it real simple so you can understand what's happening. If you knew what I knew, there's nothing short of breathing that will keep you out of this equity pool." **(Personal promotion videotaped by Plaintiff White)**

"You need to get your butt over to that church over there on 13th & Jamaica on the 28th and you need to see the founder's wife who is going to be here talking to you about the propensity of equity and what it does for families. They are building foundations. Do you understand what I'm saying? They deal with the Goergen Family. The Goergen Family that actually has the Wharton School of Business was named after Robert Goergen. It's called the Goergen School of Entrepreneurship.

150

Nick Sarnicola himself just did an endowment at the Muskegon Community College where they are building a wing on there for the School of Entrepreneurship. These are our leaders! They are showing us what to do! And some of ya'll are still talking about "well you know, that equity." Seriously? You gonna play with it?" (**Personal promotion videotaped by Plaintiff White**)

- Statements made on the handout prepared by Owens that if Plaintiffs invest they would "receive a portion of 6% of $2.2 billion projected to be over $10 billion by 2020":

**VISALUS EQUITY PLAN**
Jan 1, 2015----Dec. 31, 2016
Receive a Portion of 6% of 2.2 Billion
Projected to Be over $10 Billion in Year 2020
Would You Be Interested in Seeing How You Could Qualify
FOR EQUITY FOR LIFE IN VISALUS
A COMPANY WITH 10 YEARS of SUCCESS
WHO HAS ACCOMPLISHED THE FOLLOWING

Visalus is a 2.2 Billion Dollar Company To Date in Sales

Donated over 5.5 Million Meals to Charities/Disaster Relief

Shipped over 750,000 Free Kits (3 For Free Program)

Created over 60 Millionaires Through Promoter Program

Has Had Over 20,000 Promoters Qualify For BMW

Over 3 Million Health Transformations (wt. loss/ muscle up)

Visalus is Presently in 14 Countries World Wide and Expanding

Experienced, Dedicated Leaders Taking The Company Globally
*A Once in A lifetime Opportunity*

202. None of the statements qualify for any safe harbor for forward looking statements, 15 U.S.C. Section 77z-2. None of the statements are written or oral forward-looking statements, and none were identified as a forward-looking

4:17-cv-12626-MFL-DRG   Doc # 1   Filed 08/10/17   Pg 152 of 174   Pg ID 152

statement when made. None of the statements were accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially. And each of the statements were made by a person with actual knowledge that the statement was false or misleading when made.

203.   Each of the Defendants acted with the necessary *scienter* to be held liable under this Count. Specifically, at least the following establishes sufficient knowledge and/or reckless disregard with respect to each Defendant:

**ViSalus, N. Sarnicola, B. Mallen, R. Blair, Goergen**:

- With respect to ViSalus, the individual Defendants are each high ranking managers of ViSalus. Mallen, Blair, and Goergen are also Directors. N. Sarnicola was a high level manager, became a high level promoter, and recently became a high level manager.

- Each of these individual Defendants was previously personally involved with a series of securities-related transactions during which they obtained knowledge about disclosure to investors, public and private placement, registration and filing requirements, exemption from filing requirements, and other anti-fraud protections provided under federal and state securities laws. These included regular SEC reporting while ViSalus was majority-owned by Blyth, resulting in annual Form 10K and Form 8 filings. Each was involved in making presentations to Blyth board meetings.

- Each of these Defendants was a participant in the 2012 IPO during which they filed a Form S-1 registration statement in advance of the IPO. Each of these Defendants simultaneously filed a notice of registration statement on the ViSalus website, on August 16, 2002, which is still available to viewers. That release contained a statement

that said, "This press release shall not constitute an offer to sell or a solicitation of an offer to buy these securities, nor shall there be any sale of these securities in any state…in which such an offer, solicitation or sale would be unlawful prior to registration…"  During the IPO promotional period, materials evidencing these Defendants' actual familiarity with registration requirements, solicitation, and forward-looking statements were prepared. The lack of any similar warnings, disclosures, registration or other procedural safeguards for the Plan offering was deliberate.  While the IPO registration contains detailed disclosure about ViSalus's financial condition and risks associated with purchasing its common stock, Defendants chose to withhold from the Plaintiffs during the placement information concerning the drastically deteriorated financial picture of the company since the IPO, and chose not to provide investment and liquidity warnings, risk factors associated with the investment, or any other material information they knew was customarily provided to investors.

- Each of these Defendants was personally involved in seeking capital investment into the company from professional or accredited investors at the same time as the Plan offering to the Plaintiffs. Each of these Defendants participated in a May 16, 2016 filing with the SEC claiming a Form D exemption from registration in connection with a securities placement. That form identified Defendants Blair, Mallen, and Goergen as "related persons" in "executive officer" and "director" capacities. It identified a $15M debt offering with a minimum of $25,000 investment which raised $6.4M beginning in February, 2016. The form was signed by ViSalus's in-house counsel, Adam Morgan. The existence of their filing reveals that these Defendants understood the SEC requirements for registration of an offering, understood exemption standards, and deliberately chose not to register the offering at issue.

- Goergen had been associated with a prominent New York investment house and had for years managed a private equity entity (RAM) which gave him particular expertise and information concerning securities placements and disclosures associated with such placement.

- Each of these Defendants was a participant, individually or through RAM in the MIPA transaction of 2008 and in the Recapitalization Agreement of 2014. As a result, each knew the true details about the

valuation of ViSalus stock offered to the Plaintiffs, and the true details about the September, 2014 transaction in which the Founders obtained the stock back from Blyth. Each of these Defendants knew that representations concerning reaching into family piggy banks to buy the stock were false when made just weeks and months later.

- Each of these Defendants knew the true circumstances of the 2005-06 EIP, and that the promoters who later claimed to have "invested" out of trust and belief in the Founders and the business and been made millionaires as a result had actually been given the stock as an undisclosed payment or inducement to perpetuate and expand a pyramid scheme. Each of these Defendants knew that the Plaintiffs to whom the equity offer was being made were in a vastly different position than the earlier group, and that the earlier group was the beneficiary of a conflicted transaction that had no chance of ever being repeated again.

- Each of these Defendants stood to personally profit from the offering at issue. Each of these Defendants had personal money invested in capitalizing ViSalus, and each was (and is) facing personal liability in the *Kerrigan* litigation motivating them to raise money from the Plaintiffs through this offering.

## V. Owens, G. Reynolds

- Each of these promoter Defendants knew the true circumstances of the 2005-06 EIP, and that the promoters who later claimed to have "invested" out of trust and belief in the Founders and the business and been made millionaires as a result had actually been given the stock as an undisclosed payment or inducement to perpetuate and expand a pyramid scheme. Each of these Defendants knew that the Plaintiffs to whom the equity offer was being made were in a vastly different position than they had been, and that they had been the beneficiary of a conflicted transaction that had no chance of ever being repeated again.

- Each of them willingly participated in the videotaping and dissemination of the Webinar and made personal appearances during

which they heard false statements being made concerning the equity offer and/or made those false statements. When Owens made repeated representations to the Plaintiffs concerning an April 17, 2017 payout date, he obtained such information from the Sarnicolas and Mallen and either knew it was false or recklessly failed to investigate the basis for the claim.

### A. Sarnicola

- Prior to being married to Defendant N. Sarnicola, she had been a high-ranking ViSalus promoter and had participated in the "Pyramid Thing" Internet series with her future husband. She is a co-owner with her husband of Power Couple, LLC, a company that had reached a series of undisclosed payment transactions with a number of promoters to induce them to recruit distributors into the ViSalus pyramid scheme. She was privy to the true financial details of both the MIPA and Recapitalization Agreements and to the true financial condition of the company at the time of the equity offer at issue. She willingly participated in the videotaping and dissemination of the Webinar and made personal appearances during which she heard false statements being made concerning the equity offer.

- Defendant's company was (and is) facing personal liability in the *Kerrigan* litigation motivating her to raise money from the Plaintiffs through this offering.

204.   Plaintiffs and the Class invested in the Plan in reliance on the scheme, actions, misrepresentations and/or omissions as alleged. In the alternative, Plaintiffs and the Class relies on the presumption of reliance under applicable law as set forth above. Each Plaintiff and the Class were aware of the Defendants' role in the offering as set forth herein.

205.   The actions herein described caused the injuries suffered by Plaintiffs and the Class. Plaintiffs and the Class were supplied and saw the offering on the ViSalus page and the videos and statements described. Defendants did not make available to the Plaintiffs or the Class any information or disclosure that could have corrected the misleading, false, or fraudulent statements or omissions. Plaintiffs and the Class had no opportunity to learn the true nature of the company's condition due to Defendants' concealment. But for the fraudulent and deceptive actions and statements, Plaintiffs and the Class would not have "run for equity" in the amounts and other terms set forth by the Defendants. But for the fraudulent and deceptive actions and the expectation that they would receive a portion of the 6% equity as represented by the Defendants, Plaintiffs and the Class would not have continued to purchase products and otherwise remain in good standing following their initial qualification.

## COUNT II

## Violation of Sections 12 (a) (1) and (2) of the Securities Exchange Act
## (Against Certain Defendants Only)

206.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

207.   ViSalus engaged in the offer or sale of a security in connection with the Founders Equity Incentive Plan. Plaintiffs' allegations for violations of Sections 12 (1) and (2) of the Securities Exchange Act are not preempted by the PSLRA. Plaintiff's sworn certificates are attached as Exhibits 1, 2, and 3 to this Complaint.

208.   The securities offered in this transaction were offered by Defendants N. Sarnicola, Mallen, and Blair. Certificates purporting to evidence ownership in the security were issued by Defendant ViSalus. Defendant Owens substantially and actually caused the Plaintiffs to purchase the offering. Thus each of these Defendants is liable under Section 12.

209.   Under Section 12(1) any person who offers or sells a security required to be registered under the Securities Act but not so registered is liable to the person purchasing the security. Each Defendant with the exceptions of Goergen, Reynolds, and A. Sarnicola, offered the sale of an unregistered security to the Plaintiffs and the Class. Each Plaintiff and the Class purchased a security offered by the Defendants. Each Defendant is liable to each Plaintiff and the Class under Section 12(1).

210.   Under Section 12(2) any person who by use of any means of interstate commerce offers or sells a security on the basis of a materially false or misleading prospectus or offering circular or materially false or misleading oral statements is

liable to the person purchasing from him. The description of the Plan offering contained in the ViSalus website pages posted in January, 2015 constitute a prospectus within the meaning of Section 12(2). Each Defendant with the exceptions of Goergen, Reynolds, and A. Sarnicola, sold a security on the basis of materially false statements for purposes of Section 12(2).

211.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants sold a security on the basis of materially false or misleading: (1) the ViSalus website "March To Equity" pages and (2) materially false or misleading oral statements.

212.   Plaintiffs had no knowledge of the omissions and/or misrepresentations detailed in this Complaint which form the basis of Defendants' liability under Section 12(2).

213.   Plaintiffs and the Class need not plead reliance under Section 12. The actions herein described caused the injuries suffered by Plaintiffs and the Class. But for the fraudulent and deceptive actions, Plaintiffs and the Class would not have "run for equity" in the amounts and other terms set forth by the Defendants. But for the fraudulent and deceptive actions and the expectation that they would receive a

portion of the 6% equity as represented by the Defendants, Plaintiffs and the Class would not have continued to purchase products and otherwise remain in good standing following their initial qualification. Failure to register a prospectus prevented the Plaintiffs and the Class from learning facts necessary to correct the misrepresentations and/or omissions contained in the offering circular and oral statements.

214.   Plaintiffs may recover actual damages or rescission of their equity transaction.

## COUNT III

### Violation of Michigan Uniform Securities Act, Section 509(2) MCL.451.2509(2), Sale of Unregistered, Non-Exempt Securities (Against All Defendants)

215.   Plaintiffs repeat and re-alleges each and every allegation contained above as if fully set forth herein.

216.   Michigan law governs any dispute that arose out of any dispute between a distributor and ViSalus. Each Plaintiff was also a ViSalus distributor. On information and belief, all members of the class were ViSalus distributors. Because the securities offering occurred in Michigan, Michigan blue sky laws ("MUSA")

independently govern the claims asserted by Plaintiffs and the Class. The transactions at issue are not subject to preemption under the Securities Litigation Uniform Standards Act of 1988, Pub. L. No. 105-353, 112 Stat. 3227 (codified throughout 15 U.S.C.).

217.  None of the Plan or any written material, offering circular or prospectus relating to the offer was registered in the State of Michigan.

218.  Under MUSA Section 509(2):

[A] person is liable to the purchaser if the person sells a security in violation of section 301 [of the Act,]" which prohibits the offer or sale of a security in the State of Michigan unless (a) the security is a "federal covered security"; (b) the security, transaction, or offer is exempted from registration under the Act; or (c) the security is registered under the Act.

219.  None of the exculpatory conditions is met.

220.  The actions herein described caused the injuries suffered by Plaintiffs and the Class. But for the failure to file, Plaintiffs and the Class would not have acted on the offer to "run for equity" in the amounts and other terms set forth by the Defendants. But for the failure to file a registration, Plaintiffs and the Class would not have continued to purchase products and otherwise remain in good standing

following their initial qualification. Failure to register a prospectus prevented the Plaintiffs and the Class from learning facts necessary to correct the misrepresentations and/or omissions contained in the offering circular and oral statements.

221. Under MUSA Plaintiffs and the Class may recover either actual damages, or the amount of the consideration paid for the security, together with costs, reasonable attorney fees, and interest at 6% per year from the date of the purchase.

## COUNT IV

**Violation of Michigan Uniform Securities Act, Sections 501, 502, 509(3), MCL.451.2501, 2502, 2509(3), Fraudulent Sale of Securities, Fraud in the Inducement**

**(Against All Defendants)**

222. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

223. MUSA Section 501 prohibits the following:

It is unlawful for *a person*, in connection with the offer, sale, or purchase of a security … to directly or indirectly do any of the following:

(a)   Employ a device, scheme, or artifice to defraud.

161

     (b)    Make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

     (c)    Engage in an act, practice, or course of business that operates or would operate as a fraud or deceit on another person.

224.   Each Defendant named herein is a "person" within the meaning of Section 501.

225.   Each allegation scheme, fraud, artifice, and misrepresentations and/or omissions alleged in Count I is here repeated and re-alleged with specificity as an allegation of Defendants' liability under Section 501 against that Defendant.

226.   MUSA Section 502 prohibits the following:

It is unlawful for a person that advises others for compensation, either directly or indirectly or through publications or writings, as to the value of securities or the advisability of investing in, purchasing, or selling securities … to do any of the following:

     (a)    Employ a device, scheme, or artifice to defraud another person.

     (b)    Engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

162

227.   Each Defendant named herein is a "person" within the meaning of Section 502.

228.   The promotional activities of each Defendant described herein, with the exception of Goergen, constitute "advice for compensation" within the meaning of Section 502. Each of the Defendants with the exception of Goergen made statements or ratified the making of statements relating to the future value of the equity offered, the likelihood of its appreciation, and the advisability of making the investment, all as set forth above. Each of these Defendants was paid or otherwise compensated on the basis of appearing in the videos or conducting live promotional activity. Accordingly each of these Defendants is liable to the Plaintiffs and the Class under Section 502.

229.   Section 509(3) prohibits the following:

[A] person is liable to the purchaser if the person sells a security by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading, the purchaser not knowing the untruth or omission, and the seller not sustaining the burden of proof that the seller did not know and, in the exercise of reasonable care, could not have known of the untruth or omission.

230.   Each defendant named herein is a "person" within the meaning of Section 509.

231.   Each allegation made in Count I is here repeated and re-alleged with specificity as an allegation of liability under Section 509(3) against that Defendant.

232.   Under Michigan law, fraud in the inducement exists where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon.

233.   Each Defendant fraudulently induced the Plaintiffs and the Class into the purchase of securities as described herein.

234.   Plaintiffs and the Class invested in the Plan in reliance on the scheme, actions, misrepresentations and/or omissions as alleged. In the alternative, Plaintiffs and the Class rely on the presumption of reliance under applicable law and/or the inference of reliance under applicable law.

235.   The actions herein described caused the injuries suffered by Plaintiffs and the Class. But for the fraudulent and deceptive actions, Plaintiffs and the Class

would not have "run for equity" in the amounts and other terms set forth by the Defendants. But for the fraudulent and deceptive actions and the expectation that they would receive a portion of the 6% equity as represented by the Defendants, Plaintiffs and the Class would not have continued to purchase products and otherwise remain in good standing following their initial qualification.

236.   Under MUSA Plaintiffs and the Class may recover either actual damages, or the amount of the consideration paid for the security, together with costs, reasonable attorney fees, and interest at 6% per year from the date of the purchase.

## COUNT V

## Violation of Michigan Uniform Securities Act, Sections 403(1), 509 (5), 509(6) and 509(7); MCL 451.2502, 2403(1), 2509(5) (6) (7)

## (Against All Defendants)

237.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

238.   Section 509(5) provides the following:

A person acting as an *investment adviser* or *investment adviser representative* that provides investment advice for compensation in violation of section 403(1), 404(1), or 506 is liable to the client.

165

(emphasis added)

239.   Section 509(6) provides the following:

*[A] person that receives, directly or indirectly, any consideration for providing investment advice to another person* and that employs a device, scheme, or artifice to defraud the other person or engages in an act, practice, or course of business that operates or would operate as a fraud or deceit on the other person is liable to the other person.

(emphasis added)

240.   Section 509(7) provides as follows:

The following persons are liable jointly and severally with and to the same extent as persons liable under subsections (2) to (6):

   (a)   A person that directly or indirectly controls a person liable under subsections (2) to (6)….

   (b)   An individual who is a managing partner, executive officer, or director of a person liable under subsections (2) to (6), including each individual having a similar status or performing similar functions…

   (c)   An individual who is an employee of or associated with a person liable under subsections (2) to (6) and who materially aids the conduct giving rise to the liability…

   (d)   A person that is a broker-dealer, agent, investment adviser, or investment adviser representative that materially aids the conduct giving rise to the liability under subsections (2) to (6)…

241.   Each Defendant except Goergen qualifies as an investment advisor or investment advisor representative under Section 509(5). Each Defendant except

Goergen qualifies under Section 509(6).   Each Defendant, including Goergen, is liable jointly or severally to the Plaintiffs and the Class pursuant to subsections (a)-(d) of Section 509(7). Within the meaning of that section, Defendant Goergen directly or indirectly controlled Defendants Reynolds and Owens (subsection (a)), was a managing partner or director of Defendants N. Sarnicola, Mallen and Blake (subsection (b)), and associated with the other Defendants materially aiding the offering (subsection (c)).

242.   Section 403(1) provides the following:

[A] person shall not transact business in this state as an investment adviser unless the person is registered under this act as an investment adviser or is exempt from registration as an investment adviser under [Section 401(2)].

243.   None of the Defendants named herein are registered investment advisers and unlawfully transacted business in this State or are exempt from registration.

244.   Reliance is not an element of liability under this Count. To the extent reliance is an element, Plaintiffs and the Class re-allege reliance as set forth in this Complaint.

245.   The actions herein described caused the damages suffered by Plaintiffs and the Class. But for the fraudulent and deceptive actions, Plaintiffs and the Class would not have "run for equity" in the amounts and other terms set forth by the Defendants. But for the fraudulent and deceptive actions and the expectation that they would receive a portion of the 6% equity as represented by the Defendants, Plaintiffs and the Class would not have continued to purchase products and otherwise remain in good standing following their initial qualification. Failure to register a prospectus prevented the Plaintiffs and the Class from learning facts necessary to correct the misrepresentations and/or omissions contained in the offering circular and oral statements.

## COUNT VI
## STATUTORY AND/OR COMMON LAW CONVERSION
### (ViSalus, N. Sarnicola, Mallen and Blair)

246.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

247.   Plaintiffs bring this claim on their own behalf and on behalf of each of the Class members.

248.   Statutory conversion under MCLS § 600.2919a provides that a person damaged by another person's stealing or embezzling property or converting property to the other person's own use may recover three times the amount of actual damages sustained, plus costs and reasonable attorney fees.

249.   ViSalus obtained Plaintiffs' money by using a fraudulent scheme to induce Plaintiffs to pay money to ViSalus in exchange for "equity" in ViSalus and to participate in the Plan.  Through its agents and promotional materials, ViSalus represented to Plaintiffs and the Class that they would "own equity" in ViSalus in return for spending, buying or otherwise paying moneys to ViSalus in order to obtain a portion of the 6% equity offered by Defendants N. Sarnicola, Mallen and Blair.

250.   Various Plaintiffs paid ViSalus at least $40,000 in 2015 at least $25,000 in 2016 and additional fees and costs as set forth to participate in the Plan, purchase shares in ViSalus, and remain active and eligible to receive the payouts.

251.   Defendants failed to tender Plaintiffs' common stock.

252.   Defendants have an obligation to return the amounts Plaintiffs paid to ViSalus to receive shares in ViSalus, participate in the Plan, and the fees and costs

Plaintiffs have paid in order to remain active and eligible to receive the payouts but have not returned such moneys.

253.   These Defendants are also liable for common law conversion.  Under Michigan law, a common law cause of action for conversion also exits for "[A]ny distinct act of dominion wrongfully exerted over another's personal property in denial or inconsistent with his rights therein."

254.  Defendants are thus also liable for common law conversion because they have wrongfully taken and otherwise exerted dominion over the amounts they induced Plaintiffs to pay in connection with earning equity in the Plan inconsistent with the Plaintiffs' rights therein.

## COUNT VII
## DECLARATORY AND INJUNCTIVE RELIEF
### (Against all Defendants)

255.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

256.   There exists an actual and justiciable controversy between the parties concerning the rights conveyed in the 6% equity Plan offering.

170

257.    Defendants have taken inconsistent and contradictory positions concerning the amount of shares in the Plan, the conversion of the "units" awarded to common stock, the source of their shares, and whether the Plaintiffs and the Class are owners in law of ViSalus common stock. Selling Defendants have purported to condition the tender of common stock on future acts and continued payment of moneys to ViSalus; and purport to reserve to themselves the right to dilute, restrict, void, or otherwise encumber the 6% equity or parts of it according to unknown criteria. Selling Defendants have encumbered Plaintiffs' ownership rights in violation of both Michigan and Nevada corporate and shareholder oppression laws.

258.    Plaintiffs seek a declaration from this Court in addition to any other monetary and equitable relief sought, that they and the Class are the immediate owners of 6% of the ViSalus common stock, and that such stock must be conveyed and tendered from the selling Defendants free from encumbrance, claims or further demands of payment. Defendants further seek a declaration that the selling Defendants may not convey, encumber or otherwise pledge or use as collateral any of the 6% offered in the Plan without order of this Court.

259.    Plaintiffs reserve the right to seek injunctive relief to protect their rights in the property and the claims as set forth.

## **<u>PRAYER FOR RELIEF</u>**

Plaintiffs and the Class request the following relief:

a.    Certification of the class;

b.    A judgment against the Defendants of actual damages sustained in the full amount recoverable by law;

c.    Alternatively or in addition, rescission of the investments made by Plaintiffs and the Class in such amount as would restore Plaintiffs and the Class to their condition prior to their investment;

d.    Temporary and permanent injunctive relief enjoining the defendants from further unfair, unlawful, fraudulent and/or deceptive acts, including, but not limited to, supporting, continuing or operating the securities fraud;

e.    Disgorgement of all proceeds of the securities fraud by each Defendant;

f.    A declaration that each Plaintiff and the Class have fully complied with the terms and conditions of the sale of the equity, and a declaration that Defendants may not impose further conditions or qualifications, or demand further payment of any kind as a condition to the issuance of the equity;

g.    A declaration that each Plaintiff and all members of the Class who have been issued a "unit" certificate are entitled to share 6% of the common stock owned by Defendants N. Sarnicola, Mallen, and Blair;

h.    A declaration that Plaintiffs and the Class are shareholders in ViSalus;

i.    Attorneys' fees as allowed by law;

     j.     For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper.

## <u>DEMAND FOR A JURY TRIAL</u>

Plaintiffs on their own behalf, and on behalf of the Class they represent, demand a jury trial.

Filed this 10th day of August, 2017.

Respectfully submitted,

SOMMERS SCHWARTZ, P.C.

s/ Andrew Kochanowski
Andrew Kochanowski (P55117)
Sarah L. Rickard (P78767)
Attorneys for Plaintiffs
One Towne Square, Suite 1700
Southfield, MI 48076
(248) 355-0300
akochanowski@sommerspc.com
srickard@sommerspc.com

s/ Matthew J.M. Prebeg
PREBEG, FAUCETT & ABBOTT, PLLC
Matthew J.M. Prebeg
(TX Bar No: 00791465)
Brent T. Caldwell
(TX Bar No: 24056971)
Attorneys for Plaintiffs
8441 Gulf Freeway, Suite 307
Houston, TX 77017
(832) 743-9260
mprebeg@pfalawfirm.com
bcaldwell@pfalawfirm.com

s/ Mark R. Miller
WEXLER WALLACE LLP
Edward A. Wallace
(IL Reg. No. 6230475)
Mark R. Miller
(IL Reg. No. 6283542)
Adam Prom
(IL Reg. No. 6317283)
Attorneys for Plaintiffs
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
(312) 589-6272
EAW@wexlerwallace.com
MRM@wexlerwallace.com
ap@wexlerwallace.com