UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CAPRECE BYRD, *et al.*,

        Plaintiffs,                     Case No. 17-cv-12626
                                               Hon. Matthew F. Leitman

v.

VISALUS, INC., *et al.*,

        Defendants.

_____/

## OPINION AND ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS (ECF #39) AND (2) ALLOWING PLAINTIFFS TO FILE A SECOND AMENDED COMPLAINT

      In this putative class action, Plaintiffs claim that the Defendants defrauded them into purchasing equity in Defendant ViSalus, Inc. Defendants ViSalus, Nick Sarnicola, Ashley Sarnicola, Blake Mallen, Ryan Blair, Todd Goergen, Gary Reynolds, and Michael Craig (collectively, the "ViSalus Defendants") have now moved to dismiss Plaintiffs' First Amended Complaint. (*See* ECF #39.) For the reasons that follow, the motion is **GRANTED IN PART** and **DENIED IN PART**.

1

ViSalus is a Nevada corporation that sells weight-loss shakes and other products. (*See, e.g.*, First Am. Compl. at ¶¶ 2, 29, ECF #30 at Pg. ID 366, 378.) It is "run" by its "founders," Nick Sarnicola, Blair, and Mallen. (*Id.* at ¶2, Pg. ID 366.)

ViSalus operates using a multi-level marketing ("MLM") business model. Under this model, "participants pay money to the program promoter in return for which the participants obtain the right to: (1) recruit additional participants …; (2) sell goods or services; and (3) receive payment or other compensation … based upon the sales of those [individuals that the participant recruits]." *F.T.C. v. Five Star Auto Club, Inc.*, 2000 WL 1609798, at *1 (S.D.N.Y. June 12, 2000). In other words, a company using the MLM model "markets its products not through direct sale to customers, but rather, through sales to individual distributors … who then sell to the general public" and recruit others to do the same. *Virgin Enterprises Ltd. v. American Longevity*, 2001 WL 34142402, at *1 (S.D.N.Y. Mar. 1, 2001); *Altaria Corp. v. Woodbolt Distribution, LLC*, 2014 WL 3121899, at *4 (W.D. Tex. July 7, 2014) (describing how companies using the MLM model "use[] promoters to sell directly to customers and also to enroll other promoters").

---

[1] The facts in this section are drawn from the allegations in the First Amended Complaint. The Court accepts Plaintiffs' factual allegations as true, as it must at this stage of the proceeding.

ViSalus' MLM sales and recruiting strategy worked – for a time. "Almost 400,000 people in the United States, including over 200,000 just in 2012 paid money to become a [ViSalus] distributor." (First Am. Compl. at ¶3, ECF #30 at Pg. ID 367.) But, quickly, the market became "saturated as distributors tripp[ed] over each other in the same [areas]." (*Id.* at ¶4, Pg. ID 367.) "By the end of 2012, sales [of ViSalus' products] plummeted." (*Id.*) And "[b]y 2014 [ViSalus] was in its second straight money-losing year with sales off by 80% from their high." (*Id.* at ¶8, Pg. ID 369.)

Desperate for cash, the ViSalus Defendants created a new way to make money that they referred to, at various times, as the "Founders Equity Incentive Plan" (the "Plan") and the "March to Equity." (*Id.* at ¶¶ 81 86, Pg. ID 403, 407.) Under the Plan, ViSalus promoters who met certain sales and recruiting benchmarks would obtain "equity" that would be "equivalent to 6% of [ViSalus]." (*Id.* at ¶¶ 13, 92, Pg. ID 317, 416.) This equity would entitle the promoters to receive "generations worth of dividends." (*Id.* at ¶13, Pg. ID 317.) "The goal of the Plan was to raise capital to cover [ViSalus'] immediate and urgent cash needs" – by providing an incentive for promoters to buy more product from ViSalus and recruit new distributors – while "hid[ing] the fact from the investor promoters that the company was selling worthless equity." (*Id.* at ¶81, Pg. ID 403.)

ViSalus "promoted" the Plan with an "announcement on its web page, by personal and videotaped promotion by [its founders, Nick Sarnicola, Blair, and

Mallen], and through Facebook and other social media." (*Id.* at ¶14, Pg. ID 372.) In one such video, Nick Sarnicola told potential investors that:

- He, Blair, and Mallen had spent $105 million to "buy back" ViSalus from its previous owner.
- He, Blair, and Mallen were "immediately taking 6% of the equity that [they] just … acquire[d]" and offering investors "a chance to earn some of it."
- Investors could earn "equity," become "shareholders," and get "dividend[s]."
- Participating in the Plan "could mean owning a piece of a multiple nine figure a year company…," ownership that investors could "pass on … to [their] children."

(*Id.* at ¶87, Pg. ID 408-15.) In a second video promoting the Plan, Nick Sarnicola assured investors that they had an opportunity to earn "real money" and "real equity" through participation in the Plan, and that he, Blair, and Mallen had "set aside six percent of [ViSalus]" for distributors who participated in the Plan. (*Id.* at ¶125, Pg. ID 444.) Participants in the Plan were further promised that they would receive a specific dividend payment on April 17, 2017. (*See id.* at ¶17, Pg. ID 374.)

The ViSalus Defendants also recruited individuals to help market the Plan to potential investors and current ViSalus distributors. One of these individuals was Defendant Vincent Owens, the pastor of the Household of Faith Empowerment

4

Temple in Aurora, Colorado.[2] (*See id.* at ¶38, Pg. ID 384.)   He "promoted [the Plan] to dozens or hundreds of people," including the Plaintiffs. (*Id.*)  Among other things, Owens and/or his associate Deb Johnson told the Plaintiffs that ViSalus was a successful, "expanding," company with "2.2 billion dollar[s] [] to date in sales," that six-percent "of [ViSalus] would be available" in "equity" to promoters who participated in the Plan, and that participants in the Plan would receive "years" of "dividends," including "a large payout on April 17, 2017." (*Id.* at ¶¶ 165, 169, 183, 259, Pg. ID 483-85, 492, 522.)  At the urging of Owens and/or Johnson, each of the Plaintiffs became ViSalus distributors and invested tens of thousands of dollars in order to qualify for equity through participation in the Plan. (*See id.* at ¶¶ 147-262, Pg. ID 477-523.)  Plaintiffs believed that by participating in the Plan, they would become shareholders in ViSalus and start receiving dividend payments. (*See id.*)  Plaintiffs now say that they did not receive either the promised equity or any dividends.

## II

Plaintiffs filed this putative class action on August 10, 2017, against the ViSalus Defendants and Owens.[3] (*See* Compl., ECF #1.)  They filed a First Amended

---

[2] Owens is also a Defendant in this action.  He has not moved to dismiss the First Amended Complaint.

[3] Owens' associate, Johnson, is not a party to this action.

Complaint on September 29, 2017. (*See* First Am. Compl., ECF #30.)  In the First

Amended Complaint, the Plaintiffs have brought the following claims:

- Violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 10b-5(a)-(c), 17 C.F.R. § 240.10b-5(a)-(c) against all Defendants;

- Violation of Sections 12(a)(1) and (a)(2) of the Exchange Act against all of the Defendants except for Reynolds and Ashley Sarnicola;

- Violation of Section 509(2) of the Michigan Uniform Securities Act ("MUSA"), Mich. Comp. Laws § 451.2509(2) against all Defendants;

- Violation of Sections 501, 502, and 509(3) of the MUSA, Mich. Comp. Laws §§ 451.2051, 2502, and 2509(3) against all Defendants;

- Violation of Sections 403(1), 509(5), 509(6), and 509(7) of the MUSA, Mich. Comp. Laws §§ 451.2502, 2403(1), 2509(5), and 2509(6) against all Defendants; and

- Statutory and common law conversion against Defendants ViSalus, Nick Sarnicola, Blair, and Mallen.

Plaintiffs also request declaratory and injunctive relief.  Among other things,

Plaintiffs "seek a declaration from the Court[,] in addition to any other monetary or

equitable relief sought, that they and the Class are the immediate owners of 6% of

the ViSalus common stock." (*Id.* at ¶331, Pg. ID 582.)

The ViSalus Defendants moved to dismiss Plaintiffs' claims on October 27,

2017. (*See* Mot. to Dismiss, ECF #39.)  The Court held a hearing on the motion to

dismiss on February 20, 2018. (*See* ECF #46.)   The parties filed simultaneous supplemental briefs on March 2, 2018. (*See* ECF ## 49, 50.)

### III

In the Motion, Defendants seek relief pursuant to Federal Rule of Civil Procedure 12(b)(6).   Rule 12(b)(6) provides for dismissal of a complaint when a plaintiff fails to state a claim upon which relief can be granted.   *See* Fed. R. Civ. P. 12(b)(6).   "To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct.   *See id.* (citing *Twombly*, 550 U.S. at 556).   When assessing the sufficiency of a plaintiff's claim, a district court must accept all of a complaint's factual allegations as true.   *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001).   "Mere conclusions," however, "are not entitled to the assumption of truth.   While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664.   A plaintiff must therefore provide "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action" to survive a motion

to dismiss. *Twombly*, 550 U.S. at 556. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In addition, where, as here, Plaintiffs allege fraud under Section 10(b) of the Exchange Act, they must "state with particularity the circumstances constituting fraud or mistake" under Rule 9b of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 9(b). Under this rule, Plaintiffs "must (1) specify the statements that [they] contend[] were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. At a minimum, Plaintiffs must allege the time, place and contents of the misrepresentations upon which they relied." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (internal punctuation and citations omitted). Finally, Plaintiffs must also satisfy the pleading requirements of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 (the "PSLRA") with respect to their fraud claims under Section 10(b). *See id.* Among other things, the PSLRA requires Plaintiffs to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading. 15 U.S.C. § 78u-4(b)(1).

**IV**

**A**

In Count I of the First Amended Complaint, Plaintiffs bring multiple securities fraud claims under Section 10(b) and Rules 10b-5(a), (b), and (c) of the Exchange

Act. (*See* First. Am. Compl. at ¶¶ 270-277, ECF #30 at Pg. ID 530-566.)   The ViSalus Defendants argue that the Court should dismiss all of these claims because (1) the units in the Plan offered to Plaintiffs were not "securities," (2) even if the units were "securities," the alleged misrepresentations or omissions were not made in connection with the "purchase" or "sale" of the units, (3) Plaintiffs have not sufficiently pleaded that they relied on any misstatements or omissions, and (4) Plaintiffs have not sufficiently pleaded a scheme to defraud under Rules 10b-5(a) and (c). (*See* Mot. to Dismiss, ECF #39 at Pg. ID 657-74.)  The Court concludes that Plaintiffs have sufficiently pleaded that units in the Plan are securities and that the alleged misstatements or omissions were made in connection with the purchase of a security.  But it agrees with the ViSalus Defendants that Plaintiffs' Rule 10b-5(b) claim fails because Plaintiffs have not sufficiently alleged that they relied on a particular misrepresentation made by any of these Defendants.  The Court also agrees with the ViSalus Defendants that Plaintiffs' Rule 10b-5(a) and (c) claims fail because Plaintiffs have not sufficiently alleged a scheme to defraud separate and apart from the ViSalus Defendants' alleged misrepresentations.  The Court will therefore dismiss Plaintiffs' Section 10b and Rule 10b-5 claims and grant Plaintiffs leave to amend these claims in a Second Amended Complaint.

**1**

The ViSalus Defendants first assert that the Court should dismiss all of Plaintiffs' securities-fraud claims because (1) those claims "require[] that the plaintiff [has] purchased a security[,]" (2) the "security" that Plaintiffs have identified here are units in the Plan,[4] and (3) units in the Plan are not securities. (Mot. to Dismiss, ECF #39 at Pg. ID 657-63.)  The Court disagrees.

At the hearing on Defendants' motion to dismiss, counsel for the ViSalus Defendants acknowledged that it would be proper for the Court to determine whether units in the Plan are securities by applying the framework described in *United States Securities and Exchange Commission v. Zada*, 787 F.3d 375, 380 (6th Cir. 2015). Under *Zada*, a court first determines whether the "instrument" at issue is expressly identified as a security in 15 U.S.C. § 77b(a)(1). *Id.*  If the instrument does appear in that list, then it is "presumptively [a] securit[y]." *Id.*  A defendant may "rebut [this] presumption" by showing that "the [instrument] bears a family resemblance to a list of instruments that are not securities." *Id.* (internal quotation marks omitted). "Whether the [instrument] bears a resemblance to one of those instruments depends on four factors: first, the motivation prompting the transaction; second, the plan of distribution; third, the reasonable expectations of the investing public; and fourth

---

[4] At the hearing on the motion to dismiss, Plaintiffs confirmed that the "securities" at issue and referred to in the First Amended Complaint are units in the Plan.

whether a risk-reducing factor (for example, another regulatory scheme) makes application of the Securities Acts unnecessary." *Id.*

The Court first concludes that units in the Plan are presumptively securities under *Zada*. One of the "instruments" listed in 15 U.S.C. § 77b(a)(1) is "stock," and Plaintiffs plausibly allege that units in the Plan are stock. Indeed, as quoted extensively above, the ViSalus Defendants repeatedly referred to the instrument that Plaintiffs could acquire as "equity" and referred to the holders of that equity as "shareholders," words and phrases commonly-associated with stock.

Moreover, Plaintiffs plausibly allege that the units had "the most common feature of stock" – the "right to receive dividends." *United Housing Federation, Inc. v. Foreman*, 421 U.S. 837, 851 (1975). Indeed, Plaintiffs allege that the ViSalus Defendants repeatedly promised in videos and other promotional materials that if Plaintiffs invested in the Plan, they would receive dividends:

- "But 6% of a billion dollars in dividends is $60 million a year. If we could get to that size, we'll be dividending $60 million per year to those promoters that go to work right now." (First Am. Compl. at ¶88, ECF #30 at Pg. ID 412.)

- "Twenty years from now, if you own a small piece of this company, you get a $4,000 dividend for work you did 20 years ago, you haven't even mentioned the name ViSalus in 17 years, but you had a $4,000 dividend check still? Who's happy? Who's cashing the check? See guys, this is what smart people do." (*Id.* at ¶88, Pg. ID 413.)

- "I want to be paying dividends that are seven figure dividends to our top money earners and why don't you come find out how you can be one. […] One point eight billion dollars of sales the last few years; what would it have been like had you owned a piece of that and you were getting a dividend out of it let alone the commissions that you can earn in this company." (*Id.* at ¶125, Pg. ID 445.)

- "If you wanna increase the wealth for decades to come, get as much equity as you can, but build the company up and then let's start issuing dividends to every single one of you shareholders for the rest of your lives." (*Id.* at ¶130, Pg. ID 450.)

Accordingly, Plaintiffs have plausibly alleged that units in the Plan are stock, and thus are presumptively securities under *Zada*.

The ViSalus Defendants resist the conclusion that units in the Plan are stock. They argue that "units in the Plan are best characterized as 'phantom stock'" that are "based on 'phantom' or hypothetical' shares or units." (Mot. to Dismiss, ECF #39 at Pg. ID 661.) And they insist that phantom stock "is not a security." (*Id.* at Pg. ID 663.) But the ViSalus Defendants themselves repeatedly referred to units in the Plan as "real equity." (First Am. Compl. at ¶125, ECF #30 at Pg. ID 444.) For this reason (and others), the Court cannot conclude as a matter of law at this time that units in the Plan are "phantom stock."

The Court next concludes that the ViSalus Defendants have not rebutted the *Zada* presumption that units in the Plan are securities. The first factor a court

considers in this analysis is the motivation that prompted the transaction. This factor "turns on whether the buyers' purpose was investment (suggesting a security) or commercial or consumer (suggesting a non-security)." *Zada*, 787 F.3d at 380 (internal quotation marks omitted). Here, Plaintiffs have plausibly alleged that they wanted to obtain the "equity" the ViSalus Defendants were promoting so that they could become shareholders in ViSalus, "provide for their families for years to come," and receive the dividend payments that the ViSalus Defendants promised. (First Am. Compl. at ¶19, ECF #30 at Pg. ID 376; *see also*, *e.g.*, *id.* at ¶186, Pg. ID 493.) Plaintiffs have therefore plausibly alleged that they were motivated by an investment purpose.

"The second factor is the plan of distribution for the instruments. If [an instrument] is sold to a wide range of unsophisticated people, as opposed to a handful of institutional investors, the [instrument is] more likely to be [a] securit[y]." *Zada*, 787 F.3d at 381. This factor also supports the conclusion that units in the Plan are securities. As in *Zada*, Plaintiffs have plausibly alleged that the units in the Plan were sold "to a variety of laypersons." *Id.* Indeed, none of the named Plaintiffs claim to be sophisticated investors, and Plaintiffs have specifically alleged that the ViSalus Defendants targeted "unsuspecting, unsophisticated investors." (First Am. Compl. at ¶11, ECF #30 at Pg. ID 371.)

"The third factor – the reasonable expectations of the investing public – suggests that [instruments] are securities if a reasonable person would expect the securities laws to apply to them." *Zada*, 787 F.3d at 381.  Here, Plaintiffs have plausibly alleged that they thought they were buying stock in a multi-billion dollar nutrition company.  It is plausible that a reasonable person would expect the securities laws would apply to that kind of transaction.

Finally, the fourth factor is "whether a risk-reducing factor makes application of the Securities Acts unnecessary." *Id.*  In the context of this factor, if "another regulatory scheme" applies to the instrument, then it may not be necessary to apply the securities laws in order to regulate that instrument. *Id.* at 380.  Here, the ViSalus Defendants have not identified any other federal regulation that could regulate the units in the Plan.  The Court thus cannot say that this factor rebuts the presumption that the units are securities.

In sum, when the Court weighs these factors, it concludes that the ViSalus Defendants have not rebutted the presumption that units in the Plan are securities.

**2**

The ViSalus Defendants next argue that even if units in the Plan were securities, Plaintiffs' securities-fraud claims still fail because Plaintiffs have not sufficiently alleged that the ViSalus Defendants made a false statement or omission in connection with the "purchase" or "sale" of the units. (Mot. to Dismiss, ECF #39

at Pg. ID 663-65.) The ViSalus Defendants insist that the units in the Plan were never for sale and that the Plaintiffs purchased "ViSalus kits and product," not units in the Plan. (*Id.* at Pg. ID 664.) Therefore, the ViSalus Defendants say, the Plaintiffs never "purchased" a security. (*Id.*)

This argument is not without some force. Indeed, Plaintiffs themselves allege that ViSalus "provided no means for a direct purchase" of units in the Plan. (First Am. Compl. at ¶13, ECF #30 at Pg. ID 371.) And in at least one of the promotional videos that Plaintiffs rely upon, Nick Sarnicola told potential investors that they "can't buy this equity" and "can't raise capital to get some, [they] can only go to work" (*i.e.*, by recruiting enough individuals to sign up as ViSalus promoters to qualify for an award of equity). (*Id.* at ¶88, Pg. ID 412.)

However, Plaintiffs plausibly allege that the transaction at issue here was a "purchase." The Exchange Act broadly defines the terms "buy" and "purchase" to "include any contract to buy, purchase, or otherwise acquire," and it defines the terms "sale" and "sell" to include "any contract to sell or otherwise dispose of." 15 U.S.C. § 78c(a)(13)-(14) (emphasis added). "Courts have generally recognized that [these terms] should be read flexibly in order to effect the securities laws' remedial purposes." *In re: American Continental Corporation/Lincoln Savings and Loan Securities Litigation*, 49 F.3d 541, 543 (9th Cir. 1995). And when determining whether a purchase has occurred, courts "look[] to the substance of [a] transaction

rather than its form." *Id.* Likewise, "courts interpreting the purchase and sale requirement [in the securities' laws] have generally been guided by the principle that the anti-fraud goals of [those laws] should not be frustrated by the presence of novel or atypical transactions." *Id.* at 544 (internal punctuation omitted).[5] Moreover, courts applying these principles have repeatedly concluded that a "sale" or "purchase" has occurred under the Exchange Act where an individual contracted to acquire an asset or instrument through his or her "labor" or "effort." *See, e.g.*, *Rudinger v. Insurance Data Processing*, 778 F. Supp. 1334, 1338-39 (E.D. Pa. 1991) ("An agreement exchanging a plaintiff's services for a defendant corporation's stock constitutes a 'sale' under the terms of the Securities and Exchange Act."); *Dubin v. E.F. Hutton Group, Inc.* 695 F. Supp. 139, 146 (S.D.N.Y. 1998) ("It appears wholly consistent … to conclude that the exchange of an interest in an employee stock plan in return for the service of an employee can constitute a sale to that employee of a security."); *Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 F.2d 555, 560 (2d Cir. 1985) ("We see no reason why 'the context requires' us to hold that an individual who commits herself to employment by a corporation in return for stock or the promise of stock should not be considered an investor.").

---

[5] *See also Watts v. Des Moines Register and Tribune*, 525 F. Supp. 1311, 1319 (S.D. Iowa 1981) (noting that a court "must keep in mind that a purchase or sale must be defined broadly in order to fulfill the purposes of the [securities' laws] and may in some cases encompass transactions that bear little resemblance to conventional purchases and sales") (internal citation omitted)).

Plaintiffs plausibly allege here, in effect, that ViSalus promised to grant them units in the Plan in exchange for their successful "labors" and "efforts" selling ViSalus products and recruiting new distributors. (*See*, *e.g.*, First Am. Compl. at ¶ 13, ECF #30 at Pg. ID 371.)  Thus, the Court concludes that Plaintiffs have plausibly alleged that they "purchase[d]" units in the Plan as that term is defined in the Exchange Act.

The ViSalus Defendants counter that under the Supreme Court's decision in *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058 (2014), the Plaintiffs are not "purchasers" of a security.  The plaintiffs in *Chadbourne* alleged that "they purchased uncovered securities [*i.e*., securities *not* covered by the Exchange Act] … but [] that the defendants falsely told the [plaintiffs] that the uncovered securities were backed by covered securities." *Id.* at 1062.  The Supreme Court concluded that the Exchange Act "d[id] not apply" to plaintiffs' securities-fraud claims because, among other things, "the plaintiffs d[id] not allege that the defendants' misrepresentations led anyone to buy or to sell (or to maintain positions in) covered securities." *Id.* (emphasis in original).  Defendants assert that just "like the plaintiffs in *Chadbourne* – who did not allege that they bought covered securities – Plaintiffs [here] allege only that they bought the [ViSalus] business opportunity and product; they do not allege that they 'bought' units in the Plan." (Mot. to Dismiss, ECF #39 at Pg. ID 664.)

*Chadbourne* does not control here. In that case, the plaintiffs alleged that they purchased *uncovered* securities. But here, Plaintiffs have plausibly alleged that that the units in the Plan that they purchased were *covered* securities. Thus, unlike the plaintiffs in *Chadbourne*, Plaintiffs have plausibly alleged that "defendants' misrepresentations led [them] to buy … covered securities." And, as explained above, the fact that Plaintiffs allege that they did not "buy" or "purchase" units in the Plan in the traditional sense is no bar to their claims. Plaintiffs have therefore plausibly alleged that they "purchased" a security.

### 3

Rule 10b-5(b) makes it is unlawful, "in connection with the purchase or sale of any security, … [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a claim under this rule, "a plaintiff must [plead] and prove: (1) a material misrepresentation or omission by the defendant, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, and (5) loss causation." *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 157 (2008).

The ViSalus Defendants maintain that, with one exception, "Plaintiffs' Rule 10b-5(b) claims fail because Plaintiffs have not adequately pled reliance on specific statements or omissions by the ViSalus Defendants."[6] (Mot. to Dismiss, ECF #39 at Pg. ID 666-67.) The Court agrees.

Here, Plaintiffs (except for Watts) have not sufficiently pleaded that they relied on any specific statements or omissions from the ViSalus Defendants that led to their investment in the Plan. Indeed, most of the named Plaintiffs appear to allege that they relied upon and were persuaded to invest in the Plan as a result of personal pitches they heard from Owens and his associate Johnson, *not* from the ViSalus Defendants. (*See*, *e.g.*, First Am. Compl. at ¶¶ 169, 217-18, 224-25, 235, Pg. ID 484-85, 505-09, 513.) And while the First Amended Complaint is replete with references and quotes from various ViSalus promotional videos and other statements made by the ViSalus Defendants, Plaintiffs have not specifically pleaded, among other things:

- Which Plaintiffs saw which specific videos (if any);
- When each Plaintiff watched each specific video (*i.e.*, whether it was before or after they decided to invest in the Plan); or
- Which statements made by which Defendant specifically persuaded which Plaintiff(s) to invest in the Plan.

---

[6] The ViSalus Defendants concede that Plaintiff Bryant Watts has adequately pleaded reliance with respect to statements made by ViSalus and Mallen. (*See* Mot. to Dismiss, ECF #39 at Pg. ID 669.)

For example, Plaintiff Frank McWhorter alleges that he "first heard about ViSalus from Plaintiff Caprece Bryd" and that he first signed up as a ViSalus distributor based upon a "pitch[]" from Owens about the ViSalus "business opportunity." (*Id.* at ¶235, Pg. ID 513.) McWhorter then alleges that he attended meetings at Owens' church where Owens would "show attendees ViSalus videos." (*Id.* at ¶237, Pg. ID 513-14.) But McWhorter does not identify what videos he saw, when he saw them, which, if any, of the ViSalus Defendants spoke in those videos, or whether those videos convinced him to invest in the Plan (or had anything to do with the Plan as opposed to the underlying ViSalus business opportunity). And while McWhorter alleges that "Mallen, Ashley Sarnicola, and Nick Sarnicola discussed the equity payout checks at the Denver church meetings and also at [] ViSalus regional and national events" (*id.* at ¶138, Pg. ID 514), he does not say when those discussions occurred, whether they occurred before or after he decided to invest in the Plan, or whether he relied on those statements when he decided to invest.[7]

---

[7] In Plaintiffs' response to the ViSalus Defendants' motion to dismiss, they claim that "*[p]rior* to deciding to invest in the equity in January, 2016 and March, 2016 … McWhorter attended Owens' church recruitment meetings where Owens showed the March To Equity presentations and video." (Pla.s' Resp. Br., ECF #42 at Pg. ID 716; emphasis in original.) In support for this proposition, Plaintiffs cite to paragraph 237 of the First Amended Complaint. (*See id.*) But that paragraph includes none of the specifics identified in Plaintiffs' response brief. It says only that Owens would "show the meeting attendees ViSalus videos," without identifying which videos

20

Likewise, Plaintiff Eric Harris alleges that he decided to sign up as a ViSalus promoter after "Deb Johnson traveled to Oklahoma to pitch the ViSalus business opportunity and the [Plan]." (*Id.* at ¶¶ 248-50, Pg. ID 519.) Harris then alleges that he decided to "invest[] $25,000 in ViSalus to earn equity in December 2016." (*Id.* at ¶251, Pg. ID 519.) He "paid to enroll people as customers and distributors in his business organization *because Deb Johnson told him* it was the fastest way to make equity." (*Id.* at ¶252, Pg. ID 520; emphasis added.) Harris does not allege that he attended any ViSalus events nor does he allege he ever saw any ViSalus videos or promotional materials before he decided to "invest." Indeed, the only people Harris alleges that he spoke with about ViSalus were Johnson and Owens.

As a final example, Plaintiff Connie Bates alleges that she decided to "upgrade[] her [ViSalus] account to become a ViSalus distributer" in November 2016. (*Id.* at ¶259, Pg. ID 522.) Bates says she was "convinced to invest in the ViSalus equity" as a result of a personal solicitation by Owens. (*Id.*) Bates does not allege that she ever saw any of the promotional videos that are quoted or referenced in the First Amended Complaint, nor does she allege that she decided to invest based on the content of those videos. And while Bates does say that she "attended ViSalus events that featured Blake Mallen, Ashley Sarnicola, and/or Nick Sarnicola" (*id.* at

---

were shown, and does not allege that the videos related in any way to the Plan. Nor does that paragraph identify when Owens showed McWhorter any particular video.

¶258, Pg. ID 522), she neither alleges that these Defendants pitched investing in the Plan at these events nor that she decided to invest based on any such solicitations. These allegations therefore do not adequately plead reliance.

Plaintiffs counter that under the Supreme Court's decision in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), they need not plead reliance in order to plausibly state a Rule 10b-5(b) claim. (*See* Resp. Br., ECF #42 at Pg. ID 706-711.) Under *Affiliated Ute*, where a Rule 10b-5(b) claim "primarily" involves "a failure to disclose," reliance is presumed and "positive proof of reliance is not a prerequisite to recovery." *Id.* at 153. But the presumption described in *Affiliated Ute* is not applicable here for at least two reasons.

First, the *Affiliated Ute* presumption "does not apply" because Plaintiffs' claims "primarily" involve affirmative misstatements, not failures to disclose. *Clayton v. Heartland Resources, Inc.*, 754 F.Supp.2d 884, 895 (W.D. Ky. 2010) (declining to apply *Affiliated Ute* presumption where allegations "primarily" involved "affirmative misrepresentations"). *See also Waggoner v. Barclays, PLC*, 875 F.3d 79, 95-96 (2d Cir. 2017) (holding that *Affiliated Ute* presumption did not apply "because the [p]laintiffs' complaint [was] based primarily on allegations of affirmative misrepresentations, not omissions"). Indeed, in the "overview of claims" section of the First Amended Complaint, Plaintiffs identify myriad misstatements and "outright lies" that the ViSalus Defendants told them about the Plan. (*See*, *e.g.*,

First Am. Compl. at ¶¶ 15, 17, ECF #30 at Pg. ID 372, 374.) Likewise, Plaintiffs quote affirmative misstatements at great length from various ViSalus promotional videos and webinars. (*See*, *e.g.*, *id.* at ¶88, ECF #30 at Pg. ID 409-15, quoting alleged affirmative misrepresentations in promotional video narrated by Nick Sarnicola; ¶119, Pg. ID 431-37, quoting alleged affirmative misrepresentations in Webinar featuring Nick and Ashley Sarnicola, Blair, Mallen, and Reynolds). These allegations demonstrate that the essence of Plaintiffs' claims are the ViSalus Defendants' affirmative misstatements, not their omissions.

Second, Plaintiffs may not rely on the *Affiliated Ute* presumption because it only applies where the defendant has "a duty of disclosure" *Regents of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 384 (5th Cir. 2007), and the ViSalus Defendants owed Plaintiffs no such duty here. A "duty to disclose under § 10(b) [and Rule 10b-5(b)]" only "arises 'when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" *Nolfi v. Ohio Kentucky Oil Corp*, 675 F.3d 538, 549 (6th Cir 2012) (quoting *Chiarella v. United States*, 445 U.S. 222, 228 (1980)). *See also Regents of California*, 482 F.3d at 383-84 (holding that *Affiliated Ute* presumption did not apply where defendants had no duty to disclose because they "were not fiduciaries and were not otherwise obligated to the plaintiffs"). Here, Plaintiffs have not sufficiently pleaded that there was a "fiduciary or other similar

relation of trust and confidence" between themselves and the ViSalus Defendants. Accordingly, Plaintiffs have not established that they are entitled to rely on the *Affiliated Ute* presumption in order to avoid pleading reliance.

While the Court has concluded that Plaintiffs have not sufficiently pleaded the reliance element of their Rule 10b-5(b) claim, it will provide Plaintiffs the opportunity to cure that deficiency in a Second Amended Complaint. In such a pleading, Plaintiffs shall, at a minimum, identify: the specific statements each Plaintiff individually relied upon, the particular Defendant(s) who made those statements, when the statements were made, when the Plaintiffs heard the statements, and whether the statements were made directly to Plaintiffs (and, if not, how, when, and where Plaintiffs heard the statements).

**4**

Rules 10b-5(a) and (c) make it illegal to "to employ any device, scheme, or artifice to defraud" and "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 CFR § 240.10b-5(a), (c). "To state a claim based on conduct that violates Rule 10b-5(a) and (c), [a] plaintiff must allege that a defendant (1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused the plaintiffs' injuries."

*Kerrigan v. ViSalus, Inc.*, 2016 WL 892804, at *15 (E.D. Mich. Mar. 9, 2016) (quoting *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 492 (S.D.N.Y. 2005) (emphasis removed) (testing claims under 10b-5(a) and (c) against the same pleading standard)). Crucially, "[s]cheme liability … hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement." *S.E.C. v. Kelly*, 817 F.Supp.2d 340, 344 (S.D.N.Y. 2011). *See also Benzon v. Morgan Stanley Distrib., Inc.*, 420 F.3d 598, 610 (6th Cir. 2005) (noting that "Rules 10b-5(a) and (c) encompass conduct beyond disclosure violations").

The ViSalus Defendants argue that Plaintiffs' "scheme liability" allegations under Rules 10b-5(a) and (c) fail to state a cognizable claim because Plaintiffs have not alleged any specific fraudulent acts apart from their alleged misstatements and omissions. (Mot. to Dismiss, ECF #39 at Pg. ID 673-74.) The Court agrees. As described above, in the "overview of claims" section of Plaintiffs' First Amended Complaint, Plaintiffs allege that their claims rest primarily on misstatements (and to a lesser extent omissions), not on a fraudulent scheme that existed separate from those misstatements. (*See*, *e.g.* First Am. Compl. at ¶15, ECF #30 at Pg. ID 373.) Accordingly, Plaintiffs have failed to identify a viable fraudulent scheme, apart from a misstatement or omission, that can support liability under Rules 10b-5(a) and (c).

Plaintiffs counter that "the same pyramid scheme deceptive practice as alleged in *Kerrigan [v. ViSalus]* forms the basis of the 10b-5(a) and (c) liability." (Pla.s'

Resp. Br., ECF #42 at Pg. ID 718.) But Plaintiffs do not allege that they were hurt by the operation of the pyramid scheme described in *Kerrigan*; they allege that they were injured by the misstatements and omissions that led to them investing in the Plan. And Plaintiffs allege that their injuries arose out of their investment *in the Plan*, not from the continuation of the pyramid scheme. Thus, Plaintiffs may not base their Rule 10b-5(a) and (c) claims on the operation of that scheme.

Plaintiffs next maintain that "the entire March to Equity program was a bait and switch fraudulent device designed to raise money that [D]efendants could not raise from real equity markets." (Pla.s' Resp. Br., ECF #42 at Pg. ID 718.) But Plaintiffs' Rule 10b-5(a) and (c) claims are inextricably linked to the ViSalus Defendants' alleged misstatements about the Plan. Indeed, Plaintiffs argue in response to the motion to dismiss that the ViSalus Defendants "promised ownership rights" in ViSalus and reneged on that promise. (*Id.*) Thus, Plaintiffs' own description of their claims reveals that their injuries stemmed from statements and promises that the ViSalus Defendants made, not from a separate course of conduct. Plaintiffs have therefore failed to plead a viable scheme liability claim.

**B**

In Count II of the First Amended Complaint, Plaintiffs allege that certain Defendants violated Section 12(a)(1) and (2) of the Exchange Act when they (1) sold unregistered securities and (2) made materially false statements and/or omissions

related to the sale of those securities.[8] (*See* First Am. Compl. at ¶¶ 278-87, ECF #30 at Pg. ID 567-70.)  Section 12(a)(1) prohibits the selling of unregistered securities. *See* 15 U.S.C. § 77l(a)(1); 15 U.S.C. § 77e.  Section 12(a)(2) prohibits "any person" from "offer[ing] or sell[ing] a security … which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."  15 U.S.C. §77l(a)(2).  To state claim under either provision, a plaintiff must allege that a defendant either (1) "pass[ed] title, or other interest in the security, to the buyer for value," or (2) "successfully solicit[ed] the purchase" of a security. *Pinter v. Dahl*, 486 U.S. 622, 642, 649 (1988) (applying test to claim under Section 12(a)(1)); *Smith v. Am. Nat'l Bank & Trust Co.*, 982 F.2d 936, 942 (6th Cir. 1992) (applying test to claim under Section 12(a)(2)).

Defendants Nick Sarnicola, Blair, Mallen, Goergen, and Craig argue that Plaintiffs have failed to state a cognizable Section 12 claim as to them because Plaintiffs have not alleged that any of them passed title and/or directly solicited Plaintiffs' alleged purchase of securities. (*See* Mot. to Dismiss, ECF #39 at Pg. ID 674-77.)  The Court agrees that Plaintiffs have not satisfied either prong of the *Pinter* test with respect to these Defendants.

---

[8] Plaintiffs' Section 12 claims are brought against all of the Defendants except for Ashley Sarnicola and Reynolds. (*See* First Am. Compl. at ¶281, ECF #30 at Pg. ID 567.)

Plaintiffs first assert that these Defendants "passed title" to Plaintiffs when "some of the Plaintiffs were [] given a certificate of ownership, signed by Defendants Blair, Mallen, and Sarnicola." (Pla.s' Resp. Br., ECF #27 at Pg. ID 719, citing First Am. Compl. at ¶172, ECF #30 at Pg. ID 486-87.) But these "certificates" do not appear to pass title to anything, much less a security. The certificates say only that "[i]n recognition of your dedication to the Vi mission of transforming Life, Health, and Prosperity around the world, it is our privilege to welcome you as a qualifier in the Vi Founders Equity Incentive Plan …. We look forward to sharing in our future success together, and are proud to partner with you in creating a legacy." (First Am. Compl. at ¶172, ECF #30 at Pg. ID 487.) Moreover, Plaintiffs' other allegations are fundamentally at odds with their claim that the certificates somehow "passed title." Indeed, Plaintiffs claim that they have not received the shares or units in the Plan that they were promised and that "no shares have been tendered" to them. (*Id*. at ¶17, at Pg. ID 374.) Finally, the certificates are not signed by Goergen or Craig at all, and are signed by Nick Sarnicola, Blair, and Mallen in their capacities as corporate officers of ViSalus, not in their personal capacities.[9] (*Id.* at ¶172, ECF #30 at Pg. ID

---

[9] The signature block for each individual lists their name and their role at ViSalus (*i.e.*, "Chief Executive Officer," "President," and "Global Ambassador"). (First Am. Compl. at ¶172, ECF #30 at Pg. ID 487.) The existence of these titles lends further support to the Court's conclusion that the certificates were signed in those capacities and not as individuals.

487.)  These certificates thus do not support Plaintiffs' allegations that Nick Sarnicola, Blair, and Mallen personally passed title to them.[10]

Plaintiffs next maintain that "each" of these Defendants "directly" solicited the sale of the securities at issue. (Pla.s' Resp. Br., ECF #42 at Pg. ID 719-20.)  But Plaintiffs have not alleged any facts which, if true, could establish a direct solicitation by these Defendants.  Under the solicitation prong of the *Pinter* test, "[b]eing merely a 'substantial factor' in causing the sale ... is not sufficient in itself to render a defendant liable" if the defendant did not solicit the ultimate purchase of the security.  *Pinter*, 486 U.S. at 654.   Here, to the extent the First Amended Complaint identifies any individuals as the direct solicitors of Plaintiffs' purchases, it identifies Owens and Johnson, *not* any of these Defendants.  (*See*, *e.g.*, First Am. Compl. at ¶218, ECF #30 at Pg. ID 506, describing how "Owens persuaded [Plaintiff Renae White] to find the funds to achieve equity in any way possible"; ¶259, Pg. ID 522, describing how Plaintiff Connie Bates was "convinced … to invest in the ViSalus equity" as a result of representations Owens made).

---

[10] In the First Amended Complaint, the Plaintiffs identify a *second* certificate that ViSalus gave to the Plaintiffs. (*See* First Am. Compl. at ¶187, ECF #30 at Pg. ID 494.)  Plaintiffs did not argue in response to the motion to dismiss that this certificate passed title to them.  In any event, that second certificate was also not signed by Goergen or Craig, and was signed by Nick Sarnicola, Blair, and Mallen in their corporate, not personal, capacities. (*See id.*)

In a Second Amended Complaint, Plaintiffs may attempt to re-plead their Section 12 solicitation claims. If they do so, they must, at a minimum, plead: which Defendant solicited which Plaintiff, when that solicitation occurred, whether the solicitation was made directly to Plaintiffs (and, if not, how, when, and where Plaintiffs heard the solicitation), the content of that solicitation, and facts that could tend to establish that the identified solicitation led directly to the "ultimate purchase of the security."

## C

In Count III of the First Amended Complaint, Plaintiffs allege that all of the ViSalus Defendants violated Section 509(2) of the MUSA when they offered and/or sold unregistered securities. (*See* First Am. Compl. at ¶¶288-94, ECF #30 at Pg. ID 572.) Plaintiffs acknowledge that this claim is "parallel" to the claims under Section 12 and that this claim "stands if the Section 12 claim stands." (Pla.s' Resp. Br., ECF #28 at 720 n.24). For the same reasons that the Court dismissed Plaintiffs' Section 12 claims against each of the ViSalus Defendants except for the ViSalus, it will do the same with Plaintiffs' claim under Section 509(2) of the MUSA.

## D

In Count V of the First Amended Complaint, Plaintiffs claim that the ViSalus Defendants violated Sections 403(1), 509(5), and 509(6) of the MUSA when they provided fraudulent investment advice. (*See* First Am. Compl. at ¶¶ 310-318, ECF

#30 at Pg. ID 576-79.) Section 509(5) of the MUSA provides that "[a] person acting as an investment adviser or investment adviser representative that provides investment advice for compensation in violation of section 403(1), 404(1), or 5063 is liable to the client." Mich. Comp. Laws § 451.2509(5). And Section 509(6) of the MUSA states that "[a] person that receives, directly or indirectly, any consideration for providing investment advice to another person and that employs a device, scheme, or artifice to defraud the other person or engages in an act, practice, or course of business that operates or would operate as a fraud or deceit on the other person is liable to the other person." Mich. Comp. Laws § 451.2509(6). The MUSA defines an investment adviser as:

> a person that, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or the advisability of investing in, purchasing, or selling securities or that, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities. The term includes a financial planner or other person that, as an integral component of other financially related services, provides investment advice to others for compensation as part of a business or that holds itself out as providing investment advice to others for compensation.

Mich. Comp. Laws § 451.2102a(e).

The ViSalus Defendants argue that this claim fails because Plaintiffs have not sufficiently alleged that any of the ViSalus Defendants acted as investment advisors

and/or received compensation for investment advice as the MUSA requires. (*See* Mot. to Dismiss, ECF #39 at Pg. ID 677-680.)    The Court agrees.

Simply put, the First Amended Complaint does not include any allegations that any of the ViSalus Defendants received any consideration for providing investment advice, "promulgate[d] [any] analyses or reports concerning securities," or engaged in the business of providing investment advice for compensation as the MUSA requires. Mich. Comp. Laws § 451.2102a(e).  Plaintiffs have therefore not plausibly alleged that any of the ViSalus Defendants were investment advisers.

Plaintiffs insist that the ViSalus Defendants did act as investment advisers because when they promoted the Plan, they advised Plaintiffs and others to invest in the Plan.  But Plaintiffs do not allege that they paid for any such advice or that the ViSalus Defendants received compensation in any respect for that advice.  Instead, Plaintiffs allege that they paid for the "equity" in the Plan, or paid for ViSalus products, not any advice that the ViSalus Defendants may have been offering.[11]   And

---

[11] In Plaintiffs' response to the ViSalus Defendants' motion to dismiss, Plaintiffs identify paragraphs 19, 152-53, 166-67, 225, 236, 250, and 318 of the First Amended Complaint as "fully set[ting] forth allegations detailing the amounts Plaintiffs' paid as consideration" for the ViSalus Defendants' investment advice. (Pla.s' Resp. Br., ECF #42 at Pg. ID 723.)  But these paragraphs allege only that Plaintiffs purchased "equity" or purchased ViSalus product.  They do not identify any compensation Plaintiffs paid for investment advice. (*See*, *e.g.*, First Am. Compl. at ¶19, ECF #30 at Pg. ID 375, alleging that "[e]ach Plaintiff invested between $25,000 and over $40,000 of hard-earned money they could ill afford to give the Defendants on the false promises of getting 'equity' that would allow them to provide for their families for years to come"; *id.* at ¶153, Pg. ID 479, alleging that Plaintiff Byrd "gave Owens

Plaintiffs have not identified any authority under which the ViSalus Defendants could be deemed investment advisers under the facts that Plaintiffs have pleaded here. Accordingly, Plaintiffs' investment-adviser claims under the MUSA fail to state a cognizable claim.

## E

In Counts IV and V of the First Amended Complaint, Plaintiffs bring claims under various provisions of the MUSA. In Count IV, Plaintiffs bring claims under Sections 501, 502, and 509(3) of the MUSA. (*See* First Am. Compl. at ¶¶ 295-309, ECF #30 at Pg. ID 572-76.) In Count V, in addition to the investment adviser claims discussed in sub-section D above, Plaintiffs purport to bring claims under four additional sub-sections of Section 509 the MUSA. (*See id.* at ¶¶ 313-14, Pg. ID 577-78). The Court will not permit Plaintiffs to lump numerous alleged violations of different statutes and statutory sub-sections in a single count.

Plaintiffs may re-allege claims for violations of the MUSA in a Second Amended Complaint. However, Plaintiffs must plead each alleged violation of a provision of the MUSA in a separate count. In other words, Plaintiffs may not bring claims under various sub-sections of the MUSA jointly in the same count. In each

---

her credit card information and purchased the $999 kit for [her son's] business"; *id.* at ¶225, Pg. ID 509, alleging that Plaintiff Herl "and her husband signed up as ViSalus distributors … [and each] purchased the $999 [ViSalus] kit. [Herl] was hoping to be able to sell some products but her main goal was to earn equity so that she could receive a payout check in April 2017.")

count, Plaintiffs shall, at a minimum, separately identify for each Defendant what statute (and, if applicable, what sub-section of that statute) forms the basis of the alleged claim against that Defendant and what facts could tend to support that claim.

## F

Finally, in Count VI of the First Amended Complaint, Plaintiffs allege that Defendants ViSalus, Nick Sarnicola, Blair, and Mallen are liable for common law and statutory conversion. (*See* First Amended Compl. at ¶¶ 319-327, ECF #30 at Pg. ID 579-81.) Plaintiffs' conversion claims are not sufficiently pleaded against Nick Sarnicola, Blair, and Mallen. Plaintiffs have, however, sufficiently pleaded their conversion claims against ViSalus.

## 1

Common law conversion under Michigan law involves "any distinct act of dominion wrongfully exerted over another person's personal property in denial of or inconsistent with his rights therein." *Thoma v. Tracy Motor Sales, Inc.*, 104 N.W.2d 360, 362 (Mich. 1960). *See also Aroma Wines & Equip., Inc. v. Columbian Distrib. Servs., Inc.*, 871 N.W.2d 136, 145 (Mich. 2015) (same, citing *Thoma*). A common-law claim for the conversion of money is available only in very narrow circumstances. Specifically, a plaintiff must allege that the defendant had "an obligation to return [certain] specific money entrusted to his care." *Head v. Phillips Camper Sales & Rental, Inc.*, 593 N.W.2d 595, 603–04 (Mich. App. 1999). In

*Kerrigan v. ViSalus, Inc.*, 112 F.Supp.3d 580, 615-16 (E.D. Mich. 2015), this Court held that plaintiff promoters did not state a sufficient common-law conversion claim for the conversion of money against individual defendants (including Nick Sarnicola, Blair, and Mallen) because, among other things, "Plaintiffs [did] not allege that any of those Defendants received the 'specific money' that Plaintiffs had paid to ViSalus." *Id.* at 616.

The Plaintiffs here fare no better against Nick Sarnicola, Blair, and Mallen than did the plaintiffs in *Kerrigan*. Like those plaintiffs, the Plaintiffs in this case have not alleged that Nick Sarnicola, Blair, or Mallen had an obligation to return specific money to them or that Nick Sarnicola, Blair, or Mallen ever received the specific money Plaintiffs "invested" in the Plan. And, as in *Kerrigan*, "it is difficult to see how Plaintiffs could allege the receipt of 'specific money' by any Defendant (other than ViSalus) under the circumstances here." *Id.* Indeed, Plaintiffs allege that "ViSalus," *not* Nick Sarnicola, Blair, or Mallen, "obtained Plaintiffs' money…." (First. Am. Compl. at ¶332, ECF #30 at Pg. ID 215.) Accordingly, Plaintiffs have failed to state viable common-law conversion claim against Nick Sarnicola, Blair, and Mallen. (Plaintiffs' common-law conversion claim against ViSalus does state a viable claim.[12])

---

[12] ViSalus argues that Plaintiffs' common-law conversion claim fails against it because "Plaintiffs do not allege that ViSalus failed to provide" Plaintiffs "what they paid for." (Mot. to Dismiss, ECF #39 at Pg. ID 683.) But Plaintiffs *do* allege that

Plaintiffs counter that Nick Sarnicola, Blair, and Mallen may be liable for ViSalus' common-law conversion because, under Michigan law, a corporate officer may be liable for a corporation's conversion where the officer personally participates in that conversion. *See*, *e.g.*, *MAS, Inc. v. NoCheck, LLC*, 2012 WL 13006045, at ** 5-6 (E.D. Mich. Aug. 21, 2012); *Citizens Ins. Co. of Am. v. Delcamp Truck Center, Inc.*, 444 N.W.2d 210 (Mich. App. 1989). But this authority is no help to Plaintiffs. In *MAS* and *Citizens Insurance*, the individual defendants had a direct role in the transaction that constituted the alleged conversion. For example, in *MAS*, the individual defendant "actively participated in the conversion of the funds" by personally "initiating" the wire transfers at issue. *MAS*, 2012 WL 13006045, at ** 5-6. And in *Citizens Insurance*, the defendant officer "actively participated" in the conversion where he personally refused to return an overpayment to the plaintiff. *Citizens Insurance*, 444 N.W.2d at 213.

In stark contrast here, Plaintiffs have not sufficiently alleged that Nick Sarnicola, Blair, and Mallen personally played a role in the specific financial transaction through which their funds were converted (*i.e.*, the specific solicitation that led to Plaintiffs investing in the Plan). Thus, this case differs from, and is not controlled by, *MAS* and *Citizens Insurance*.

---

they never received their shares of ViSalus and never received any dividends (including the specifically promised April 17 dividend). (*See*, *e.g.*, First. Am. Compl. at ¶324, ECF #30 at Pg. ID 580.)

Michigan's statutory conversion law allows for a plaintiff to recover treble damages where the plaintiff is damaged by "[a]nother person's stealing or embezzling property or converting property to the other person's own use." Mich. Comp. Laws § 600.2919a(1)(a). This requires a plaintiff to plead "that the defendant employed the converted property for some purpose personal to the defendant's interests." *Aroma Wines*, 871 N.W.2d at 138.

Here, Plaintiffs have not pleaded any facts that could tend to establish that Nick Sarnicola, Blair, or Mallen used Plaintiffs' money for their *personal* interests. Indeed, as explained above, Plaintiffs have pleaded that they paid *ViSalus* for the units in the Plan, not Nick Sarnicola, Blair, or Mallen. And Plaintiffs have further alleged that their money was used to support the allegedly-phony ViSalus pyramid scheme, not that it was used for Nick Sarnicola, Blair, or Mallen's own personal interests. (*See* First. Am. Compl. at ¶81, ECF #30 at Pg. ID 401, alleging that "[t]he goal of the Plan was to raise capital to cover [ViSalus'] immediate and urgent cash needs….") Moreover, Plaintiffs did not address this argument in their response brief, and the Court therefore considers the statutory conversion claim against these Defendants abandoned. *See*, *e.g.*, *Phillips v. UAW Int'l*, 149 F. Supp. 3d 790, 798 (E.D. Mich. 2016) ("A plaintiff abandons undefended claims.") (citing *Doe v. Bredesen*, 507 F.3d 998, 1007-08 (6th Cir. 2007)).

**V**

For the reasons stated above, the ViSalus Defendants' motion to dismiss (ECF #39) is **GRANTED IN PART AND DENIED IN PART** as follows:

- With the exception of Plaintiff Watts' Rule 10b-5(b) claim against Defendants Mallen and ViSalus, Counts I, II, IV, and V are dismissed against all of the ViSalus Defendants;

- Count III is dismissed against all of the ViSalus Defendants except for ViSalus; and

- Count VI is dismissed against Defendants Nick Sarnicola, Blair, and Mallen only.

Plaintiffs may file a Second Amended Complaint by no later than **May 4, 2018**.

**IT IS SO ORDERED**.

/s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: April 5, 2018

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 5, 2018, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764