UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CAPRECE BYRD, BRYANT WATTS,
RENAE WHITE, LAURA HERL, DR.
FRANK McWHORTER,
ERIC J. HARRIS, SR., and CONNIE
BATES, individually, and on behalf of
all others similarly situated,

       Case No. 4:17-cv-12626
       Hon. Matthew F. Leitman

       Plaintiffs,

vs.

VISALUS, INC., NICK SARNICOLA,
ASHLEY SARNICOLA, BLAKE
MALLEN, RYAN BLAIR, TODD
GOERGEN, GARY J. REYNOLDS,
VINCENT OWENS, KEVIN
MERRIWEATHER and MICHAEL
CRAIG,

       Defendants.

_____/

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO
DISMISS PORTIONS OF THE SECOND AMENED
COMPLAINT**

# <u>TABLE OF CONTENTS</u>

INDEX OF AUTHORITIES ...................................................................................ii

I.   RESPONSE TO ARGUMENT DIRECTED TO SCHEME
LIABILITY ALLEGATIONS........................................................................ 1

II.   RESPONSE TO ARGUMENT DIRECTED TO SCIENTER................. 10

III. RESPONSE TO ARGUMENTS DIRECTED AGAINST 10B5
CLAIM AND TODD GOERGEN................................................................ 15

IV. RESPONSE TO ARGUMENTS DIRECTED TO BLUE SKY
LAWS CLAIMS .......................................................................................... 16

    A.   Plaintiffs Agree To Not Assert Section 501 Claim............................. 16

    B.   Plaintiffs' Count V Mistakenly Transposed Subsection (3)
With Subsection (2)..................................................................................... 17

    C.   Count VI Under Section 509(7) Should Not Be Dismissed
Because It Lists the Purchaser Liability Subsection 3 Rather
Than Seller Liability 2........................................................................ 18

i

## INDEX OF AUTHORITIES

**Cases**

*Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 610
   (6th Cir. 2005)...................................................................................... 1

*Burnett v. Rowzee*, 561 F. Supp. 2d 1120, 1125 (C.D. Cal. 2008) .................... 2, 8

*CKB168 Holdings, Ltd.*, 210 F. Supp. 3d at 445-46......................................... 8, 9

*Greene v. Benefit Mortg. Corp.*, No. 08-12968, 2009 U.S. Dist.
   LEXIS 1163, at *4 ............................................................................ 10

*In re Alstom S.A.,* 406 F. Supp 2d 402, 475 (S.D.N.Y. 2005) ............................... 1

*In re Miller Energy Res. Sec. Litig.,* No. 3:11-CV-386-TAV-CCS,
   2014 WL 415730, at *7 (E.D. Tenn. Feb. 4, 2014)........................... 11

*In re Parmalat Sec. Litig.,* 376 F.Supp.2d 472, 501 (S.D.N.Y.2005) ............... 1, 2

*JAC Holding Enters., Inc. v. Atrium Capital Partners, LLC*, 997 F.
   Supp. 2d 710, 735 (E.D. Mich. 2014)............................................ 7, 16

*Kerrigan v. Visalus, Inc.*, 2016 U.S. Dist. LEXIS 29958, at *47
   (E.D. Mich. Mar. 9, 2016) .............................................2, 10, 11, 15

*Louisiana Mun. Police Employees Ret. Sys. v. KPMG, LLP,* No.
   1:10CV01461, 2012 WL 3903335, at *5 (N.D. Ohio Aug. 31, 2012)............. 15

*S.E.C. v. Lucent Techs., Inc.,* 610 F. Supp. 2d 342, 360 (D.N.J. 2009)................ 2

*SEC v. Constantin*, 939 F.Supp. 2d 288,308 (S.D.N.Y. 2013)............................. 7

*SEC v. Curshen*, 888 F.Supp. 2d 1299, 1308 (S.D. Fla. 2012) ........................... 8

*SEC v. McDuffie*, 2014 U.S. Dist. LEXIS 128664, at *28-29 (D. Colo.
   Sep. 15, 2014) .................................................................................... 8

*Tellabs, [Inc. v. Makor]* 551 U.S. 308 (2007) .............................................. 10, 13

*U.S. S.E.C. v. Geswein,* No. 5:10CV1235, 2011 WL 4541308, at *12
   (N.D. Ohio Aug. 2, 2011) .................................................................. 1

*Zwick Partners, LP v. Quorum Health Care Corp., et al.,* No. 3:16-
   CV-2475, 2018 WL 2933406, at *4 (M.D. Tenn. Apr. 19, 2018).................... 15

## I.   RESPONSE TO ARGUMENT DIRECTED TO SCHEME LIABILITY ALLEGATIONS

The Second Amended Complaint ("SAC") pleads scheme liability under Rules 10b-5(a) and (c). These subsections make it illegal "to employ any device, scheme, or artifice to defraud" and "to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  Existing case law has not defined the full contours or limits of what is scheme liability, but "[t]he Supreme Court has repeatedly emphasized that Section 10(b) is not to be construed "technically and restrictively, but flexibly to effectuate its remedial purposes." *In re Parmalat Sec. Litig.,* 376 F.Supp.2d 472, 501 (S.D.N.Y.2005)." See *U.S. S.E.C. v. Geswein,* No. 5:10CV1235, 2011 WL 4541308, at *12 (N.D. Ohio Aug. 2, 2011), *report and recommendation adopted in relevant part,* No. 5:10CV1235, 2011 WL 4565861 (N.D. Ohio Sept. 29, 2011) ("the statute 'creates civil liability for a wide range of securities fraud,' and is to be construed flexibly.'); *Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 610 (6th Cir. 2005).  In *In re Alstom S.A.,* 406 F. Supp 2d 402, 475 (S.D.N.Y. 2005) the court said:

> [I]t is possible for liability to arise under both subsection (b) and subsections (a) and (c) of Rule 10b–5 out of the same set of facts, where the plaintiffs allege both that the defendants made misrepresentations in violations of Rule 10b–5(b), as well as that the defendants undertook a deceptive scheme or course of conduct that went beyond the

1

misrepresentations. … Thus, even if a defendant who did not make any statements in connection with a particular fraud may not be held liable for fraudulent misrepresentations under subsection (b), that defendant may still be held liable under subsections (a) and (c) if it is alleged that they participated in scheme that encompassed conduct beyond misrepresentations.[1]

As far as what that extra thing that must be present for scheme liability to attach, courts repeatedly found that both "sham" or "inherently deceptive" schemes, (see, e.g., *In re Parmalat, supra,* 376 F. Supp. 2d at 504 ("[t]he transactions in which the defendants engaged were by nature deceptive. They depended on a fiction, namely that the invoices had value"), *and* deceptive conduct in connection with the sale of a security "that gives the victims a false impression" is actionable scheme liability under 10b5(a) and (c). *S.E.C. v. Lucent Techs., Inc.,* 610 F. Supp. 2d 342, 360 (D.N.J. 2009); *Burnett v. Rowzee*, 561 F. Supp. 2d 1120, 1125 (C.D. Cal. 2008) (scheme liability arises out of deceptive act is one that has, 'the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme.')

---

[1] This Court in *Kerrigan v. Visalus, Inc.*, 2016 U.S. Dist. LEXIS 29958, at *47 (E.D. Mich. Mar. 9, 2016) said, "To state a claim based on conduct that violates Rule 10b-5(a) and (c), [a] plaintiff must allege that a defendant (1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused the plaintiffs' injuries." Additionally, "a plaintiff must identify an allegedly 'deceptive or manipulative act' by the defendant beyond making a misstatement or omission. The Court did not explore the contours of what constitutes that "deceptive or manipulative act" beyond finding that the inherently fraudulent pyramid scheme would be one such scheme liability.

Rule 10b5-(a) and (c) scheme liability exists because the sale of the Founders' Equity Plan securities was effected through misrepresentations and omissions that convinced Plaintiffs to buy the securities, and through deceptive acts designed to keep them from finding out that what they bought isn't what they thought they got. The Plaintiff investors were fraudulently told they would be getting a piece of equity that would be theirs to keep, to generate dividends for their families for "generations." Defendants planned and executed a bait and switch: common stock was *not* sold, but Plaintiffs didn't learn they wouldn't get "dividends" for months and years they invested, and not before they told each other and others about the "opportunity." The scheme was designed to deceive the basic nature of what was being offered from the outset. When Plaintiffs learned there were no "dividends" to be had, but instead realized they had to keep buying ViSalus products and "working" if they wanted to ever be paid anything resembling a dividend on their investment, it was too late. They had unwittingly joined and pumped a ton of money into a failing pyramid scheme.

Thus there was a clear separation from the scheme and the msrepresentations/omissions. The misrepresentations and omissions that are the basis of the 10b-5(b) claim were induced Plaintiffs to believe they were being offered

an opportunity to buy stock likely to appreciate and produce dividends.[2] Had Defendants simply packaged these same lies into a private offering prospectus, and had Plaintiffs simply bought 6% of outstanding ViSalus stock from Sarnicola, Mallen or Blair before finding out the price they paid for the stock wasn't $143 million but $0, this would only be a 10b5-(b) case. But this scheme by necessity encompassed more. In order to convince Plaintiffs to buy into the offer, Defendants had to fool Plaintiffs into joining ViSalus's failing pyramid scheme as distributors and to keep at it, and by their own example as "shareholders" convince other promoters to invest, before anyone figured out that ViSalus had no plan, there was no equity that was going to be given out, and if investors wanted to get anything at all, they had to stay on as distributors and keep buying ViSalus weight loss shakes forever.

This bait and switch was accomplished by necessarily deceptive conduct. Par. 344 lists in summary fashion the details of the scheme that is exhaustively detailed in the SAC. For two years from when the Plan was rolled out in January, 2015

---

[2] These lies were that ViSalus common stock was worth investing in: we paid $143 million for it just weeks ago, we have a plan to be huge, we are a billion dollar company, listed in Par. 347. These are generally (1) false statements/omissions relating to buying back the company with own funds; (2) false statements/omissions that ViSalus was a "billion dollar" company with a plan to be as big as Amway or Herbalife; (3) false statements/omissions that earlier promoters had made millions in an equity plan like the one offered; (4) false statements that this was a time-sensitive offer.

4

Defendants (1) needed to hide the purpose of why they were offering this Founders' Equity (to prop up a failing pyramid scheme),[3] (2) deceptively hide the fact they were not actually selling or planning to convey ViSalus common stock,[4] and (3) needed to fool the buyers into believing that "qualifying" meant that they had gotten

---

[3] The *purpose* of this equity offering is relevant: it was to prop up the pyramid scheme, by concocting a false-pathway to equity in what the investors were led to believe was a legitimate business opportunity. Unlike the typical misrepresentations in an offering prospectus or investor presentation 10b5-(b) claim, the context of this fraudulent offering takes it further into scheme liability. In order to entice investors into the plan, Defendants had to get them to agree to be distributors. By necessity, Defendants falsely promoted ViSalus as a legitimate business opportunity and profitable business, through its website, at conventions, in press releases, flyers, advertisements, and videos. (Pars. 13-15, 30-39, 85-147, 342-344) and concealed the risks and warnings associated with the company's true business model (as a pyramid scheme), the company's financial stability, and profitability. (Pars. 2, 13-16, 81-82, 341-46). By 2015, when the first offering was made, Defendants' pyramid scheme was failing. (The details of what management knew are contained in Pars. 60-64, 67-69; management's failed plan to raise money from institutional investors in 2016 is detailed in Pars. 72-82). That failure had to be concealed from the 2015-2016 investors.

[4] That is why there was a long delay between the alleged "qualifying" and delivery (or non-delivery) of any document that indicated that Plaintiffs got something other than common stock (see, e.g., Par. 99). Defendants concealed their scheme not only through deception, but also by intimidating and threatening promoters who asked about the equity payouts they were owed or who sought to join this litigation. Pars. 107, 110, 192-198, 209-10, 329, 334, 344. Many of these actions are independently deceptive, but each is deceptive in the context of ViSalus's operation of the fraudulent equity investment scheme and because ViSalus is a failing pyramid scheme. Had Defendants not taken actions to misrepresent and conceal the legitimacy of ViSalus and the equity offering, Plaintiffs would not have signed up to participate in the equity program and would not have been financially harmed. Par. 346.

equity and Plaintiffs weren't actually indentured shake-sellers whose dividends depended on continued buying of products they did not want.[5] Hence, Defendants created a false appearance of legitimacy of the equity investment scheme, with the early investors were paraded on stages with hats and signs signifying they were "shareholders," and deceptive looking "certificates" given out, causing new investors to believe that they too would get "equity" of value, when in fact no shares or ownership interest was ever passed.[6] And Defendants made sure that this

---

[5] See for example, allegations by Caprece Byrd about why she invested into the second year of the Plan, because she wanted to get more "equity," not because she wanted a second distributorship (Pars. 185-187); she invested not because she wanted to sell ViSalus shakes but for the "generational wealth" promised (Par. 198); similar allegations by Bryant Watts (Par. 201) who actually borrowed the money to buy "equity" and purchased product and enrolled 20 promoters so he could do so (Pars. 206, 208); Renae White, who cashed out her 401k and car so she could get her "equity," and now believes she must pay for the new LIV program run by ViSalus (Pars. 219, 223); Laura Hurl, who was interested in "equity" and the promised April 2017 payout and who never expected to continue a ViSalus business (Pars. 227, 236); Frank McWhorter (same, Par. 250).

[6] To lure prospective investors and retain current investors, Defendants cultivated a false image of legitimacy, in part, by portraying qualifying distributors as "shareholders" in ViSalus, even giving those "shareholders" equity certificates, special lanyards, and "I Own It" hats to wear at conferences – where they were publicly identified as "shareholders" and marched on stage holding their certificates to serve as examples of success to prospective distributor-investors. See for example, allegations by Caprece Byrd about being paraded on stage and seeing others do the same (Pars. 160-161, 164-165); Brant Watts (same, Par. 207); Frank McWhorter (same, Par. 244). ViSalus even set up designated areas for the "shareholders" to be paraded with their "certificate of qualification," hats and lanyards with "I Own It" messages (attended by various Plaintiffs, Pars. 14, 178, 233, 248), and special "shareholder" meetings (Pars. 179, 207) like one where Defendant Merriweather pitched the "equity" plan to prospective investors in a separate meeting at a hotel

message, independent of the inducing misrepresentations, was spread throughout the targets of the campaign.[7] Of course, by the time Plaintiffs found out that "I Own It" means "I'm In ViSalus Selling Shakes No One Wants Forever," it was too late: each of them had spent $20,000 or much more for ViSalus to book as general revenue.

Each of the actions- press releases, Facebook posts, "I Own It" hats, deception about what Plaintiffs bought and the rest--  that spread the scheme in furtherance of that "path to equity" scheme are inherently deceptive and grounds for scheme liability under 10b-5(a) and (c). *See JAC Holding Enters., Inc. v. Atrium Capital Partners, LLC*, 997 F. Supp. 2d 710, 735 (E.D. Mich. 2014) (allowing a scheme liability claim where the alleged conduct was "not just specific false statements . . . but the planning and carrying out of a comprehensive scheme, by specific steps, to mislead the buyers as to JAC's value. ."); *SEC v. Constantin*, 939 F.Supp. 2d 288,308 (S.D.N.Y. 2013) (granting summary judgment where "false promises about expected returns," combined with other conduct intended to further the fraud, "suggest[s] the

---

(Par. 298). The "certificate of qualification" was itself deceptive, inducing various Plaintiffs to believe that they indeed had purchased equity. (See Candace Byrd, Pars. 173, 179; Bryant Watts, Pars. 207, 208; Frank McWhorter Par. 248).

[7] This is why the SAC details the advance planning of who to target the offer to (Par. 106, existing promoters to get them to spend more money), the press release (Par. 88), and by email blasts to the existing promoters and on Twitter and Facebook, where promoters were either encouraged to say untrue things ("I qualified and will be a millionaire!" see Pars. 110, 147) or the Defendants themselves served to promote the offering through their own deceptive posts (see Pars. 127-133). This coordinated campaign took this fraud far beyond lies in a private offering prospectus.

existence of a wide-sweeping fraudulent investment scheme"); These actions also bear a striking similarity to the actions found to satisfy scheme liability in *Burnett v. Rowzee, supra*, 561 F. Supp 2d at 1128, where "investors relied on the 'false appearance" created by … interest payments to make investments and encourage others to invest in the scheme."

The context in which this was all done—to convince promoters to buy into a failing pyramid scheme-- also was part of the scheme. *See CKB168 Holdings, Ltd.*, 210 F. Supp. 3d at 445-46 (finding scheme liability where the defendants created the false appearance that a pyramid scheme was "a legitimate company"); *SEC v. Curshen*, 888 F.Supp. 2d 1299, 1308 (S.D. Fla. 2012) (finding allegations that one defendant "orchestrated the false media campaign" surrounding the company, which included "arranging for the posting of a false website" touting company developments and issuing press releases claiming fictious achievements sufficient to allege scheme liability); *SEC v. McDuffie*, 2014 U.S. Dist. LEXIS 128664, at *28-29 (D. Colo. Sep. 15, 2014) (similar).

Defendants' objections are not well-founded. They argue that "Plaintiffs' bullet-point list of actions [in paragraph 344] is…impermissible group pleading" because Plaintiffs "do not specify who engaged in which specific act and when." Def. Br. at 6. But Defendants ask this Court to read Plaintiffs' allegations out of context, and ignore the fact that the bullet-point list of actions in Par. 344 is *meant*

to be a bullet point summary which incorporates the detailed other allegations throughout the SAC which specify who engaged in the specific acts and when. *See, e.g.*, 2, 7, 9-18, 30-39, 63-71, 83-84, 339, 341 (Defendants' roles in pyramid scheme and development of equity investment scheme) 85-147, 342-346 (Defendants' roles in operation of equity investment scheme and creation of the false appearance that the scheme and ViSalus are legitimate and profitable).

Defendants' substantive contention, that "none of the bullet point 'actions' amounts to 'an inherently deceptive act that is distinct from alleged misconduct." Def. Br. at 6. only focuses on a single allegation, and again ignores the other allegations of the SAC and asks this Court to read each allegation out of context.[8] As detailed above, each one of the alleged actions was meant to—and did—advance the creation, operation, and concealment of Defendants' complex scheme to offer equity in a failing illegal pyramid scheme. And similar to recruiting promoters into a pyramid scheme, it is inherently deceptive.[9] So is threatening, intimidating, and

---

[8] Defendants' ignore all but one of Plaintiffs' allegations—cherry-picking a single sentence regarding the "buy back" of shares from Blyth, to conclude, without support, that the conduct alleged by Plaintiffs is not inherently deceptive. Def. Br. at 6. However, the "buy back" of ViSalus stock was a part of creating and facilitating the scheme to offer equity in the failing illegal pyramid scheme. The fact that Blyth was having financial problems of its own, or that the Plan had not been rolled out yet, are irrelevant. It was an initial act in a scheme to defraud investors.

[9] Courts have found that the creation and operation of a pyramid scheme is sufficient to establish scheme liability because a pyramid scheme is "nothing but a 'course of business which operates . . . as a fraud.'" *See SEC v. CKB168 Holdings, Ltd*., 210 F.

deceiving distributors who seek more information or who attempt to bring a lawsuit. These allegations, at this juncture, must be accepted as true. *Greene v. Benefit Mortg. Corp.*, No. 08-12968, 2009 U.S. Dist. LEXIS 1163, at *4 (E.D. Mich. Jan. 8, 2009) (courts must "construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true…"). Based on the foregoing reasons, Plaintiffs' Rules 10b-5(a) and (c) claims should survive Defendants' motion to dismiss.

## II.   RESPONSE TO ARGUMENT DIRECTED TO SCIENTER

For a pleading to qualify as raising a strong inference of scienter, the inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, [Inc. v. Makor]* 551 U.S. 308 (2007) at 314. In making this analysis, a court must accept all factual allegations in the complaint as true, consider the complaint in its entirety, including documents incorporated into the complaint by reference and matters of which a court may take judicial notice, and "take into account plausible opposing inferences." *Id.* at 322–24.

---

Supp. 3d 421, 445-46 (E.D.N.Y. 2016) (finding that promoters committed inherently deceptive acts by "engaging in what they claimed were the promotional activities of a legitimate [multi-level marketing company] – organizing seminars and in-person meetings, providing training and support to downlines, providing access to back office accounts, and portraying [the company's] product as useful…" and "offer[ing] victims false assurances about [the company's] legitimacy."); *see also Kerrigan,* 2016 U.S. Dist. LEXIS 29958, at *50 (finding Plaintiffs sufficiently alleged scheme liability by alleging that "ViSalus Defendants, created, structured, operated, funded, and controlled the alleged pyramid scheme"). Here, Plaintiffs have similarly alleged Defendants created, structured, operated and controlled a scheme consisting of a course of business operating as fraud.

*In re Miller Energy Res. Sec. Litig.*, No. 3:11-CV-386-TAV-CCS, 2014 WL 415730, at *7 (E.D. Tenn. Feb. 4, 2014).[10]

The SAC makes out a compelling case that both Merriweather and Reynolds, had actual knowledge, or were reckless in not realizing, that the 2015 offering they were promoting was materially different in kind, risk, and reward than the 2008 deal that enriched them.[11] When Reynolds and Merriweather made and allowed their

---

[10] The Court has already either found, or the Defendants have not challenged, that Craig, Reynolds and Meriweather had the requisite scienter to engage in the securities fraud alleged in the *Kerrigan* litigation, which had spelled out their long-term experience with the company as both former executives (Craig) and high-ranking promoters in the alleged pyramid scheme fraud.

[11] Reynolds promoted the equity offering by personal appearances and recorded statements, as well as having his name and video used in the main ViSalus page. Pars. 37; 92. His words leave no doubt that he was explicitly telling potential investors that yesterday's great deal was likely to occur again:

> Nine years ago I bought into a vision … Now what's been great about where we're at today is that we didn't do 15x. We did much greater than 15x so that means we made a lot more money. And also we've been able to establish a company that is valuable. We have a track record. So unlike what we had nine years ago, we now have a track record. It's proven. So like when any other company that you think you're gonna potentially invest in or put time in, you know, you hope that it's going to achieve something. We've done it. We've got a 10-year track record and I keep telling people this on a daily basis: what we did in the last ten years as a company, we'll do more in the next five years than we did in the previous ten combined…. But this is real and as Nick just said, we're giving you free money. All you have to do is choose action.

(Par. 120, similar Par. 131). Merriweather personally presented the offering to a group in Denver and that offering included a materially false "hockey

statements about the old deal (look at how much money I made!) to be made to the new, unsophisticated investors, the implication that the new offering was like the old was irresistible.  To assess whether Reynolds and Merriweather simply repeated lines that someone wrote or intended to say things with intent to defraud is easy. Both men had extensive knowledge about the state of the company, the nature of the company's changed business, and the nature of claims made against the business, in 2015 and 2016 when they made the fraudulent statement. Both promoters were high-level operatives for at least 10 years. We know this because Reynolds admits it in Par. 120, and Merriweather was part of the same group as Reynolds. They had been participants in the 2008 deal which itself was the result of ViSalus stock being given them in 2005-2006. Their actual experience and knowledge surrounding the old deal raises a cogent assumption that their 2015-2016 comparisons of the new "opportunity" to the ways in which they themselves were enriched was made with fraudulent intent or at best recklessly made.

When these statements were made both Merriweather and Reynolds knew, or were reckless in not inquiring, that the prior equity deal they were comparing the new investment opportunity was materially different than the current offering, and to base the future likelihood of success, much less riches, on looking back to a

---

stick" graph. Par. 298. Merriweather, like Reynolds, also played on his past success in the earlier Blyth buyout. (Par. 39).

different deal was a premeditated fraud. To start with, the prior deal was an Employee Incentive Plan in which the shares were *given away* and actual shares, not limited "units" were issued. (Par. 52). And both Defendants knew where the deal that paid them was funded—Blyth—and also knew in 2015 and 2016 that there was no Blyth on or over the horizon. They also knew, by virtue of having been long-term recruiters and promoters, that the "billion" dollar numbers that both claimed about ViSalus were pure bunk. Each had access to their downline numbers, and each could see what was objectively apparent about the company in 2015, that it was a fraction of the size during the buyout years. Thus, per *Tellabs, supra*, would a reasonable person deem the inference "at least as strong" as the inference that Merriweather and Reynolds were gullible idiots who did not have the slightest comprehension of how and why they had made millions of dollars in a prior private equity sale, and who knowledgeably spoke to investors about the company's bright and rosy future out of pure ignorance?

As to Craig, Defendants acknowledge that Craig was an insider who was given the task of brainstorming about what the offering would say and was actually given actual financial disclosures about the sorry condition of the company while the offering was going on. Pars. 97, 103-104.[12] They attempt to parse his quoted

---

[12] The SAC details the statements Craig made. Par 133 quotes his wife's team Facebook page and his own email blasts (Pars. 137, 138) including the alleged 5 year plan and ViSalus's "global expansion."

comment in Par. 104 as if he was advocating transparency, but of course that is not the point. The relevance of the internal email that was quoted was that Craig was concerned from the outset that the offering was illusory ("…it is a bit "grey" and does lend to people thinking that if they earn it you can take it all away…"), yet when it came out some weeks later, and he promoted it to his own downline in email blasts, the concern he had expressed was never addressed. So Craig consciously promoted a plan that he knew would be misunderstood by investors.

Defendants acknowledge that Par. 296 alleges Craig appeared at the Kansas City Convention in October, 2015 before Byrd (who attended the KC convention) decided to invest. The statements Craig made at the convention included the same 5 year plan projections Craig had earlier disseminated to other potential investors— projections that he knew or should have known were materially false.[13]  Defendants acknowledge Craig was actually given the true projections, far below the "billions" he was advising people were around the corner, just months after the KC appearance—but the offering lasted until the end of 2016 (actually was artificially extended into early 2017). The SAC places Craig in the small inner circle of those who drafted, approved, and rolled out the fraudulent offering. It is a reasonable assumption that Craig, a veteran of the company since 2005, a recipient of the early

---

[13] Par. 297 also places Craig in making statements concerning his past "success" with the prior stock buyout during the KC convention. Exactly like Merriweather and Reynolds, Craig knew the comparison to 2008 was misleading at best.

stock purchase, and a defendant in the *Kerrigan* lawsuit since 2014, was not in the dark about the company's collapse when he spoke in front of Plaintiff Byrd in October, 2015 and lied about the 2020 Plan that did not exist.

## III.    RESPONSE TO ARGUMENTS DIRECTED AGAINST 10B5 CLAIM AND TODD GOERGEN

The SAC does not allege that Todd Goergen made particular misrepresentations directly relied on by any Plaintiff. The SAC asserts Goergen has independent liability under Section 10b-5 (a) and (c), and Defendants do not appear to claim that Goergen should not be a 10b-5 (a) or (c) Defendant.

Plaintiffs do allege he was one of the authors of the statements made on the ViSalus website attributed to the company. The SAC alleges and details how and why he was one of the authors of the offering and participated in its plan and executed its dissemination at the time he was Chief Operating Officer of ViSalus. Pars. 34, 36.  Thus, Goergen did more than "simply assist," in the making of the plan, *see Zwick Partners, LP v. Quorum Health Care Corp., et al.,* No. 3:16-CV-2475, 2018 WL 2933406, at *4 (M.D. Tenn. Apr. 19, 2018) ("Plaintiffs have sufficiently alleged that the CHS Defendants did more than simply assist. As noted, the "maker" of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."); *Louisiana Mun. Police Employees Ret. Sys. v. KPMG, LLP,* No. 1:10CV01461, 2012 WL 3903335, at *5 (N.D. Ohio Aug. 31, 2012) (courts after *Janus* have interpreted

the attribution element of *Janus* to reach corporate officers who sign statements filed with the SEC and have been quoted in press releases.); *JAC Holding Enterprises, Inc. v. Atrium Capital Partners, LLC,* 997 F. Supp. 2d 710, 734 (E.D. Mich. 2014) ("Despite the constriction of "maker" liability after *Janus* to those with "ultimate authority" over a statement, that liability still may extend to corporate officers who sign a false statement under their responsibility and authority as agents of the corporation."). The complaint alleges that Goergen knew his name was used to bolster the offering—several of the misrepresentations made by Blair and Sarnicola use his name, or the fact they were recording at his house, or how much the Goergen family means to Visalus. To the extent discovery unveils that Goergen himself made actionable statements it is premature to dismiss (to the extent anything is dismissed) any 10b-5 claims against Goergen at this time with prejudice.

## IV.   RESPONSE TO ARGUMENTS DIRECTED TO BLUE SKY LAWS CLAIMS

### A. Plaintiffs Agree To Not Assert Section 501 Claim

Plaintiffs agree that Section 501 does not appear to provide a private cause of action and will accordingly agree to withdraw that claim.

16

### B. Plaintiffs' Count V Mistakenly Transposed Subsection (3) With Subsection (2)

Defendants correctly point out that Subsection 3 of Section 509 applies to actions by sellers, not purchasers. The listing of Subsection 3 as the operative subsection rather than the correct Subsection 2, (which applies to actions by purchasers against sellers and which substantively mirrors Subsection 3), was unfortunately a transcription error in a very lengthy complaint.

What Count V describes in its body (and of course the entire complaint) is a violation of Subsection 2. *See, e.g.,* SAC Par. 383 ("Each Defendant's role in the *solicitation of Plaintiffs to purchase the equity offering* has been set forth in this Complaint and is incorporated herein. Under Section 509(3) [sic], *each Defendant sold a security* and is therefore liable to each Plaintiff and the class for violation of Section 509(3) [sic].") (emphasis added), similarly par. 386 ("But for the fraudulent and deceptive actions and the expectation that they would receive a portion of the 6% equity as represented by the Defendants, *Plaintiffs and the Class would not have continued to purchase products* and otherwise remain in good standing following their initial qualification. It is common sense to infer that no plaintiff would have paid $25,000 or more for equity in a company that would never be conveyed to the plaintiff, and if it ever was, would be worthless.") (emphasis added).

The scrivener's error should have been caught and corrected prior to filing. Plaintiffs seek leave to correct the subsection asserted from "Section 509(3)" to "Section 509(2)" in the title and pars. 380 and 383-384. If Defendants have argument with respect to Count V other than this "gotcha" Plaintiffs do not oppose them raising it.[14]

### C. Count VI Under Section 509(7) Should Not Be Dismissed Because It Lists the Purchaser Liability Subsection 3 Rather Than Seller Liability 2

Just as Defendants were not really confused about the transposed Section 509 liability subsections in Count V, the transposition error listed in par. 389, also listing Subsection 3 rather than 2, should not be used as a basis for dismissing Count VI. As that count makes clear (along with every other claim in the complaint) liability under Subsection 7 is premised on the named Defendants' actions in connection with the offer and sale of securities. *See* Par. 395 ("But for the fraudulent and deceptive actions and the expectation that they would receive a portion of the 6% equity as represented by the Defendants, *Plaintiffs and the Class would not have continued to*

---

[14] Defendants' footnote relating to" asking" about Subsection 3 demands a short response. Rather than having a meet and confer, a short email was sent the day before the motion was filed pointing out that Subsection 3 applied to seller's claims. With all due respect, Defendants obviously were not genuinely confused that Plaintiffs were claiming to be the sellers here.  And yes, someone on Plaintiffs' team did not proofread the complaint in this respect.

*purchase products* and otherwise remain in good standing following their initial qualification. ... Failure to register a prospectus prevented the Plaintiffs and the Class from learning facts necessary to correct the misrepresentations and/or omissions contained in the offering circular and oral statements.") Section 7 liability is the joint and several liability provision, and the claim describes which Defendants is named for each subsection of that claim.

If Defendants have arguments relating to the substance of the claim under Subsection 7, Plaintiffs do not oppose additional briefing. Save for that, Plaintiffs seek leave to correct Par. 389 from "509(3)" to "509(2)."

Dated: June 29, 2018

Respectfully submitted,

s/ Andrew Kochanowski
Andrew Kochanowski (P55117)
SOMMERS SCHWARTZ, P.C.
Attorneys for Plaintiffs
One Towne Square, Suite 1700
Southfield, MI 48076
(248) 355-0300
akochanowski@sommerspc.com

s/ Matthew J.M. Prebeg
PREBEG, FAUCETT & ABBOTT, PLLC
Matthew J.M. Prebeg
(TX Bar No: 00791465)
Brent T. Caldwell
(TX Bar No: 24056971)
Attorneys for Plaintiffs
8441 Gulf Freeway, Suite 307
Houston, TX 77017
(832) 743-9260

19

mprebeg@pfalawfirm.com
bcaldwell@pfalawfirm.com

s/ Mark R. Miller
WEXLER WALLACE LLP
Edward A. Wallace
(IL Reg. No. 6230475)
Mark R. Miller
(IL Reg. No. 6283542)
Adam Prom
(IL Reg. No. 6317283)
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
(312) 589-6272
EAW@wexlerwallace.com
MRM@wexlerwallace.com
ap@wexlerwallace.com

s/ Patrick E. Cafferty
Patrick E. Cafferty (P35613)
CAFFERTY CLOBES MERIWETHER
  & SPRENGEL LLP
220 Collingwood Dr., Ste. 130
Ann Arbor, MI  48104
(734) 769-2144
pcafferty@caffertyclobes.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 29, 2018, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record on the ECF Service List.

I also certify that on June 29, 2018, I sent a copy of the foregoing paper to Pro Se Defendant, Vincent Owens, via U.S., First Class Mail, at the last known address on file:

Vincent Owens
1300 Jamaica Street
Aurora, CO 80010

s/ Andrew Kochanowski
Andrew Kochanowski (P55117)
SOMMERS SCHWARTZ, P.C.